## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

| | |
|---|---|
| *In re* : | **Chapter 11** |
| : | |
| **INTERNATIONAL ALUMINUM** : | **Case No. 10-_____ (___)** |
| **CORPORATION, *et al.*,** : | |
| : | **(Joint Administration Requested)** |
| **Debtors.** : | |

-------------------------------------------------------------x

## DECLARATION OF JEFFREY B. PARK IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

I, Jeffrey B. Park, pursuant to section 1746 of title 28 of the United States Code,

hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer of International Aluminum Corporation

("**IAC**"), a Delaware corporation and IAC Holding Co. ("**Holdings**"), the parent company of the

affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession

(collectively, the "**Debtors**").[1]  I have served as Chief Financial Officer since August 20, 2007, and,

in my current capacity, I am familiar with the day-to-day operations, business, and financial affairs

of the Debtors.

2.      I submit this declaration (the "**Declaration**") to assist the Court and other

parties in interest in understanding the circumstances that compelled the commencement of these

chapter 11 cases (the "**Reorganization Cases**") and in support of (i) the Debtors' voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**")

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: International Aluminum Corporation (3332), IAC Holding Co. (3119), United States Aluminum Corporation (8449), United States Aluminum Corporation – Carolina (3238),United States Aluminum Corporation – Illinois (2481), United States Aluminum Corporation – Texas (6269), RACO Interior Products, Inc. (0437), General Window Corporation (7764), International Extrusion Corporation – Texas (9058), International Extrusion Corporation (5103), International Window – Arizona Inc. (2781), and International Window Corporation (5989).

filed on the date hereof (the "**Commencement Date**") and (ii) the relief, in the form of motions and applications, that the Debtors have requested of the Court (the "**First Day Pleadings**").

3.        Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4.        Parts I through IV of this Declaration provide a description of the Debtors' organizational structure, business operations, capital structure, and the circumstances giving rise to the commencement of these Reorganization Cases. Part V summarizes the First Day Pleadings and the relief they seek, which the Debtors believe is crucial to their successful reorganization.

**I.**

**ORGANIZATIONAL STRUCTURE**

5.        IAC was started in 1957 as a single aluminum window manufacturer and gradually expanded into an integrated manufacturer of quality aluminum and vinyl products for use in commercial and residential applications. IAC is headquartered in Monterey Park, California and has approximately 936 employees. Holdings, a Delaware corporation, owns 100% of the equity interests in IAC. IAC, in turn, owns 100% of the equity interests in each of the remaining Debtors. The following diagram illustrates the Debtors' organizational structure:[2]

---

[2] Maestro Products, Inc. and United States Aluminum of Canada, Ltd. are not Debtors.



## II.

## THE DEBTORS' BUSINESS

      6.    The Debtors' business is divided into three groups: Commercial Products, Residential Products, and Aluminum Extrusion. The Commercial Products group produces interior and exterior products utilized in several combinations to produce systems for commercial construction and remodeling and tenant improvement. The Commercial Products group offers a full range of aluminum entrance doors, store fronts, curtain walls, window walls, sloped glaze systems, and operable windows for exterior applications. The Commercial Products group also offers interior aluminum door frames and glazing systems for use in commercial buildings. The aforementioned aluminum products are commonly used in retail storefronts, office buildings, educational buildings, healthcare facilities, manufacturing facilities, and hotels. The Commercial Products group has approximately 3,100 active accounts with key customers and operates in 17 facilities throughout the United States.

      7.    The Residential Products group manufactures an extensive line of windows and doors serving the residential and light commercial building industry. These products are fabricated from aluminum and vinyl for use in the new home construction, remodeling, and replacement markets. The Residential Products group sells products to various distributors,

wholesalers, and retailers, including building products distributors, glass shops, architects and design specifiers, replacement window companies, lumberyards, home centers, and homebuilders. Windows and doors are specifically designed to meet a customer's needs. The Residential Products group has approximately 1,100 active accounts with key customers and operates in 3 facilities throughout the United States.

8.     Finally, the Aluminum Extrusion group provides extruded aluminum linear shapes and configurations to the aluminum products market. Its extrusions are commonly utilized in the residential and commercial building industry in structural and decorative applications, as well as a wide range of products, including computers, sporting goods, automobiles, and solar heating equipment. Approximately 60% of the Aluminum Extrusion group's sales are to the Debtors' Commercial Products and Residential Products groups and approximately 40% of sales are to third-party companies.[3] The Aluminum Extrusion group operates in 1 facility located in Waxahachie, Texas.[4]

9.     The Debtors estimate that, as of November 30, 2009, the Debtors' unaudited consolidated assets totaled approximately $198,028,000 and unaudited consolidated liabilities totaled approximately $216,918,000. The Debtors further estimate that their unaudited consolidated revenues for the 12 months ended November 30, 2009 were approximately $177,199,000.

## III.

## PREPETITION CAPITAL STRUCTURE

### A.     The Acquisition

10.     On August 16, 2006, Holdings (then known as VCC Holding Corp.) was formed by Genstar Capital Partners IV, L.P. and Stargen IV, L.P. (together, the "**Genstar Parties**")

---

[3]  The Aluminum Extrusion group has over 200 active accounts with key customers.

[4]  The Debtors recently shut down their operations in Alhambra, California.

4

to acquire IAC, which, at the time, was a public company incorporated in California with its common stock listed on the New York Stock Exchange. On March 30, 2007, Holdings acquired all of the then-outstanding shares of IAC's common stock pursuant to an Agreement and Plan of Merger (the "**Acquisition**"). IAC was subsequently reincorporated in the State of Delaware.

11.     As consideration for the Acquisition, the public shareholders of IAC received $53.00 in cash for each share of IAC common stock held by them immediately prior to the Acquisition, in the aggregate amount of approximately $228.4 million. This total consideration amount consisted of (i) approximately $44.65 million invested by the Genstar Parties; (ii) $5 million invested by Carlyle Mezzanine Partners, L.P. and its affiliates; (iii) $350,000 invested by Richard E. Almy; (iv) approximately $125 million of a term loan facility pursuant to the Credit Agreement (as defined below); (v) approximately $45 million of a Senior Subordinated Loan Agreement (as defined below); and (vi) approximately $8.4 million from IAC's cash on hand at the closing of the Acquisition. As a result of the Acquisition, Holdings became the sole stockholder of IAC and the parties who contributed to the Acquisition became holders of Series A Preferred Stock of Holdings.[5]

**B.     The Credit Agreement and Pledge and Security Agreement**

12.     In connection with the Acquisition, IAC entered into a credit agreement with various financial institutions and other entities from time to time parties thereto (collectively, the "**Senior Lenders**") and Canadian Imperial Bank of Commerce, New York Agency, as administrative agent for the Senior Lenders (the "**Administrative Agent**"). The Senior Lenders extended to IAC a $125 million term loan and made available a $20 million revolving loan facility, both maturing on March 30, 2013 (the "**Credit Agreement**").

---

[5]  Subsequent to the Acquisition, certain members of the IAC Board of Directors and IAC management contributed an additional $750,000 to Holdings for 75,000 shares of Series A Preferred Stock of Holdings. In addition, Carlyle Mezzanine Partners, L.P. and its affiliates transferred approximately 45% of the initial shares of Series A Preferred Stock obtained in connection with the Acquisition to (i) AEA Mezzanine Fund LP and its affiliates and (ii) New York Life Investment Management Mezzanine Partners II, LP and its affiliates.

13.     In connection with the Credit Agreement, the Administrative Agent, IAC, and the other Debtors, as guarantors, entered into the Pledge and Security Agreement, dated as of March 30, 2007 (the "**Pledge and Security Agreement**," and together with the Credit Agreement, all other security agreements, pledge agreements, mortgages, deeds of trust, control agreements and other loan, security or ancillary documentation executed or delivered in connection therewith by any of the Debtors in favor of the Administrative Agent or any of the Senior Lenders, the "**Prepetition Agreements**").

C.     **The Senior Subordinated Loan Agreement**

14.     IAC also entered into a mezzanine facility (the "**Senior Subordinated Loan Agreement**") with Carlyle Mezzanine Partners, L.P., as agent for the lenders and as a lender, Carlyle Capital Corporation Limited, as a lender, and the other entities party thereto as lenders from time to time (collectively, the "**Mezzanine Lenders**"). The Mezzanine Lenders extended a $45 million loan to IAC to finance the Acquisition. The Senior Subordinated Loan Agreement is guaranteed by the Debtors other than IAC, but the obligations under it are contractually subordinate to the Debtors' obligations to, and the liens held by, the Senior Lenders under the Prepetition Agreements.

D.     **The Sale-Leaseback Transactions**

15.     Subsequent to the completion of the Acquisition, and as permitted under the Credit Agreement and the Senior Subordinated Loan Agreement, (i) IAC entered into a sale-leaseback transaction with Alum Landlord (DE) QRS 16-105, Inc. (the "**US Landlord**") on June 14, 2007, whereby IAC sold certain of the properties held by its domestic subsidiaries to the US Landlord and the US Landlord leased them back to IAC (the "**US Sale-Leaseback Transaction**"), and (ii) United States Aluminum of Canada, Limited, a non-Debtor Canadian subsidiary of IAC ("**USAC**"), entered into a sale-leaseback transaction with Alum (Alberta) ULC (the "**Canadian**

**Landlord**") on July 27, 2007, whereby USAC sold certain of its properties to the Canadian Landlord and the Canadian Landlord leased them back to USAC (the "**Canadian Sale-Leaseback Transaction**").

16.    The aggregate consideration for the purchase of the above-properties by the US Landlord and Canadian Landlord was approximately $60 million. Under the lease agreements entered into in connection with the US Sale-Leaseback Transaction and the Canadian Sale-Leaseback Transaction, the aggregate annual rent for the properties is approximately $5.1 million.[6] Each of the lease agreements has a term of 20 years, renewable in 10-year increments at IAC's or USAC's option, as applicable.

**IV.**

## CIRCUMSTANCES GIVING RISE TO THE DEBTORS' REORGANIZATION CASES

17.    The Debtors commenced these Reorganization Cases primarily because of the decline in the commercial and residential construction activity in the United States, which (i) impacted the level of demand for the Debtors' products; (ii) reduced the Debtors' overall profitability; (iii) impacted the Debtors' overall liquidity; and (iv) as a result of the foregoing, caused events of default under the Credit Agreement and the Senior Subordinated Loan Agreement.

**A.    Decline in Commercial and Residential Construction Activity**

18.    The commercial and residential building sector has been plagued by the overall economic slowdown in the United States and the lack of credit available to the Debtors' customers and purchasers of the Debtors' products. The residential construction sector remains relatively weak in the midst of one of the greatest economic downturns in the U.S. housing market. Most residential homebuilders have reported decreases in new home orders, a trend that is

---

[6]  The Debtors pay approximately $4.4 million of annual rent to the US Landlord and approximately $700,000 of annual rent to the Canadian Landlord.

exacerbated by (i) the substantial nationwide inventory of homes on the housing market; (ii) a growing wave of residential home foreclosures; and (iii) limited availability of financing for developers and home buyers. In addition, the Debtors' commercial and residential products were significantly impacted by the decrease in demand in the remodeling and repair sector, which began in the fourth quarter of 2008 and has maintained at a relatively low demand rate in 2009.

19. Beginning around December 2008, in response to the decreased demand for products, and to reduce the impact of the aforementioned market difficulties, the Debtors' senior management re-assessed their overall business operations and strategy and implemented a number of proactive steps to strengthen their competitive position and attempt to restore profitability including, but not limited to, the following:

    i.      Implementing sales training in all three business segments;
    ii.     Revising existing commissions programs;
    iii.    Leveraging potential benefits from the federal stimulus program;
    iv.    Centralizing product development and combining and reorganizing sales territories;
    v.     Holding weekly meetings with each facility to review labor costs;
    vi.    Implementing margin based pricing by region;
    vii.   Implementing a company-wide wage freeze;
    viii.  Negotiating lower purchased materials pricing;
    ix.    Implementing a central warehouse;
    x.     Proactively managing their balance sheet;
    xi.    Performing a market study for each operating group; and
    xii.   Scaling-back or closing operations at certain facilities.

**B.**    **Defaults Under the Credit Agreement and the Senior Subordinated Loan Agreement**

20. Despite the aforementioned efforts, on or around May 2009, the Debtors' senior management determined that events of default had occurred under the Credit Agreement and the Senior Subordinated Loan Agreement due to the breach of the Debtors' Total Leverage Ratio (as defined in the Credit Agreement) covenant contained in the Credit Agreement and a

corresponding default to a similar provision contained in the Senior Subordinated Loan Agreement. The Debtors have not made scheduled interest payments under the Senior Subordinated Loan Agreement since March 2009.

21.     As a result of the aforementioned events of default, the Debtors' senior management engaged in a series of good-faith discussions with the Administrative Agent and, eventually, an ad hoc committee of the Senior Lenders holding a majority of the principal amount of the outstanding debt under the Credit Agreement. The Debtors engaged Moelis & Company and Weil, Gotshal & Manges LLP to, among other things, provide restructuring advice to the Debtors' senior management, provide restructuring advice to the IAC Board of Directors, participate in negotiations with the Administrative Agent and the Senior Lenders, and assist in the formulation of a comprehensive business plan.

22.     As a result of the Debtors' good faith negotiations, the Debtors, the Administrative Agent, and certain Senior Lenders (the "**Required Supporting Holders**") entered into a Restructuring Support Agreement dated as of December 31, 2009 (the "**Restructuring Support Agreement**"). The Restructuring Support Agreement and the term sheet attached thereto (together with all agreements and exhibits attached thereto, the "**Term Sheet**") provide for the Debtors' financial restructuring to be effected through a pre-negotiated joint plan of reorganization (the "**Plan**"). The Required Supporting Holders hold more than 72% in principal amount of claims under the Prepetition Agreements and constitute a majority of the holders of such secured obligations, and, along with the Administrative Agent, have agreed to support the Plan. In accordance with the Restructuring Support Agreement and the Term Sheet, the Debtors filed the Plan and an accompanying disclosure statement (the "**Disclosure Statement**") on the Commencement Date.

23.     The Plan provides, among other things, for the following treatment of Claims and Equity Interests (each as defined in the Plan):

> (i)     holders of Allowed Credit Agreement Claims will receive their (i) *pro rata* share of the Excess Cash, (ii) *pro rata* share of the New Term Notes and (iii) *pro rata* share of 100% of the New Equity outstanding on the Effective Date, less any of the New Equity distributed on the Effective Date pursuant to the Management Incentive Plan; and

> (ii)    holders of Allowed Senior Subordinated Notes Claims will receive no distribution on account of such Claims.

24.     In addition, the Plan provides for the payment in full of (i) general unsecured claims; (ii) allowed administrative expense claims; (iii) federal, state, and local tax claims; (iv) certain priority non-tax claims; and (v) certain other secured claims.

25.     Confirmation of the Plan and implementation of the contemplated restructuring would substantially reduce the Debtors' financial indebtedness and enhance the Debtors' long-term growth prospects and competitive position.  Due to prepetition cost reduction efforts to "right size" their operations, the Debtors have generated positive cash flow from operations and maintained strong relationships with their key constituents.

26.     During the chapter 11 process, the Debtors intend to continue normal operations, including maintaining their high standards of customer service for which they are known, as they restructure their operations and overall debt for the benefit of their creditors and all other parties in interest.  The Debtors are cognizant, however, that bankruptcy filings may negatively impact manufacturing companies like the Debtors disproportionately more than companies in other industries.  Prolonged chapter 11 cases have the potential to severely impact the Debtors' overall profitability and relationships with employees, vendors, customers and suppliers.  Every day the Debtors are in chapter 11, business competitors may use the negative stigma associated with bankruptcy to persuade or lure customers away.  The Debtors believe, however, that

filing the Plan, the Disclosure Statement, and an emergency motion to approve the Disclosure Statement on the Commencement Date, along with securing the support of the Required Supporting Holders and the Administrative Agent through the Restructuring Support Agreement, will enable the Debtors to emerge from chapter 11 as expeditiously as possible without losing a significant number of customers and damaging relationships with employees, vendors, and suppliers.

## V.

## SUMMARY OF FIRST DAY PLEADINGS

27.     Concurrently with the filing of the Reorganization Cases, the Debtors have filed, for the Court's approval, a number of First Day Pleadings, which the Debtors believe are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity.  It is my understanding that Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Commencement Date.  Certain of the First Day Pleadings filed by the Debtors request that the Court authorize the Debtors to immediately pay all or part of a claim that arose prior to the Commencement Date.  As set forth in more detail below, in such instances, the relief sought is necessary to avoid immediate and irreparable harm to the Debtors.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Pleading.

## A.     **Joint Administration Motion**

### 1.     **Relief Requested**

28.     As noted above, IAC and 11 of its affiliates filed voluntary petitions under chapter 11 on the Commencement Date.  The Debtors request that these Reorganization Cases be procedurally consolidated through joint administration pursuant to Bankruptcy Rule 1015.

## 2. Basis for Relief Requested

29.     Most, if not all, of the motions, applications, and other pleadings filed in these Reorganization Cases will relate to relief sought jointly by all of the Debtors. Joint administration will ease the administrative burden on the Court, the Office of the United States Trustee for the District of Delaware, and parties in interest by allowing the Debtors' cases to be administered as a single joint proceeding instead of many independent chapter 11 cases. A single docket will also make it easier for all parties in each of the Reorganization Cases to stay apprised of all the various matters before the Court. The Debtors will also likely realize substantial cost savings and reduced administrative burdens by sending notices in the cases to a single matrix of creditors and Bankruptcy Rule 2002 list, rather than maintaining separate notice lists. Separate administration of the Reorganization Cases would impose extraordinary burdens on counsel and the Debtors, requiring monitoring multiple dockets and necessitating filing separate motions in each of the Reorganization Cases even though the relief requested might be identical as to each Debtor. This would result in substantial additional expenses of administration. Accordingly, I believe that the relief requested in the joint administration motion is necessary to avoid the immediate and irreparable harm that would result from the failure to consolidate through joint administration.

## B.     Cash Management Motion

### 1.     Relief Requested

30.     The Debtors request, pursuant to sections 105(a), 345(b), and 363(c) of the Bankruptcy Code, that this Court enter an order (i) authorizing the Debtors to (a) continue their existing cash management system, and (b) maintain existing bank accounts and business forms, and (ii) granting a 60 day extension of time to comply with section 345(b) of the Bankruptcy Code. Without the requested relief, the Debtors would be unable to maintain their financial operations effectively and efficiently, which would cause significant harm to the Debtors and to their estates.

## 2.    **Basis for Relief Requested**

31.    In the ordinary course of business, the Debtors use their centralized cash management system to accurately and efficiently collect, transfer, disburse, and periodically invest funds generated by their business operations.  In particular, the cash management system performs several functions including: (i) collecting payments made to the Debtors from customers and (ii) disbursing payments to the Debtors' vendors, service providers, employees, taxing authorities, and other entities to whom they owe obligations.  The Debtors maintain accounting controls to accurately trace their funds through the cash management system to ensure that all transactions are adequately documented and readily ascertainable.

32.    Any disruption of the Debtors' cash management system, including closure of bank accounts, would cause delays in the collection and disbursement of funds.  Such delays could cause the Debtors to default in their postpetition accounts payable obligations to third parties, which, in turn, could cause vendors and other third parties to cease providing goods and services to the Debtors.  Such a result would obviously have a severe and adverse impact upon the Debtors' reorganization efforts.  Moreover, if the Debtors were required to immediately close their existing bank accounts and terminate their cash management system, it would be extremely difficult (if not impossible) and expensive to promptly establish new bank accounts and a new cash management system with sufficient sophistication to fulfill the Debtors' business needs.

33.    The Debtors are requesting authority to use their existing check stock and electronically generated forms, rather than obtain new check stock reflecting their status as debtors in possession and listing the case number under which the Reorganization Cases are being jointly administered.  To the extent the Debtors use check stock, any new check stock ordered will reflect their status as debtors in possession and list the case number under which the Reorganization Cases are being jointly administered.

34. The Debtors invest certain funds in their bank accounts in the ordinary course of operating their cash management system. The Debtors believe that these funds are secure and that obtaining bonds to secure those funds, as required by section 345(b) of the Bankruptcy Code, would be unnecessary and detrimental to the Debtors' estates and creditors. The Debtors therefore respectfully request a 60 day extension of their time to comply with the requirements of section 345(b) of the Bankruptcy Code. During that time, the Debtors will discuss their investment practices with the Office of the United States Trustee for the District of Delaware to determine what modifications, if any, would be appropriate under the circumstances.

35. I believe that the continued operation of the Debtors' cash management system is in the best interests of the Debtors' estates and creditors and will avoid immediate and irreparable harm to the Debtors.

## C. Cash Collateral Motion

### 1. Relief Requested

36. The Debtors request the entry of an interim order (a) pursuant to sections 361, 363, and 507 of the Bankruptcy Code (i) authorizing the Debtors to use Cash Collateral; (ii) granting adequate protection to the Administrative Agent and Senior Lenders for any diminution in value of their respective interests in their Prepetition Collateral, including Cash Collateral; and (iii) scheduling a final hearing to consider the relief requested in the cash collateral motion and the entry of a final order.

### 2. Basis for Relief Requested

37. The Debtors have determined that they have an urgent and immediate need to use Cash Collateral to operate their business during these Reorganization Cases. The Debtors propose to use Cash Collateral pursuant to the terms and condition outlined in the proposed Interim Order and to provide adequate protection as set forth in the interim order and the motion. The

interim order expressly provides that the Debtors reserve all rights to contest the asserted liens of

the Administrative Agent and the Senior Lenders on the Debtors' cash and cash equivalents as of

the Commencement Date. The Debtors submit that, under the circumstances, the terms and

conditions contained in the interim order are fair and reasonable and in the best interests of their

estates and creditors. Accordingly, I believe that the relief requested in the cash collateral motion is

necessary to avoid immediate and irreparable harm.

## D.    Utilities Motion

### 1.    Relief Requested

38.    The Debtors request, pursuant to sections 105(a) and 366 of the Bankruptcy

Code, that this Court enter interim and final orders (i) prohibiting utilities (collectively, the "**Utility

Companies**") from altering, refusing, or discontinuing service; (ii) deeming Utility Companies

adequately assured of future performance; (iii) establishing procedures for determining adequate

assurance of payment; and (iv) scheduling a final hearing.

### 2.    Basis for Relief Requested

39.    In connection with the operation of their businesses and management of their

properties, the Debtors obtain electricity, natural gas, water, telephone services and/or other similar

services (collectively, the "**Utility Services**") from a number of Utility Companies. Annexed to the

motion seeking the foregoing relief (the "**Utilities Motion**") is a nonexclusive list of Utility

Companies and their affiliates that provide Utility Services to the Debtors as of the Commencement

Date (the "**Utility Service List**"). The relief requested in the Utilities Motion is for all Utility

Companies providing Utility Services to the Debtors and is not limited to those listed on the Utility

Service List.

40.    In the 12-month period prior to the Commencement Date, the Debtors paid an

average of approximately $450,000 per month on account of Utility Services. Historically, the

Debtors have had an excellent payment history with the Utility Companies. Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Reorganization Cases. Should any Utility Company refuse, or discontinue service, even for a brief period, the Debtors' business operations would be disrupted severely, and such disruption would jeopardize the Debtors' reorganization efforts. It is essential that the Utility Services continue uninterrupted during the Reorganization Cases.

41.     I believe granting the Debtors the authority to issue one or more letters of credit or to deposit into a segregated escrow account, an amount equal to two (2) weeks of Utility Services, calculated as a historical average over the 12 months prior to the Commencement Date (the "**Adequate Assurance Deposit**"), for the benefit of any Utility Company, except to the extent a Utility Company agrees to a lesser amount or already holds a letter of credit securing the Debtors' performance, together with the other procedures set forth in the Utilities Motion, is in the best interest of the Debtors and their estates. Based on the foregoing calculation, the Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $225,000. Escrowing this deposit will enable the Debtors to continue to operate their business in chapter 11 without disruption to their Utility Services. I further believe that the procedures for requesting additional assurance as set forth in the Utilities Motion will protect the Debtors' operations while also giving each Utility Company the ability to evaluate the Debtors' adequate assurance, and the ability to seek additional assurance.

**E.     Employee Motion**

**1.     Relief Requested**

42.     The Debtors request, pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code, that this Court enter an order authorizing (i) the Debtors to continue to (a) pay, in their sole discretion, wage, salary and commission obligations, payroll taxes, garnishments, expense

reimbursements, employee benefits, and retirement plan and benefit obligations, and costs incident to the foregoing, and (b) maintain and continue to honor their practices, programs, and policies for their employees as they were in effect on the Commencement Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) the Debtors' banks and financial institutions to receive, honor, process, and pay any and all checks or wire transfers drawn on the Debtors' accounts in satisfaction of such obligations and benefits. The Debtors request authority to pay approximately $2.4 million on an interim basis to satisfy prepetition payroll and benefit obligations and related expenses.

2. **Basis for Relief Requested**

43. As of the Commencement Date, the Debtors employ approximately 936 employees. The Debtors have outstanding obligations with respect to their employees, some of which became due and payable in the prepetition period and some of which will be due and payable in the ordinary course of business in the postpetition period. The continued operation of the Debtors' business and their successful reorganization depends upon the retention and cooperation of the Debtors' employees and other personnel. The Debtors cannot successfully reorganize without their employees' continued support and their historical knowledge, experience, and industry relationships that are vital to the Debtors' businesses. Any failure to pay outstanding obligations may lead to the deterioration of employee morale, which, at this juncture, could negatively affect the value of the Debtors' assets and businesses and their ability to reorganize successfully under chapter 11. Accordingly, the Debtors have requested authority to satisfy their employee-related obligations and continue their ordinary course employee-related benefits and programs as in effect prior to the Commencement Date.

44. Moreover, if the checks issued and fund transfers requested in payment of prepetition employee obligations are not honored, or if such earned obligations are not timely paid

postpetition, the Debtors' employees may suffer extreme personal hardship and may even be unable, in some instances, to pay their daily living expenses. It is inequitable to place employees in such an untenable position while relying upon such individuals for the continuation of the Debtors' operations.

45.     Based upon the foregoing, I believe that the relief requested is in the best interests of the Debtors and their respective estates, will avoid immediate and irreparable harm to the Debtors, and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption.

**F.     Insurance Motion**

**1.     Relief Requested**

46.     The Debtors seek the entry of an order, pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy Code, authorizing the Debtors to: (i) continue their insurance programs and policies, including, but not limited to, renewing insurance policies, and (ii) pay their pre- and postpetition obligations with respect thereto. In addition, the Debtors seek authority to modify the automatic stay solely with respect to employees holding workers' compensation claims, to allow those employees to proceed with their claims. The Debtors request authority to pay approximately $325,000 on an interim basis to satisfy prepetition insurance obligations and related expenses.

**2.     Basis for Relief Requested**

47.     I am generally familiar with the Debtors' insurance programs. I believe that the nature of the Debtors' business and the extent of their operations make it essential for them to maintain their insurance programs on an ongoing and uninterrupted basis. If the Debtors fail to pay their insurance obligations, including all payments under the Debtors' prepetition premium finance arrangements, then the insurance carriers may seek to terminate the existing insurance programs, or

they may decline to renew the programs or refuse to insure the Debtors in the future. In addition, the Debtors' obligations are secured by all unearned premiums or dividends payable to the Debtors under the insurance policies covered by the premium finance arrangements. It is also my understanding that the Debtors could be fined substantial amounts by various state workers' compensation boards if the workers' compensation programs are not maintained. Finally, it is my understanding that the guidelines established by the United States Trustee for the District of Delaware require the Debtors to maintain certain of the insurance programs, including workers' compensation and general liability insurance.

48.    I believe that the authority to pay the insurance obligations in accordance with the Debtors' prepetition practices is in the best interests of the Debtors and their estates, will avoid immediate and irreparable harm to the Debtors, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

## G.    **Customer Programs Motion**

### 1.    **Relief Requested**

49.    The Debtors request, pursuant to sections 105(a), 363(b), and 503(b)(1) of the Bankruptcy Code, the entry of an order authorizing the Debtors to (a) honor and continue the following prepetition customer programs: (i) warranty programs; (ii) volume rebate programs; (iii) loyalty program; (iv) cooperative advertising program; (v) exchanges, refunds, and billing adjustments; (vi) refund of customer deposits; and (vii) joint check procedures (collectively, the "**Customer Programs**") and (b) satisfy all prepetition obligations relating to the Customer Programs. The Debtors request authority to pay approximately $820,000 on an interim basis to satisfy prepetition obligations relating to the Customer Programs, *provided, however*, that the $820,000 cap would not apply to obligations relating to the joint check procedures.

2. **Basis for Relief Requested**

50.     I believe that the Debtors' Customer Programs are essential to the Debtors' business operations and the maintenance of goodwill with their customers. Customers are the keystone to the Debtors' businesses and future success. It is essential to the Debtors' businesses that the Debtors be permitted to continue the Customer Programs and honor the prepetition obligations thereunder. If the Debtors were not permitted to make the prepetition payments in respect of the Customer Programs pursuant to the terms of their contracts or customary practices, the Debtors' relationships with existing customers will suffer, and the Debtors risk losing prospective customers due to the uncertainty over the Debtors' commitment to honoring their obligations to their customers. Many of the Debtors' customers have alternative sources for obtaining the products they purchase from the Debtors, and some of these customers may instead choose to do business with the Debtors' competitors if the Debtors do not obtain authority to continue these Customer Programs. Future customers may also be less likely to enter into contractual relationships with the Debtors as the Debtors' competitors will seek to use the Reorganization Cases and the Debtors' inability to honor these Customer Programs to sell their own products.

51.     Accordingly, I believe the relief requested will avoid immediate and irreparable harm to the Debtors' business operations and maintain goodwill with their customers.

**H.    Tax Motion**

1. **Relief Requested**

52.     The Debtors seek the entry of an order authorizing the Debtors to pay certain prepetition sales and use taxes, property taxes, franchise taxes, and business license and permit fees. In addition, the Debtors request that the Debtors' banks and financial institutions be authorized to honor any electronic transfers initiated or checks that relate to the foregoing prepetition tax

obligations. The Debtors request authority to pay approximately $1 million in tax related obligations.

**2.    Basis for Relief Requested**

53.    I believe that the payment of the Debtors' prepetition taxes is critical to the Debtors' continued and uninterrupted operations. Among other things, failure to pay these amounts could, in some instances, jeopardize the Debtors' ability to do business in a particular state, result in personal liability for the Debtors' officers or directors, and/or subject the Debtors to unnecessary interest expenses. Furthermore, certain taxes, such as sales and use taxes, are only being held by the Debtors in trust for the benefit of the taxing authorities and, thus, are not property of the Debtors' estates. Finally, based on my knowledge and conversations with the Debtors' counsel, it is my understanding that certain of the Debtors' taxes are entitled to priority status under the Bankruptcy Code and, therefore, must be paid in full before any general unsecured obligations may be satisfied. Accordingly, I believe that the relief requested in the tax motion is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtors to pay their taxes.

**I.    Schedules and Statements Motion**

**1.    Relief Requested**

54.    The Debtors request, pursuant to Bankruptcy Rule 1007 and Rule 1007-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), that this Court enter an order (i) extending the time within which to file their (a) schedules of assets and liabilities; (b) schedules of executory contracts and unexpired leases; (c) lists of equity holders; (d) schedules of current income and expenditures; and (e) statements of financial affairs (collectively, the "**Schedules and Statements**") to April 5, 2010 (for a total of 90 days from the Commencement Date).

2. **Basis for Relief Requested**

55. Due to the circumstances under which the Debtors commenced these Reorganization Cases and the demands on the limited resources available to the Debtors at this time, the Debtors anticipate that they will be unable to complete the Schedules and Statements in the 30 days provided by the Bankruptcy Rules and the Local Rules and, therefore, request an additional 60 day extension of the applicable time period to April 5, 2010 (for a total of 90 days from the Commencement Date). Completing the Debtors' Schedules and Statements will require the Debtors and their advisors to collect, review, and assemble copious amounts of information from books, records, and documents relating to the claims of thousands of creditors, as well as the Debtors' many assets and contracts. Assembling the necessary information would require a significant expenditure of the Debtors' time and effort, as well as that of their employees, at a time when such resources would be best spent towards effectuating the Debtors' reorganization efforts. Nevertheless, recognizing the importance of the Schedules and Statements in the Reorganization Cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances.

56. I respectfully submit that in light of (i) the large amount of information that must be assembled and compiled; (ii) the significant amount of employee time that must be devoted to the task of completing the Schedules and Statements; and (iii) the many pressing items that must be addressed at the inception of the Reorganization Cases, ample cause exists for the Court to grant the Debtors the requested extension for filing their Schedules and Statements.

**J.  Motion to Preliminarily Approve the Disclosure Statement, Establish Solicitation Procedures, Approve the Form of Ballot, Establish Voting and Tabulation Procedures, and Schedule a Combined Disclosure Statement and Confirmation Hearing**

1. **Relief Requested**

57. The Debtors request the entry of an order (i) preliminarily approving the

Disclosure Statement; (ii) approving the form of notice of combined hearing on the approval of the Disclosure Statement and confirmation of the Plan; (iii) approving the solicitation packages and procedures for the distribution thereof; (iv) approving the form of ballot and distribution thereof, setting the record date, the voting deadline, and establishing procedures for vote tabulation; (v) establishing procedures for filing objections to the Disclosure Statement and confirmation of the Plan; and (vi) authorizing related relief.

### 2.  **Basis for Relief Requested**

58.     The Required Supporting Holders hold over 72% in principal amount and over 50% in number of the Debtors' senior secured claims held by the Senior Lenders under the Credit Agreement, which are classified under the Plan as Class 2 (Credit Agreement Claims). Class 2 is the only class entitled to the vote to accept or reject the Plan. As set forth above, the Required Supporting Holders have agreed to support the Plan. Therefore, the most sensitive and complex task required to effectuate a successful reorganization – the negotiation of consensual agreements with critical creditor constituencies – has already been accomplished in advance of the Commencement Date. Accordingly, it is in the best interests of the Debtors' estates and creditors to proceed with the confirmation process as expeditiously as possible.

59.     The Debtors respectfully request that the Court consider the proposed timetable (provided below) as it is in the interests of all parties in interest in these Reorganization Cases. The relief sought in this motion is necessary to the efficient prosecution of these Reorganization Cases and will assist in the expeditious confirmation of the Plan while providing adequate notice to, and protection of the rights of, creditors. It is appropriate that a scheduling order be entered at this time so that creditors may be informed as promptly as possible of the anticipated scheduling of events preceding the hearing on confirmation of the Plan (the "**Confirmation Hearing**"). The proposed schedule affords creditors and all other parties in interest ample notice of

the proceedings.

60.     Below is a table highlighting the dates relevant to the Debtors' proposed procedures to solicit votes for the Plan (the "**Solicitation Procedures**") and setting forth the Debtors' proposed dates for the mailing of Non-Voting and Voting Solicitation Packages (as defined below), the deadline to object to the adequacy of the Disclosure Statement and/or confirmation of the Plan (the "**Objection Deadline**"), deadlines for serving and responding to written discovery and conducting depositions relating to the adequacy of the Disclosure Statement and/or the Proposed Plan, and the Confirmation Hearing.

| Proposed Timetable[7] | |
| --- | --- |
| Commencement Date | January 4, 2010 |
| Commencement of Solicitation Date | 7 days after the Court enters an order approving the Debtors' Motion to PreliminarilyApprove the Disclosure Statement |
| Discovery Deadline | 9 days after the Commencement of Solicitation Date |
| Response Deadline | 21 days after the Commencement of Solicitation Date |
| Deposition Period | Between 24-31 days after the Commencement of Solicitation Date |
| Voting Deadline | 37 days after the Commencement of Solicitation Date |
| Objection Deadline | 37 days after the Commencement of Solicitation Date |
| Confirmation Hearing | Week of March 1, 2010 |

61.     The Debtors also request that an order be entered approving the Solicitation Procedures, including the ballot, tabulation procedures and related activities undertaken in connection with the Plan.

---

[7]  The dates and times proposed in this table as well as in the motion are subject to the Court's availability.

62.    The Debtors further request that the Court direct any objections to the Disclosure Statement and/or the Plan be in writing, filed with the Clerk of the United States Bankruptcy for the District of Delaware, together with proof of service thereof, set forth the name of the objector, and the nature and amount of any claim or interest asserted by the objector against the estate or property of the Debtors, state with particularity the legal and factual basis for such objection and be served upon the parties specified in the motion so as to be received no later than 4:00 p.m. prevailing Eastern time on the day that is 37 days after the Commencement of Solicitation Date.

63.    I am informed that pursuant to section 1125(c) of the Bankruptcy Code and Bankruptcy Rule 3017(d), a debtor's plan and disclosure statement need not be served on all creditors; rather, a court may authorize the debtor to serve on unimpaired creditors a notice in lieu of the disclosure statement and plan.  There are several thousand unimpaired claimants in these Reorganization Cases, a number of whom may have their prepetition claims paid during the pendency of these cases (such as employees and certain taxing authorities).  Requiring the Debtors to serve the voluminous Plan and Disclosure Statement upon each unimpaired claimant would cause the Debtors to incur unnecessary and excessive costs.

64.    Accordingly, the Debtors propose to distribute the following materials to each of the voting holders of Credit Agreement Claims (the "**Voting Class**").  The Debtors shall send each member of the Voting Class: (i) the order preliminarily approving the Disclosure Statement; (ii) the Disclosure Statement and Confirmation Hearing Notice; (iii) the Disclosure Statement, which shall include the Plan as an exhibit; and (iv) a ballot customized for such holder as described below with instructions and a return envelope (collectively, the "**Voting Solicitation Package**").

65.     To each holder of a claim or interest not entitled to vote because such holder's claim or interest is either unimpaired or fully impaired, the Debtors shall send: (i) the order preliminarily approving the Disclosure Statement; (ii) the Confirmation Hearing Notice; and (iii) a Notice of Non-Voting Status; provided, however, the Debtors shall provide such holder a Disclosure Statement and/or Plan upon written request (collectively, the "**Non-Voting Solicitation Package**").

66.     The Debtors propose to distribute the following materials to (i) the U.S. Trustee, (ii) the attorneys for any statutorily appointed committee, and (iii) all other parties requesting service in these Reorganization Cases: (i) the order preliminarily approving the Disclosure Statement; (ii) the Disclosure Statement and Confirmation Hearing Notice; and (iii) the Disclosure Statement, which shall include the Plan as an exhibit (collectively, the "**Notice Solicitation Package**" together with the Voting and Non-Voting Solicitation Packages, the "**Solicitation Packages**").

67.     I am further advised that Bankruptcy Rule 3017(c) provides that, on or before approval of a disclosure statement, the court shall fix a time within which the holders of claims or equity security interests may accept or reject a plan. The Debtors will mail the Solicitation Packages within seven (7) days after an order preliminarily approving the Disclosure Statement is entered (the "**Commencement of Solicitation Date**"). Based on such a schedule, the Debtors propose that, in order to be counted as a vote to accept or reject the Plan, each ballot must be properly executed, completed, and delivered no later than 4:00 pm (Eastern Time) (the "**Voting Deadline**") on the day which is 37 days after the Commencement of Solicitation Date. The Debtors believe that such solicitation period is a sufficient time within which holders of claims and interests can make an informed decision whether to accept or reject the Plan. Moreover, the proposed discovery deadlines do not prejudice the rights of any party-in-interest because they provide

reasonable and ample time to conduct discovery relating to the adequacy of the Disclosure Statement and/or the Proposed Plan. In light of the pre-arranged nature of these cases and the fact that the Plan has the support of the Required Supporting Holders, I believe the relief requested is in the best interests of the Debtors, their creditors, and all parties in interest.

### K.  Application to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors

#### 1.  Relief Requested

68.    The Debtors request authorization, pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f), to employ and retain Kurtzman Carson Consultants LLC ("**KCC**") as the official claims and noticing agent in the Reorganization Cases.

#### 2.  Basis for Relief Requested

69.    After soliciting and evaluating proposals from other potential claims agents, the Debtors selected KCC based on, among other things, its expertise in providing similar services in chapter 11 cases. The Debtors request authorization to compensate and reimburse KCC in accordance with the terms of the Services Agreement for all services rendered and expenses incurred in connection with these Reorganization Cases. The Debtors believe that such compensation is reasonable and appropriate for services of this nature and comparable to those charged by other providers of similar services.

70.    The Debtors estimate that there are thousands of potential creditors in these Reorganization Cases, many of which may file proofs of claim. Thus, I believe that the noticing, as well as receiving, docketing and maintaining of a significantly large number of proofs of claim would be unduly time consuming and burdensome for the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware.

71.     Based on the foregoing, I believe the retention and appointment of KCC in connection with the administration of these Reorganization Cases is in the best interests of the Debtors, their creditors, and all parties in interest.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: January 4, 2010

BY: _Jeffrey B. Park_____
     Jeffrey B. Park
     Chief Financial Officer