**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------------x
                                      :

| | |
|---|---|
| *In re* | **Chapter 11** |
| | |
| **INTERNATIONAL ALUMINUM CORPORATION,** *et al.*, | **Case No. 10-_____ (___)** |
| | **(Jointly Administered)** |
| **Debtors.** | |

----------------------------------------------------------------x

**DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF IAC HOLDING CO., INTERNATIONAL ALUMINUM CORPORATION, UNITED STATES ALUMINUM CORPORATION, UNITED STATES ALUMINUM CORPORATION-CAROLINA, UNITED STATES ALUMINUM CORPORATION-ILLINOIS, UNITED STATES ALUMINUM CORPORATION-TEXAS, RACO INTERIOR PRODUCTS, INC., GENERAL WINDOW CORPORATION, INTERNATIONAL EXTRUSION CORPORATION-TEXAS, INTERNATIONAL EXTRUSION CORPORATION, INTERNATIONAL WINDOW-ARIZONA, INC., <u>AND INTERNATIONAL WINDOW CORPORATION</u>**

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

- and -

RICHARDS, LAYTON & FINGER, P.A.
Attorneys for Debtors and
Debtors in Possession
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

IAC Holding Co., International Aluminum Corporation, United States Aluminum Corporation, United States Aluminum Corporation-Carolina, United States Aluminum Corporation-Illinois, United States Aluminum Corporation-Texas, RACO Interior Products, Inc., General Window Corporation, International Extrusion Corporation-Texas, International Extrusion Corporation, International Window-Arizona, Inc. and International Window Corporation (collectively, the "***Debtors***") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of title 11 of the United States Code (the "***Bankruptcy Code***"):

## SECTION 1.   DEFINITIONS AND INTERPRETATION

### A.   **Definitions**.

The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

1.1.   ***Administrative Agent***  means Canadian Imperial Bank of Commerce, New York Agency, as administrative and collateral agent under the Credit Agreement.

1.2.   ***Administrative Agent's Professionals*** means Latham & Watkins, LLP, Duane Morris LLP, and Richter Consulting, Inc.

1.3.   ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of any of the Reorganization Cases Allowed under and in accordance with, as applicable, sections 330, 364(c)(1), 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' estates or operating the Debtors' businesses, (b) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Reorganization Cases, (c) any compensation for professional services rendered and reimbursement of expenses incurred by a professional retained by order of the Bankruptcy Court or otherwise allowed pursuant to section 503(b) of the Bankruptcy Code, and (d) all reasonable fees and expenses incurred by the Administrative Agent's Professionals, pursuant to their respective prepetition engagement letters.

1.4.   ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.5.   ***Allowed*** means, with reference to any Claim or Equity Interest, (a) any Claim or Equity Interest arising on or before the Effective Date (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Equity Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court or (c) any Claim or Equity Interest expressly Allowed hereunder.

1.6.   ***Bankruptcy Code*** has the meaning ascribed to such term in the introduction.

1.7.   ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Reorganization Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Reorganization Cases under section 151 of title 28 of the United States Code.

1.8.   ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code,

as amended from time to time, applicable to the Reorganization Cases, and any local rules of the Bankruptcy Court.

1.9.    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.10.    ***Cash*** means legal tender of the United States of America.

1.11.    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.12.    ***Class*** means any group of substantially similar Claims or Equity Interests classified by the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.13.    ***Collateral*** means any property or interest in property of the estate of any Debtor subject to a lien, charge or other encumbrance to secure the payment or performance of a Claim, which lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.14.    ***Commencement Date*** means the date on which each of the respective Debtors commenced its Reorganization Case.

1.15.    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.16.    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.17.    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.18.    ***Credit Agreement*** means that certain Credit Agreement, dated as of March 30, 2007, as amended through the date hereof, by and among IAC, the lenders party thereto and the Administrative Agent (as further amended or otherwise modified from time to time).

1.19.    ***Credit Agreement Claims*** means the Senior Lender Credit Agreement Revolver Claims and the Senior Lender Credit Agreement Term Claims.

1.20.    ***Debtors*** has the meaning ascribed to such term in the introduction.

1.21.    ***Disbursement Agent*** means any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a Disbursement Agent under Sections 6.6, 6.7, and 6.9 hereof.

1.22.    ***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time pursuant to the terms of the Restructuring Support Agreement, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

1.23.    ***Disputed Claim*** means any Claim or Equity Interest (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or

1111 of the Bankruptcy Code, or (b) for which a proof of claim or interest for payment has been timely filed with the Bankruptcy Court or a written request for payment has been made.

1.24.  ***Distribution Record Date*** means, except with respect to any publicly traded securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be five (5) Business Days after the Confirmation Date.

1.25.  ***Effective Date*** means the Business Day on or after the Confirmation Date specified by the Debtors on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to the effectiveness of the Plan specified in Section 9 hereof have been satisfied or waived; *provided*, *however*, that such Business Day shall be no later than 90 days after entry of the Confirmation Order.

1.26.  ***Equity Interest*** means the interest of any holder of an equity security of any of the Debtors represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in any of the Debtors, whether or not transferable, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

1.27.  ***Excess Cash*** means the Debtors' Cash on hand in excess of $20 million on a pro forma basis net of actual and estimated Administrative Expense Claims as of the Effective Date.

1.28.  ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a stay, new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied, or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for *certiorari* or move for a stay, new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a "Final Order."

1.29.  ***General Unsecured Claim*** means any Claim against any of the Debtors that (a) is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Credit Agreement Claim, Other Secured Claim, Notes Claim, Intercompany Claim, or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

1.30.  ***Group Tax Returns*** has the meaning ascribed to such term in Section 12.6(a).

1.31.  ***Holdings*** means IAC Holding Co.

1.32.  ***IAC*** means International Aluminum Corporation.

1.33.  ***IAC Group*** means (i) the affiliated group of corporations, within the meaning of Section 1504 of the Tax Code, of which Holdings is the common parent, and (ii) any other group of corporations filing consolidated, combined or unitary tax returns for state and local tax purposes that includes Holdings, of which IAC or any subsidiary of IAC is also a member (other than any such group of which IAC or any subsidiary of IAC is the parent).

1.34. **IAC Subsidiary Debtors** means United States Aluminum Corporation, United States Aluminum Corporation – Carolina, United States Aluminum Corporation – Illinois, United States Aluminum Corporation – Texas, RACO Interior Products, Inc., General Window Corporation, International Extrusion Corporation-Texas, International Extrusion Corporation, International Window–Arizona, Inc., and International Window Corporation.

1.35. **Intercompany Claim** means any claim held by (i) a Debtor against another Debtor or (ii) a non-Debtor subsidiary against a Debtor.

1.36. **Management Incentive Plan** means the management incentive plan, which shall be substantially in the form set forth in Exhibit "C" attached hereto.

1.37. **New Board** means each board of directors appointed pursuant to Section 5.2(c) of the Plan.

1.38. **Newco** means Reorganized IAC or a legal entity organized pursuant to the laws of Delaware that will acquire the assets of IAC and assume the reinstated liabilities and other obligations of IAC hereunder in accordance with terms hereof on the Effective Date, as more fully described in the Plan Supplement.

1.39. **New Credit Agreement** means the Credit Agreement, to be dated as of the Effective Date, by and among Reorganized Holdings and the other Reorganized Debtors, and the holders of Credit Agreement Claims, and the Administrative Agent (as amended or otherwise modified from time to time in accordance with the terms thereof), which will be filed as part of the Plan Supplement and consistent with the terms set forth in the Plan Term Sheet.

1.40. **New Equity** means the equity interests of Reorganized Holdings that will be issued on the Effective Date in accordance with the terms hereof.

1.41. **New Security Agreement** means that certain Security Agreement to be dated as of the Effective Date, and which will be filed as part of the Plan Supplement and consistent with the terms set forth in the Plan Term Sheet.

1.42. **New Term Notes** means those certain amended and restated term notes in the aggregate principal amount of $38,000,000 that will be issued pursuant to the New Credit Agreement.

1.43. **Notes Claim** means any Claim against any Debtor under or in connection with the Senior Subordinated Notes or the Senior Subordinated Loan Agreement.

1.44. **Other Secured Claim** means a Secured Claim, other than a Credit Agreement Claim.

1.45. **Person** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.46. **Plan** means this joint plan of reorganization, including the exhibits and schedules hereto and contained in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Restructuring Support Agreement.

1.47. **Plan Documents** means the documents to be executed, delivered, assumed and/or performed in conjunction with the consummation of the Plan on the Effective Date which may include, but are not limited to, the Restated Bylaws, the Restated Certificate of Incorporation, the New Credit Agreement, the Registration Rights Agreement, and the Shareholders Agreement. Except as otherwise provided herein, the Plan Documents must be reasonably acceptable to the Consenting Holders (as defined in the Restructuring Support Agreement). Each of the Plan Documents to be entered into as of the Effective Date will be filed in draft form in the Plan Supplement.

1.48. **Plan Supplement** means a supplemental appendix to the Plan, to be filed with the Bankruptcy Court prior to the Confirmation Hearing, that will contain the draft forms of the Plan Documents to be entered into as of the Effective Date.

1.49. **Plan Term Sheet** means the IAC Preliminary Restructuring Proposal Term Sheet annexed hereto as Exhibit "A" (and as may be as amended or otherwise modified from time to time in accordance with the terms of the Restructuring Support Agreement).

1.50. **Priority Non-Tax Claim** means any Claim against any of the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.51. **Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.52. **Registration Rights Agreement** means the agreement between Reorganized IAC and any holder of 10% or more of the issued and outstanding shares of the New Equity, which shall be filed as part of the Plan Supplement and entered into on the Effective Date and shall provide for each such holder of New Equity to have two separate demand rights to require Reorganized IAC to register its New Equity and for piggyback registration rights for the other initial holders of the New Equity.

1.53. **Released Parties** means (a) each present and former director, officer, employee, manager, partner, and member of (i) the Debtors, (ii) the holders of the Credit Agreement Claims who held such claims at any time prior to the Effective Date, (iii) the holders of Equity Interests in Holdings, (iv) the Administrative Agent and its Affiliates, (v) Genstar Capital, LLC, in its capacity as an advisor under that certain Advisory Services Agreement by and between Genstar Capital, LLC and Holdings dated as of March 30, 2007, (b) each holder of a Credit Agreement Claim, (c) each holder of an Equity Interest in Holdings, IAC or any of the IAC Subsidiary Debtors, (d) the Administrative Agent and its Affiliates, and (e) each Advisor of the Debtors, the holders of Credit Agreement Claims, the holders of Equity Interests in Holdings, and the Administrative Agent. For purposes of this definition, "*Advisors*" means each financial advisor, investment banker, professional, accountant and attorney, and each of their respective employees, parent corporations, subsidiaries, affiliates and partners.

1.54. **Reorganization Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors.

1.55. **Reorganized Debtors** means Reorganized Holdings, Newco, and all of the Debtors (including any successor corporation or entity by merger), as reorganized as of the Effective Date in accordance with the Plan.

1.56. **Reorganized Holdings** means either Newco or any ultimate top tier holding company that directly or indirectly owns the assets of IAC, as will be set forth in more detail, along with the terms and steps of the corporate structuring of the Reorganized Debtors, in the Plan Supplement.

1.57.    ***Reorganized IAC*** means IAC on and after the Effective Date.

1.58.    ***Required Supporting Holders*** means the Senior Lenders party to the Restructuring Support Agreement.

1.59.    ***Restated Bylaws*** means the bylaws or amended and restated bylaws to be adopted by Reorganized Holdings on the Effective Date, which shall be substantially in the form to be included in the Plan Supplement.

1.60.    ***Restated Certificate of Incorporation*** means the certificate of incorporation or the amended and restated certificate of incorporation to be adopted by Reorganized Holdings and filed with the Secretary of State of the State of Delaware prior to or on the Effective Date, which shall be substantially in the form to be filed as part of Plan Supplement.

1.61.    ***Restructuring Support Agreement*** means that certain Restructuring Support Agreement, dated as of December 31, 2009, and annexed hereto as Exhibit "B."

1.62.    ***Revolving Loan*** means that certain revolving credit loan memorialized through the revolving notes issued under the Credit Agreement.

1.63.    ***Secured Claim*** means a Claim to the extent (a) secured by a lien on Collateral, to the extent of the value of such Collateral (i) as set forth in the Plan, or (ii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.64.    ***Securities Act*** means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

1.65.    ***Senior Lenders*** means the lenders party to the Credit Agreement.

1.66.    ***Senior Lender Credit Agreement Revolver Claim*** means any Claim arising out of the Revolving Loan governed by the Credit Agreement.

1.67.    ***Senior Lender Credit Agreement Term Claim*** means any Claim arising out of the Term Loan governed by the Credit Agreement.

1.68.    ***Senior Subordinated Administrative Agent*** means Carlyle Mezzanine Partners, L.P., as agent under the Senior Subordinated Loan Agreement.

1.69.    ***Senior Subordinated Loan Agreement*** means that certain Senior Subordinated Loan Agreement dated as of March 30, 2007, as amended through the date hereof, by and among IAC, Holdings, certain subsidiaries of IAC parties thereto from time to time and Carlyle Mezzanine Partners, L.P., as agent and a subordinated lender, Carlyle Capital Corporation Limited, as a subordinated lender and the other subordinated lenders parties from time to time thereto.

1.70.    ***Senior Subordinated Notes*** means those certain 12.75% Senior Subordinated Notes due 2014, issued by IAC pursuant to the Senior Subordinated Loan Agreement.

1.71.    ***Shareholders Agreement*** means that certain agreement of the shareholders of Reorganized IAC, which may be entered into on the Effective Date.

1.72. **_Tax Code_** means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury regulations promulgated thereunder.

1.73. **_Term Loan_** means that certain term loan memorialized through term notes issued under the Credit Agreement.

**B.** **Interpretation, Application of Definitions and Rules of Construction**.

For purposes of the Plan: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (3) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (4) unless otherwise specified, all references in the Plan to sections are references to sections of the Plan; (5) unless otherwise specified, all references in the Plan to exhibits are references to exhibits in the Plan Supplement; (6) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to sections of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise set forth in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents filed in the Reorganization Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Reorganization Cases, unless otherwise stated; and (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors after the Effective Date in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**SECTION 2.** **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS**

**2.1** **_Administrative Expense Claims_**.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or a different treatment is provided for by order of the Bankruptcy Court (including, without limitation, any order governing the use of cash collateral) each holder of an Allowed Administrative Expense Claim shall receive payment in full in Cash of the unpaid portion of such Allowed Administrative Expense Claim (a) in the case of professionals retained by the Debtors in the ordinary course of their business, if any, on such terms as are customary between the Debtors and such professionals, or (b) with respect to all other holders of Allowed Administrative Expense Claims, on the latest of (i) the Effective Date, (ii) the date on which such payment would be made in the ordinary course of the Debtors' business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents

relating to such transactions, and (iii) the date on which such Administrative Expense Claim becomes Allowed.

**2.2** *Professional Compensation and Reimbursement Claims*.

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, and (b) be paid in full from the Debtors' or Reorganized Debtors' Cash on hand in such amounts as are allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Allowed Claim and the Debtors or, on and after the Effective Date, the Reorganized Debtors. The Reorganized Debtors are authorized to pay compensation for services rendered and reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

**2.3** *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim, (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date, or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business.

**SECTION 3.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**

As set forth more fully below, the Plan is premised upon the substantive consolidation of the Debtors for purposes of the Plan only. Accordingly, for purposes of the Plan, the assets and liabilities of the Debtors are deemed the assets and liabilities of a single, consolidated entity.

The following table designates the Classes of Claims against, and Equity Interests in, the Debtors, and specifies which of those Classes and Equity Interests are (a) impaired or unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Credit Agreement Claims | Impaired | Yes |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | Notes Claims | Impaired | No (deemed to reject) |
| 5 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 6 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 7 | Equity Interests in IAC and IAC Subsidiary Debtors | Unimpaired | No (deemed to accept) |
| 8 | Equity Interests in Holdings | Impaired | No (deemed to reject) |

## SECTION 4.  TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 4.1  *Priority Non-Tax Claims (Class 1)*.

(a)  <u>Impairment and Voting</u>.  Class 1 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)  <u>Distributions</u>.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a different treatment, each such holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the holder of such Claim.

### 4.2  *Credit Agreement Claims (Class 2)*.

(a)  <u>Impairment and Voting</u>.  Class 2 is impaired by the Plan.  The Credit Agreement Claims shall be Allowed in full and, for the avoidance of doubt, shall not be subject to avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection or any challenges under any applicable law or regulation by any Person, in the aggregate amount of (i) $118,800,000, <u>plus</u> (ii) all accrued and unpaid interest thereon at the non-default contract rate under the Credit Agreement as of the Commencement Date, except to the extent such interest is otherwise provided herein to be paid or satisfied, <u>plus</u> (iii) all other Obligations (as defined in the Credit Agreement), except to the extent that the claims of the Administrative Agent under the Credit Agreement are otherwise provided to be paid or satisfied.  Each holder of an Allowed Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Credit Agreement Claim shall receive (i) its *pro rata* share of the Excess Cash, (ii) its *pro rata* share of the New Term Notes and (iii) its *pro rata* share of 100% of the New Equity outstanding on the Effective Date, less any of the New Equity distributed on the Effective Date pursuant to the Management Incentive Plan.

### 4.3  *Other Secured Claims (Class 3)*.

(a)  <u>Impairment and Voting</u>.  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)  <u>Distributions</u>.  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, each Allowed Other Secured Claim shall be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of an event of default.  All Allowed Other Secured Claims that are not due and payable on or before the Effective Date shall, at the Debtors' option, be paid (i) in the ordinary course of business in accordance with the course of practice

between the Debtors and such holder with respect to such Claim or (ii) by transfer of the Collateral to the holder of such Claim.

### 4.4 *Notes Claims (Class 4)*.

(a) <u>Impairment and Voting</u>. Class 4 is impaired by the Plan. Each holder of an Allowed Senior Subordinated Notes Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have rejected the Plan.

(b) <u>Distributions</u>. On the Effective Date, the Senior Subordinated Loan Agreement and each of the Senior Subordinated Notes shall be canceled and terminated and the Notes Claims shall be extinguished with no distribution.

### 4.5 *General Unsecured Claims (Class 5)*.

(a) <u>Impairment and Voting</u>. Class 5 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b) <u>Distributions</u>. Each holder of an Allowed General Unsecured Claim shall receive payment in full in Cash of the unpaid portion of such Allowed General Unsecured Claim on the latest of (i) the Effective Date (or as soon thereafter as is reasonably practicable), (ii) the date on which such Claim would be paid in the ordinary course of the Debtors' business, (iii) as otherwise agreed by the Debtors and the holder of such Claim, and (iv) the date on which such General Unsecured Claim becomes Allowed; *provided, however*, that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business. The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

### 4.6 *Intercompany Claims (Class 6)*.

(a) <u>Impairment and Voting</u>. Class 6 is unimpaired by the Plan. Each holder of an Allowed Equity Interest in IAC or any IAC Subsidiary Debtor is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b) <u>Distributions</u>. On or as soon as practicable after the Effective Date, all Intercompany Claims will either be reinstated to the extent determined to be appropriate by the Debtors or adjusted, waived, continued or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by equityholders of Reorganized Holdings.

### 4.7 *Equity Interests in IAC and IAC Subsidiary Debtors (Class 7)*.

(a) <u>Impairment and Voting</u>. Class 7 is unimpaired by the Plan. Each holder of an Allowed Equity Interest in IAC or any IAC Subsidiary Debtor is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b) <u>Distributions</u>. On the Effective Date and subject to Sections 5.2 and 5.5 of the Plan, all of the Equity Interests of the IAC Subsidiary Debtors shall be owned by Newco and all existing Equity Interests of IAC shall be cancelled.

**4.8** *Equity Interests in Holdings (Class 8)*.

(a)　　Impairment and Voting. Class 8 is impaired by the Plan. Each holder of an Allowed Equity Interest in Holdings is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have rejected the Plan.

(b)　　Distributions. On the Effective Date, or as soon thereafter as is reasonably practicable, all existing Equity Interests in Holdings shall be cancelled, and the Equity Interests of each holder of an Allowed Equity Interest in Holdings shall be extinguished with no distribution.

## SECTION 5.　MEANS FOR IMPLEMENTATION

**5.1**　*Substantive Consolidation of Debtors for Plan Purposes Only*.

The Plan is premised upon the substantive consolidation of the Debtors for purposes of the Plan only. The Debtors propose procedural substantive consolidation to avoid the inefficiency of proposing, voting on, and making distributions in respect of entity-specific claims. Accordingly, on the Effective Date, all of the Debtors and their estates shall, for purposes of the Plan only, be deemed merged and (a) all assets and liabilities of the Debtors shall be treated for purposes of the Plan only as though they were merged, (b) all guarantees of Holdings, IAC and the IAC Subsidiary Debtors of payment, performance, or collection of obligations of any other Debtor shall be eliminated and cancelled, (c) all joint obligations of two (2) or more Debtors, and all multiple Claims against such entities on account of such joint obligations, shall be considered a single claim against the Debtors, and (d) any Claim filed in the Reorganization Cases shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Unless otherwise set forth herein, such substantive consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors (including the corporate ownership of the IAC Subsidiary Debtors), (ii) any Intercompany Claims, or (iii) the substantive rights of any creditor. If any party in interest challenges the proposed limited substantive consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by-entity basis.

**5.2**　*Corporate Action*.

(a)　　General. Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) selection of the directors and officers for the Reorganized Debtors, (ii) transfer of the assets of IAC, or any other Reorganized Debtor to Reorganized Holdings, as more fully described in the Plan Supplement, (iii) Reorganized Holdings' distribution of the New Equity, as more fully described in the Plan Supplement, to satisfy Credit Agreement Claims in accordance with Section 4.2(b) of the Plan, (iv) distribution of the New Term Notes, (v) adoption of the Management Incentive Plan, (vi) gifting to holders of Allowed General Unsecured Claims in the form of Cash distributions to satisfy Allowed General Unsecured Claims in accordance with Section 4.5 of the Plan, (vii) dissolution of Holdings and IAC on or as of the Effective Date or as soon as practicable thereafter, and (viii) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall occur in accordance with the Plan and any governing agreements or transfer documents and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors ; provided, however, that the Required Supporting Holders must unanimously consent to any corporate structure of the Reorganized Debtors to be implemented hereunder, including, to the transfer of IAC's assets to Newco; provided further that the Debtors may elect, with the unanimous consent of the Required Supporting Holders, to

utilize an alternative corporate structure to distribute the New Equity to holders of Credit Agreement Claims in accordance with Section 4.2 of the Plan and pursuant to the Management Incentive Plan. Any such alternative structure will be described in the Plan Supplement and shall comply with Section 12.7 of the Plan. As a result, holders of Credit Agreement Claims that have accepted the Plan shall be deemed to have accepted the Plan with the alternative corporate structure and any holders of Claims who were deemed to accept the Plan because such Claims were unimpaired shall continue to be deemed to accept the Plan. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, (w) the Shareholders Agreement, (x) the Registration Rights Agreement, (y) the New Credit Agreement, and (z) any and all other agreements, documents, securities and instruments relating to the foregoing (including without limitation security documents). The authorizations and approvals contemplated by this Section 5.2(a) shall be effective notwithstanding any requirements under non-bankruptcy law.

(b)     Restated Organizational Documents. On the Effective Date, Reorganized Holdings shall adopt the Restated Certificate of Incorporation and the Restated Bylaws and shall file the Restated Certificate of Incorporation with the Secretary of State of the State of Delaware. In addition, on or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the Restated Certificate of Incorporation, the certificates of incorporation of the Debtors that are corporations and the organization documents for the Debtors that are limited liability companies shall also be amended (and as to the corporate Debtors, filed with the Secretary of State of their respective states of incorporation) as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends. On the Effective Date, the boards of directors of each corporate Reorganized Debtor shall be deemed to have adopted the restated bylaws for such Reorganized Debtor.

(c)     Boards of Directors. On the Effective Date, the operation of Reorganized Holdings shall become the general responsibility of its board of directors, subject to, and in accordance with, the Restated Certificate of Corporation and Restated Bylaws of Reorganized Holdings. On the Effective Date, the operation of each of the other Reorganized Debtors shall become the general responsibility of its respective board of directors or board of managers, as applicable, subject to and in accordance with its respective restated certificates of incorporation and restated bylaws or other organizational documents. The initial boards of directors of Reorganized Holdings and the other Reorganized Debtors shall be disclosed in the Plan Supplement. The initial board of directors of Reorganized Holdings shall consist of five (5) directors, one (1) of whom shall be Richard E. Almy, two (2) of whom shall be independent directors unaffiliated with either the Debtors or the holders of the Credit Agreement Claims, and two (2) members whom shall be selected by the holders of the Credit Agreement Claims. The initial board of directors of the other Reorganized Debtors shall, in each case, consist of three (3) directors, one (1) of whom shall be Richard E. Almy, one (1) of whom shall be the Chief Financial Officer of Reorganized Holdings, and one (1) of whom shall be the group head of the applicable Reorganized Debtor.

(d)     Officers. The initial officers of Reorganized Holdings and the other Reorganized Debtors shall be disclosed in the Plan Supplement. The selection of officers of Reorganized Holdings and the other Reorganized Debtors after the Effective Date shall be as provided in the respective restated

certificates of incorporation and restated bylaws or other organizational documents of Reorganized Holdings or the applicable Reorganized Debtor.

### 5.3 *Distribution of New Term Notes*.

On the Effective Date, the New Credit Agreement shall be executed and delivered, and Reorganized IAC, Reorganized Holdings and the other Reorganized Debtors and any of their affiliates are authorized, as applicable, to distribute the New Term Notes and to execute, deliver and enter into, *inter alia*, the New Credit Agreement and the New Security Agreement without the need for any further corporate action and without further action by the holders of Claims or Equity Interests. A copy of the New Credit Agreement and the New Security Agreement will be filed as part of the Plan Supplement.

The New Credit Agreement shall be given in renewal and rearrangement of and in substitution (but not in payment) for, and shall re-evidence the Credit Agreement Claims net of Excess Cash and the value of the New Equity received hereunder by holders of the Credit Agreement Claims. Such re-evidenced Credit Agreement Claims shall continue to be secured by first priority, perfected, valid and enforceable liens in the collateral pursuant to, and as set forth in the New Security Agreement.

### 5.4 *Issuance of New Equity*.

The issuance of New Equity hereunder and under the Management Incentive Plan is authorized without the need for any further corporate action.

### 5.5 *Merger/Dissolution/Consolidation.*

On or as of the Effective Date or as soon as practicable thereafter and without further need for any further action, the Reorganized Debtors may (including to, among other things, effectuate the restructuring transactions described in Section 1.56 hereof) (i) cause any or all of the Debtors to be merged into one or more of the Reorganized Debtors or any of their affiliates, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors or any of their affiliates, or (iii) engage in any other transaction in furtherance of the Plan consistent with the Plan Term Sheet.

### 5.6 *Cancellation of Existing Securities and Agreements*.

Except for purposes of evidencing a right to distributions under the Plan with respect to executory contracts or unexpired leases that have not been assumed by the Debtors or as otherwise provided hereunder, on the Effective Date, all of the agreements and other documents evidencing (a) the Claims or rights of any holder of a Claim against the Debtors, including all credit agreements, indentures and notes evidencing such Claims, (b) the Equity Interests in Holdings, and (c) any options or warrants to purchase Equity Interests of Holdings, IAC or any of the IAC Subsidiary Debtors, or obligating such Debtors to issue, transfer or sell Equity Interests or any other capital stock of such Debtors, shall be amended, restated, substituted for or cancelled, as the case may be.

### 5.7 *Surrender of Existing Securities*.

On the Effective Date, the Equity Interests in Holdings and IAC shall be deemed to have been surrendered to the Debtors by each holder thereof and such security shall be deemed cancelled.

### 5.8 *New Agreements with Existing Management*.

On the Effective Date, Reorganized IAC shall enter into new employment agreements with certain of the Debtors' existing senior management as part of the Management Incentive Plan.

### 5.9 *Cancellation of Liens*.

Except as otherwise provided in the Plan (including without limitation the continuation of the liens securing the Credit Agreement Claims), upon the occurrence of the Effective Date, any lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of any Debtor (including any cash Collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such lien, including the execution, delivery and filing or recording of such releases.

### 5.10 *Compromise of Controversies*.

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

### 5.11 *Exemption from Securities Laws.*

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, any issuance under the Plan of the New Equity will be exempt from registration under the Securities Act and the Reorganized Debtors will not be subject to the reporting requirements of the Securities Exchange Act of 1934.

### 5.12 *Exemption From Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to the Plan shall be exempt from the imposition and payment of any and all transfer taxes (including, without limitation, any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the consummation of the Plan and the Plan Documents) pursuant to sections 1146(a), 505(a), 106 and 1141 of the Bankruptcy Code.

## SECTION 6.   DISTRIBUTIONS

### 6.1        *Voting of Claims*

Each holder of an Allowed Claim in an impaired class of Claims that is entitled to vote on the Plan pursuant to Sections 3 and 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court approving procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

### 6.2        *Cramdown and No Unfair Discrimination*

In the event that any impaired Class of Claims or Equity Interests rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (a) request that the Bankruptcy Court confirm the Plan in accordance with 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, and/or (b) amend the Plan in accordance with Section 12.7 hereof.

### 6.3        *Distribution Record Date*.

Except with respect to any publicly traded securities, as of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims.  The Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims occurring on or after the Distribution Record Date.  The Debtors, the Reorganized Debtors or any party responsible for making distributions pursuant to this Section 6 shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 6.4        *Date of Distributions*.

Except as otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is reasonable practicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.5        *Sources of Cash for Distributions*.

All Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations and Cash on hand.

### 6.6        *Disbursement Agent*.

Unless otherwise specified herein, all distributions under this Plan shall be made by Reorganized Holdings as Disbursement Agent or such other entity designated by Reorganized Holdings as a Disbursement Agent on the Effective Date.  No Disbursement Agent hereunder, including, without limitation, the Administrative Agent, shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 6.7 *Rights and Powers of Disbursement Agent*.

Each Disbursement Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursement Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by such Disbursement Agent to be necessary and proper to implement the provisions hereof.

### 6.8 *Expenses of the Disbursement Agent*.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by each Disbursement Agent acting in such capacity (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.9 *Delivery of Distributions*.

(a)     Last Known Address.  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to the address of such holder as set forth in the books and records of the Debtors, unless the applicable Reorganized Debtor has been notified by such holder in writing of a change of address, including by the filing of a proof of claim or interest by such holder that contains an address for such holder different from the address reflected on the Debtors' books and records.  In the event that any distribution to any holder is returned as undeliverable, the Disbursement Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursement Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

(b)     Distributions by Administrative Agent.  The Administrative Agent shall be the Disbursement Agent for the Allowed Credit Agreement Claims.  Distributions under the Plan to holders of such Allowed Credit Agreement Claims shall be made by the Reorganized Debtors to the Administrative Agent, which, in turn, shall make the distributions to the holders of such Allowed Claims. The Administrative Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to its administration of distributions.  Upon delivery by the Reorganized Debtors of the distributions in conformity with Section 4.2(b) of the Plan to the Administrative Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

### 6.10 *Manner of Payment Under Plan*.

(a)     All distributions under the Plan shall be made by, or at the direction of, the Disbursement Agent on behalf of the applicable Debtor.

(b)     All distributions of New Equity made on account of the Management Incentive Plan shall be made by Reorganized IAC.

(c)     At the option of the applicable Disbursement Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.11    *No Fractional Shares of New Equity*.

No fractional shares of capital stock shall be issued or distributed under the Plan and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of capital stock that is not a whole number, the actual distribution of shares of capital stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of capital stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### 6.12    *Setoffs and Recoupment*.

Except as set forth in Section 4.2(a) of the Plan, the Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.

### 6.13    *Distributions After The Effective Date*.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but by which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.14    *Cash Distributions*.

No payment of Cash of less than $100 shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the appropriate Disbursement Agent.

### 6.15    *No Postpetition Interest on Claims*.

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or as required by applicable bankruptcy law, postpetition interest shall not accrue on or after the Commencement Date on account of any Claim.

## SECTION 7.    PROCEDURES FOR DISPUTED CLAIMS

### 7.1    *Disputed Claims/Process*.

On and after the Effective Date, except as otherwise provided herein, all Claims will be paid in the ordinary course of business of the Reorganized Debtor.  If the Debtors dispute any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Reorganization Cases had not been commenced and shall survive the Effective Date as if the Reorganization Cases had not been commenced.  Notwithstanding section 502(a) of the Bankruptcy Code, and considering the unimpaired treatment of all holders of General Unsecured Claims under this

Plan, all proofs of claim filed in these Reorganization Cases shall be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn. The deemed withdrawal of all proofs of claim is without prejudice to any claimant's rights under this Section 7.1 of the Plan to assert their Claims in any forum as though the Debtors' cases had not been commenced.

**7.2**     *Objections to Claims*.

Except insofar as a Claim is Allowed under the Plan and notwithstanding Section 7.1 above, the Debtors or the Reorganized Debtors shall be entitled to object to Claims.

**7.3**     *Estimation of Claims*.

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**7.4**     *No Distributions Pending Allowance*.

Notwithstanding any other provision hereof, if any portion of an Administrative Expense Claim or a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed, and any property withheld pending the resolution of such Claim shall be reallocated *pro rata* to the holders of Allowed Claims in the same Class.

**7.5**     *Distributions after Allowance*.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursement Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

**7.6**     *Preservation of Claims and Rights to Settle Claims*.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section

1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any Person, without the approval of the Bankruptcy Court, subject to the terms of Section 7.2 hereof, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

### SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### 8.1    *Assumption and Rejection of Contracts and Leases*.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) previously expired or terminated pursuant to its own terms, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date or (d) is set forth in a schedule, as an executory contract or unexpired lease to be rejected filed by the Debtors as part of the Plan Supplement.  The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

#### 8.2    *Cure of Defaults*.

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors upon assumption thereof or as soon as practicable thereafter.  If there is a dispute regarding (a) the nature or amount of any cure, (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, any cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

#### 8.3    *Rejection Claims*.

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the Debtors and their counsel within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their estates, and their property.

**8.4** *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their certificates of incorporation and bylaws or organizational documents, as applicable, or any other agreements entered into by any Debtor at any time prior to the Effective Date, to indemnify current and former directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Commencement Date, shall not be discharged or impaired by confirmation of the Plan. Such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors hereunder and shall continue as obligations of the Reorganized Debtors. Any Claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

**8.5** *Survival of Other Employment Arrangements.*

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all collective bargaining agreements to which the Debtors are party and all employee compensation and benefit plans (other than the existing incentive plans to be replaced by the Management Incentive Plan) entered into before or after the Commencement Date and not since terminated shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed pursuant to the Plan. The Debtors' obligations under such agreements, plans and programs shall survive confirmation of the Plan, except for (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1113, 1114 and 1129(a)(13) of the Bankruptcy Code) and (b) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

**8.6** *Insurance Policies.*

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect. All other insurance policies shall re-vest in the Reorganized Debtors.

**8.7** *Advisory Services Agreement.*

That certain Advisory Services Agreement, dated as of March 30, 2007, by and between Holdings and Genstar Capital, LLC, shall be deemed and treated as an executory contract pursuant to the Plan and shall be rejected by the Debtors. No Claims shall arise, survive or result from such rejection.

**SECTION 9.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

**9.1** *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date of the Plan is subject to satisfaction of the following conditions precedent:

(a)    Confirmation Order. The Confirmation Order in form and substance reasonably acceptable to the Administrative Agent shall have been entered by the Court and shall have become a

Final Order in full force and effect and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

        (b)    <u>Execution and Delivery of Other Documents</u>.  All other actions and all agreements, instruments or other documents necessary to implement the Plan, including all documents comprising the Plan Supplement, shall have been (i) effected or (ii) duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

        (c)    <u>Regulatory Approvals</u>.  The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents necessary to implement the Plan and that are required by law, regulation, or order.

        (d)    <u>Consents</u>.  All other authorizations, consents and approvals determined by the Debtors to be necessary to implement the Plan shall have been obtained.

        (e)    <u>Corporate Formalities</u>.  The Restated Certificate of Incorporation shall be filed with the Secretary of State of the State of Delaware contemporaneously with the Effective Date.

        (f)    <u>Other Acts</u>.  Any other actions the Debtors determine are necessary to implement the terms of the Plan shall have been taken.

### 9.2    *Waiver of Conditions Precedent*.

Each of the conditions precedent in Section 9.1 hereof may be waived, in whole or in part, by the Debtors (with the prior written consent of the Administrative Agent) in writing without notice or order of the Bankruptcy Court.

### 9.3    *Effect of Failure of Conditions*.

If the conditions specified in Section 9.1 hereof have not been satisfied or waived in the manner provided in Section 9.2 hereof by the date that is ninety (90) days after the Confirmation Date, then:  (a) the Confirmation Order shall be of no further force or effect; (b) no distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests in the Debtors shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (d) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors; and (e) the Plan shall be deemed withdrawn; <u>provided</u>, <u>however</u>, that the Debtors may extend such ninety (90) day period by an additional thirty (30) day period with the prior written consent of the Administrative Agent.

## SECTION 10.  EFFECT OF CONFIRMATION

### 10.1    *Vesting of Assets*.

On the Effective Date, except as otherwise provided in the Plan (including, without limitation, the continuation of the liens of the Senior Lenders in accordance with, and as evidenced by, the New Security Agreement), pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' estates shall vest in the Reorganized Debtors, or any transferee of the Reorganized Debtors

pursuant to restructuring transactions authorized hereby, free and clear of all Claims, liens, encumbrances, charges, and other interests. Except as otherwise provided in the Plan, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. On and after the Effective Date, the Reorganized Debtors shall be authorized to operate their respective businesses, and to use, acquire or dispose of assets, without supervision or approval by the Bankruptcy Court and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### 10.2    *Binding Effect*.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### 10.3    *Discharge of the Debtors*.

Except to the extent otherwise expressly provided in the Plan (including, without limitation, the re-evidencing of the Credit Agreement Claims (less the Excess Cash and value of the New Equity distributed to the holders of the Credit Agreement Claims) by the New Credit Agreement), the treatment of all Claims against or Equity Interests in the Debtors under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Commencement Date, or against their estate or properties or interests in property. Except as otherwise expressly provided in the Plan, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full exchange for the consideration provided under the Plan. Except as otherwise expressly provided in the Plan, all Persons shall be precluded from asserting against the Debtors, the Reorganized Debtors, or their respective properties or interests in property any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

### 10.4    *Exculpation*.

Notwithstanding anything provided herein, as of the Effective Date, none of the Released Parties shall have or incur any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan, or any other act or omission in connection with the Reorganization Cases, the Plan, or any contract, instrument, indenture, or other agreement or document related thereto or delivered thereunder; *provided, however*, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent that such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

### 10.5    *Term of Injunctions or Stays*.

(a)    Except as otherwise expressly provided herein, all Persons who have held, hold or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Reorganized Debtor, or its successors, assigns, or

affiliates, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor, or its successors, assigns, or affiliates, with respect to any such Claim or Equity Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor, or its successors, assigns, or affiliates, or against the property or interests in property of any Reorganized Debtor, or its successors, assigns, or affiliates, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Reorganized Debtor, or its successors, assigns, or affiliates, or against the property or interests in property of any Reorganized Debtor, or its successors, assigns, or affiliates, with respect to any such Claim or Equity Interest, and (v) pursuing any Claim released pursuant to Section 10.7 of the Plan.

(b)     Unless otherwise provided, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**10.6     *Injunction Against Interference with Plan*.**

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**10.7     *Releases*.**

(a)     <u>Releases by Debtors</u>.  Except for the right to enforce the Plan, each Debtor shall, effective upon the occurrence of the Effective Date, be deemed to forever release, waive and discharge each of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Reorganization Cases, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Reorganization Cases, or the Plan; subject to a limited carve-out solely for criminal acts and intentional fraud.

(b)     <u>Releases by Holders of Claims</u>.  Except for the right to enforce the Plan, each Person who votes to accept the Plan, or who, directly or indirectly, is entitled to receive a distribution under the Plan, including Persons entitled to receive a distribution via an attorney, agent, indenture trustee or securities intermediary, shall, effective upon the occurrence of the Effective Date, be deemed to forever release, waive and discharge each of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Reorganization Cases, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Reorganization Cases, or the Plan.

### 10.8    *Preservation of Claims*.

Except as otherwise provided in the Plan, including Section 10.7, as of the Effective Date, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, any action, cause of action, liability, obligation, right, suit, debt, sum of money, damage, judgment, claim and demand whatsoever, whether known or unknown, in law, equity or otherwise, accruing to the Debtors shall become assets of the Reorganized Debtors, and the Reorganized Debtors shall have the authority to commence and prosecute such causes of action for the benefit of the estates of the Debtors.  After the Effective Date, the Reorganized Debtors shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such causes of action without approval of the Bankruptcy Court.

### 10.9    *Reservation of Rights*.

The Plan shall have no force or effect unless and until the Effective Date.  Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

### 10.10    *Plan Supplement*.

A draft form of the Plan Documents to be entered into as of the Effective Date and any other appropriate documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court ten (10) days prior to the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at www.kccllc.net/Intalum as they become available.

## SECTION 11.  RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction over all matters arising in, arising under, and related to the Reorganization Cases and the Plan for, among other things, the following purposes:

(a)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom.

(b)    To determine any and all motions, adversary proceedings, applications, contested matters, or other litigated matters pending on the Effective Date.

(c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein.

(d)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated.

(e)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court.

(f)     To hear and determine any timely objections to Administrative Expense Claims or to proofs of claim and Equity Interests, including any objections to the classification of any Claim or Equity Interest, and to allow or disallow any Disputed Claim, in whole or in part.

(g)     To consider any amendments to or modifications of the Plan, or remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

(h)     To hear and determine all applications of retained professionals under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date.

(i)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the documents comprising the Plan Supplement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing.

(j)     To issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation.

(k)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

(l)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code).

(m)     To hear and determine all disputes involving the existence, scope and nature of the discharges granted under Section 10.3 of the Plan.

(n)     To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 10.4 of the Plan or the releases granted under Section 10.7 of the Plan.

(o)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

(p)     To enter a final decree closing the Reorganization Cases.

(q)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located.

## SECTION 12.   MISCELLANEOUS PROVISIONS

### 12.1   *Payment of Statutory Fees*.

On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.  Notwithstanding Section 5.1 above, the Debtors shall pay all of the foregoing fees on a per-Debtor basis.

**12.2** *Reserved.*

**12.3** *Dissolution of Statutory Committees and Cessation of Fee and Expense Payment*.

Any statutory committees appointed in the Reorganization Cases shall dissolve on the Effective Date. Provided that all such fees and expenses payable as of the Effective Date have been paid in full, the Reorganized Debtors shall not be responsible for paying any fees and expenses incurred after the Effective Date by the Administrative Agent's Professionals, and the professionals retained by any statutory committees, unless such fees and expenses are payable under the terms of the New Credit Agreement.

**12.4** *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**12.5** *Intercompany Claims.*

On or as soon as practicable after the Effective Date, all intercompany claims will either be reinstated to the extent determined to be appropriate by the Debtors or adjusted, waived, continued or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by equityholders of any Reorganized Debtor.

**12.6** *Determination of Tax Filings and Taxes*.

(a)     For all taxable periods ending on or prior to, or including, the Effective Date, Reorganized United States Aluminum Corporation shall prepare and file (or cause to be prepared and filed) on behalf of the IAC Group, all group tax returns, reports, certificates, forms or similar statements or documents (collectively, "*Group Tax Returns*") required to be filed or that Reorganized United States Aluminum Corporation otherwise deems appropriate, including the filing of amended Group Tax Returns or requests for refunds. If requested by Reorganized United States Aluminum Corporation, Holdings shall promptly execute or cause to be executed and filed any Group Tax Returns of the IAC Group submitted to Reorganized Holdings for execution or filing. Neither IAC nor Holdings shall file or amend any Group Tax Return for any taxable periods (or portions thereof) described in the preceding sentence without Reorganized United States Aluminum Corporation's written consent.

(b)     Holdings, Reorganized Holdings, IAC, Reorganized IAC, and Reorganized United States Aluminum Corporation shall cooperate fully with each other regarding the implementation of this Section 12.6 of the Plan (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Section 12.6 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals or litigation with respect to such taxes. Without limiting the generality of the foregoing, Holdings shall execute prior to the Effective Date a power of attorney authorizing Reorganized Holdings and Reorganized United States Aluminum Corporation to correspond, sign, collect, negotiate, settle and administer tax payments and Group Tax Returns for the taxable periods described in Section 12.6(a).

(c)     The Reorganized Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to

any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

(d) If Holdings or IAC receives written notice from a taxing authority of any pending examination, claim, settlement, proposed adjustment or related matters with respect to taxes that could affect any other member of the IAC Group (by operation of law or by reason of this Plan), it shall so notify Reorganized Holdings in writing within ten (10) business days thereafter. Reorganized Holdings shall have the sole right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the IAC Group. With respect to any such proceeding and with respect to the preparation and filing of any Group Tax Returns of the IAC Group, Reorganized Holdings and Reorganized United States Aluminum Corporation may act in its own self-interest and in the interest of its subsidiaries and affiliates, without regard to any adverse consequences to Holdings or IAC.

(e) If Holdings or IAC is dissolved, merged out of existence, or otherwise treated in a manner that terminates the IAC Group for applicable tax purposes, immediately before such termination, Holdings or IAC (as applicable) shall designate Reorganized United States Aluminum Corporation as the "substitute agent" (within the meaning of Treasury Regulation Section 1.1502-77) for the IAC Group in accordance with Treasury Regulation Section 1.1502-77 and Rev. Proc. 2002-43, 2002-28 I.R.B. 99 (July 15, 2002), in either case, as amended or supplemented, and any comparable provision under state and local law, with respect to all taxable periods ending on or before, or including, the Effective Date

(f) Reorganized Holdings shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of the IAC Group, including for any taxable period ending on or prior to, or including, the Effective Date. Within five (5) business days after receipt of any such refunds or credits, Holdings shall notify Reorganized Holdings thereof and shall transfer any refunds to Reorganized Holdings by wire transfer or otherwise in accordance with written instructions provided by Reorganized Holdings.

**12.7** *Amendments*.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors (with the prior written consent of the Administrative Agent) at any time prior to or after the Confirmation Date, but prior to the Effective Date. Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification complies with the requirements of this Section 12.7 and does not materially and adversely change the treatment of the Claim of such holder; *provided, however*, that any holders of Claims who were deemed to accept the Plan because such Claims were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

**12.8** *Effectuating Documents and Further Transactions*.

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**12.9** *Revocation or Withdrawal of the Plan*.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors take such action, the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in further proceedings involving the Debtors.

**12.10** *Severability*.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the prior written consent of the Administrative Agent), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Nothing in this Section shall be construed to relieve the Debtors from complying with section 1127 of the Bankruptcy Code, to the extent that provision would be applicable, irrespective of this Section.

**12.11** *Schedules and Exhibits Incorporated*.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if fully set forth herein.

**12.12** *Solicitation of the Plan*.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors, the Administrative Agent and the Senior Lenders, and each of their respective directors, officers, employees, Affiliates, agents, members, managers, partners, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

**12.13** *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

**12.14**    *Compliance with Tax Requirements*.

In connection with the Plan and all instruments issued in connection herewith and distributed hereunder, any Person issuing any instruments or making any distribution under the Plan, including any Person described in Sections 5.3 and 5.4 hereof, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any Person issuing any instruments or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or distributing Person for payment of any such tax obligations.

**12.15**    *Notices*.

All notices, requests, and demands to or upon the Debtors, Senior Lenders or the Administrative Agent to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    if to the Debtors, to:

767 Monterey Pass Road
Monterey Park, California  91754
Attn:  Jeff Park, CFO
Telephone:  (323) 264-1670
Facsimile:  (323) 266-3838

with copies to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:  Gary T. Holtzer, Esq.
        Robert S. Lemons, Esq.
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

(b)    if to the Senior Lenders or the Administrative Agent, to:

CIBC World Markets
300 Madison Avenue, 4th Floor
New York, New York  10017
Attn:  Lindsay Gordon
Telephone:  (212) 856-3579
Facsimile:  (212) 856-4135

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York  10022-4834
Attn:  Mark Broude, Esq.
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864


Dated:  January 4, 2010

Respectfully submitted,

International Aluminum Corporation
IAC Holding Co.
United States Aluminum Corporation
United States Aluminum Corporation–Carolina
United States Aluminum Corporation–Illinois
United States Aluminum Corporation–Texas
RACO Interior Products, Inc.
General Window Corporation
International Extrusion Corporation
International Extrusion Corporation–Texas
International Window–Arizona, Inc.
International Window Corporation


By: /s/ Richard E. Almy
        Richard E. Almy
        Chief Executive Officer

**EXHIBITS AND SCHEDULES TO**
**DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF**
**THE BANKRUPTCY CODE OF IAC HOLDING CO., INTERNATIONAL ALUMINUM**
**CORPORATION, UNITED STATES ALUMINUM CORPORATION, UNITED STATES**
**ALUMINUM CORPORATION-CAROLINA, UNITED STATES ALUMINUM CORPORATION-**
**ILLINOIS, UNITED STATES ALUMINUM CORPORATION-TEXAS, RACO INTERIOR**
**PRODUCTS, INC., GENERAL WINDOW CORPORATION, INTERNATIONAL EXTRUSION**
**CORPORATION-TEXAS, INTERNATIONAL EXTRUSION CORPORATION, INTERNATIONAL**
**WINDOW-ARIZONA, INC., AND INTERNATIONAL WINDOW CORPORATION**

**Exhibit A to Plan**

**Plan Term Sheet**

## International Aluminum Corporation

### PRELIMINARY RESTRUCTURING PROPOSAL
### TERM SHEET

December 14, 2009

This term sheet describes the material terms of a preliminary restructuring proposal (the "***Proposal***") of IAC Holding Co. ("***Holdings***"), International Aluminum Corporation ("***IAC***") and IAC's domestic wholly-owned subsidiaries (other than Maestro Products, Inc.) (the "***Domestic Subsidiaries***" and collectively with Holdings and IAC, the "***Loan Parties***"). The Proposal embodies and is premised on a comprehensive compromise and settlement between the Loan Parties and certain of their equity and debt constituencies (the "***Restructuring***"). The transactions contemplated by this term sheet are subject to conditions to be set forth in definitive documents and the information contained herein is strictly confidential. This term sheet does not constitute an offer of securities and is being presented for discussion and settlement purposes only. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement (as defined below). Terms not otherwise modified herein shall be as in the current Credit Agreement.

**[Please note that this Term Sheet is subject to tax review and diligence and therefore, the structure of the transactions contemplated by this Term Sheet may change to accommodate the results of such analysis.]**

## I. PARTIES

| | |
|---|---|
| **Borrower:** | IAC. |
| **Guarantors:** | The Domestic Subsidiaries. |
| **Administrative Agent:** | Canadian Imperial Bank of Commerce, New York Branch will act as sole and exclusive administrative agent and collateral agent (in such capacity, the "***Administrative Agent***"). |
| **Senior Lenders:** | Holders of claims (collectively, the "***Senior Lenders***") arising under that certain Credit Agreement dated as of March 30, 2007, by and among IAC, the lenders party thereto, and Canadian Imperial Bank of Commerce, New York Agency ("***CIBC",*** and in its capacity as administrative agent and collateral agent, the "***Agent***") (as amended or otherwise modified from time to time, the "***Credit Agreement***"). |
| | The "***Senior Secured Debt***" consists of (i) revolving credit loans in the aggregate outstanding principal amount of $20 million *plus* all accrued and unpaid interest thereon (the "***Revolving Loan***") and (ii) a term loan in the aggregate principal amount of approximately $98.8 million plus all accrued and unpaid interest thereon (the "***Term Loan***"). |

| | |
|---|---|
| **Noteholders** | Holders of claims (collectively, the "***Noteholders***") arising under that certain Senior Subordinated Loan Agreement dated as of March 30, 2007, among Holdings, IAC, the subsidiary guarantors party thereto, Caryle Mezzanine Partners, L.P., as agent for the lenders and as a lender, Carlyle Capital Corporation Limited, as a lender and the other entities party thereto as lenders from time to time (as amended or otherwise modified from time to time, the "***Subordinated Loan Agreement***"). |
| | The "***Mezzanine Debt***" consists of the obligations arising under the Subordinated Loan Agreement and the 12.75% Senior Subordinated Notes (the "***Notes***") in an aggregate outstanding principal amount of approximately $48.1 million *plus* all accrued and unpaid interest thereon. |
| **Equity Holders** | Genstar Capital Partners IV, L.P. and certain of its affiliates and other persons holding capital stock of Holdings (collectively, the "***Current Equityholders***"). |

## II. THE PRELIMINARY PROPOSED RESTRUCTURING

| | |
|---|---|
| **A. Treatment of Senior Secured Debt:** | The Senior Secured Debt will be satisfied with a package of cash payment, the New Term Loan (as defined below), and new common equity as described below.  In full satisfaction of their Senior Secured Debt, the Senior Lenders will receive the following on the effective date of the Restructuring (the "***Effective Date***"): |
| **Cash Payment** | Cash on hand of the Loan Parties in excess of $20 million (net of (i) actual and estimated costs and expenses of the restructuring (including fees and expenses of professionals, including reasonable fees for tax professionals of the steering committee of Senior Lenders) as of the effective date of closing and (ii) any tax refunds received as a result of the use of net operating loss carrybacks relating to the Fiscal Years ended June 30, 2009 or June 30, 2010 (the "***Tax Refunds***")), which payment will be applied pro rata as between the Revolving Loan and the Term Loan. |
| **Common Equity** | 100% of the common equity of Holdings as reorganized or, if different, such other entity that directly or indirectly owns the assets currently owned by IAC ("***Reorganized Holdings***") (prior to dilution from the Management Incentive Plan). |
| **Term Loan:** | |
| Type and Amount: | A 5-year term loan in the aggregate principal amount of $38 million (the "***New Term Loan***"), the material terms of which are as set forth below and otherwise will be substantially similar to those contained in the Credit Agreement for the Term Loan. |

| | |
|---|---|
| Borrower: | IAC or, if different, such entity that directly owns the assets currently owned by IAC (the "***Borrower***") |
| Maturity: | The date that is five years after the closing date. |
| Amortization: | 1% per annum with a bullet at maturity. |
| Interest Rate: | LIBO Rate Loan, bearing cash-pay interest at the sum of LIBO Rate *plus* 4.25%, with a LIBO Rate floor of 2.5%, *plus* 3.25% PIK interest, in each case, payable quarterly in arrears. |
| Guarantees: | Guaranteed by Reorganized Holdings (if it is not the Borrower) and the Domestic Subsidiaries. |

*Other Material Terms of the New Term Loan*

| | |
|---|---|
| Voluntary Prepayments and Commitment Reductions: | Voluntary prepayments of the New Term Loan will be permitted at any time without premium or penalty. All voluntary prepayments to be applied as directed by Borrower. |
| Mandatory Prepayments: | Mandatory prepayments will be substantially similar to those contained in the Credit Agreement, provided that (i) 100% of Net Disposition Proceeds, including in respect of the Alhambra facility and (ii) on an annual basis, 75% of Excess Cash Flow[1] for the Fiscal Year ended June 30, 2011, and 75% of Excess Cash Flow in each Fiscal Year thereafter, <u>provided</u>, <u>however</u>, that the prepayment percentage shall be reduced to 50% of Excess Cash Flow if the Maximum Total Net Leverage ratio is less than 3.0:1.0, in each case, shall be applied to the New Term Loan; <u>provided</u>, <u>further</u>, that notwithstanding the foregoing, all Tax Refunds shall be excluded for purposes of calculating Excess Cash Flow and shall not be required to be prepaid by the New Loan Parties (as defined below) pursuant to the terms of the New Term Loan. |
| Collateral | The obligations of the Borrower, Reorganized Holdings and the Domestic Subsidiaries (the "***New Loan Parties***") in respect of the New Term Loan, any swap agreements provided by any Senior Lender (or any person that is an affiliate of a Senior Lender at the time of such transaction) shall be secured by (i) a perfected first lien security interest (subject to permitted liens) on the equity interests of the Domestic Subsidiaries and substantially all of the assets of the Loan Parties, including cash (other than the Trust Funds (as defined below)) and (ii) 65% of the equity interests of the New Loan Parties' first tier foreign subsidiaries (the "***Collateral***"). |
| | For purposes of this Term Sheet, "***Trust Funds***" shall mean all funds held by the New Loan Parties as a fiduciary, all taxes required to be collected or withheld (including, without limitation, federal and state withholding taxes), other funds and taxes for |

---

[1] With modifications to be agreed.

which the New Loan Parties or their directors, officers or employees may have criminal or personal liability, and accrued and unpaid employee compensation.[2]

Notwithstanding anything to the contrary contained herein, (x) the New Loan Parties shall not be required to provide Collateral or to perfect a security interest in any Collateral to the extent the burden or cost of obtaining or perfecting a security interest therein outweighs the benefit of the security afforded thereby as reasonably determined by the Agent or if the granting of a security interest in such asset would be prohibited by enforceable anti-assignment provisions of contracts or applicable law (after giving effect to relevant provisions of the Uniform Commercial Code) and (y) no foreign law security or pledge agreements shall be required.

Covenants

- Affirmative and Other Covenants:     Affirmative covenants, including reporting, to be determined.

- Negative Covenants:     Negative covenants to be determined.

- Financial Covenants:     Minimum Liquidity Covenant[3] tested at the average of the weekly cash reports for the prior Fiscal Quarter and calculated in accordance with standard Company practice, beginning with the first full Fiscal Quarter following the effective date of the chapter 11 plan of reorganization implementing the Restructuring, with a 37.5% cushion to management's long-term business plan (the "**Plan**") for Fiscal Years 2010, 2011 and 2012.

  Maximum Capital Expenditures of (i) $2.5 million in Fiscal Years 2010 and 2011, (ii) $3.0 million for Fiscal Year 2012, and (iii) $5.0 million in each of Fiscal Years 2013 and 2014.

---

[2] Trust Funds will, at the election of the New Loan Parties, either be maintained in a segregated account or properly accounted for.

[3] All cash collateral posted by the New Loan Parties in respect of letters of credit shall be included for purposes of calculating the New Loan Parties' liquidity positions pursuant to the Minimum Liquidity Covenant.

Maximum Total Net Leverage Ratio[4], tested on the last day of each Fiscal Quarter beginning with the Fiscal Quarter ended September 30, 2012 as follows:

| Date | Max. Total Net Leverage Ratio |
|---|---|
| September 30, 2012 | 6.50:1.0 |
| December 31, 2012 | 5.50:1.0 |
| March 31, 2013 | 4.00:1.0 |
| June 30, 2013 | 3.75:1.0 |
| September 30, 2013 | 3.50:1.0 |
| December 31, 2013 | 3.50:1.0 |
| March 31, 2014 | 3.00:1.0 |
| June 30, 2014 | 2.75:1.0 |
| September 30, 2014 and thereafter | 2.75:1.0 |

Minimum Cash Interest Coverage Ratio, tested on the last day of each Fiscal Quarter beginning with the Fiscal Quarter ended September 30, 2012 as follows:

| Date | Min. Cash Interest Coverage Ratio |
|---|---|
| September 30, 2012 | 1.00:1.0 |
| December 31, 2012 | 1.50:1.0 |
| March 31, 2013 | 2.00:1.0 |
| June 30, 2013 | 2.00:1.0 |
| September 30, 2013 | 2.25:1.0 |
| December 31, 2013 | 2.25:1.0 |
| March 31, 2014 | 2.50:1.0 |
| June 30, 2014 | 2.75:1.0 |
| September 30, 2014 and thereafter | 2.75:1.0 |

- Equity Cure Rights: TBD.

**B.  Treatment of Mezzanine Debt:** The Mezzanine Debt will be terminated and cancelled and all such claims of the Mezzanine Debt will be expunged without receiving any distribution.

**C.  Treatment of Current Equityholders' Interests:** (1) The current equity interests of the Current Equityholders will be terminated and cancelled and all such claims of the Current Equityholders will be expunged.

---

[4] For the avoidance of doubt, any non-cash losses arising as a result of a change in the method of accounting for inventory (from FIFO to LIFO) shall be added back to EBITDA for purposes of calculating the Maximum Total Net Leverage Ratio and the Minimum Cash Interest Coverage Ratio.

(2) That certain Advisory Services Agreement, dated as of March 30, 2007, by and between Holdings and Genstar Capital, LLC, shall be deemed and treated as an executory contract pursuant to the Plan and shall be rejected.  Genstar Capital, LLC agrees to waive any claim to rejection damages or unpaid fees (including advisory fees).

**D.  Trade and other General Unsecured Claims**

All trade and general unsecured claims will remain current and unimpaired.

## III. OTHER MATERIAL TERMS

**A.  Management Incentive Plan**

Market-based incentive plan to be determined (the "***Management Incentive Plan***").

**B.  Governance**

The initial board of directors of Reorganized Holdings after the Effective Date will consist of 5 members; one member of which will be Richard E. Almy, the CEO of Holdings, and the remainder of which will be designated in accordance with the terms set forth on Exhibit A attached hereto.

**C.  Releases and Exculpation**

To the extent permitted by applicable law and approved by the Bankruptcy Court, the Loan Parties and each person who, directly or indirectly, is entitled to receive a distribution under the bankruptcy plan, including, without limitation, persons entitled to receive a distribution via an attorney, agent, indenture trustee or securities intermediary, shall, effective upon the Effective Date, be deemed to forever release, waive and discharge all claims, demands, causes of action and the like, relating to (i) the Loan Parties and their affiliates and advisors, (ii) the officers and directors of the Loan Parties, (iii) the Current Equityholders, (iv) the Agent and (v) the Senior Lenders, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise.

**D.  Indemnification of Prepetition Officers and Directors**

Under the Restructuring, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, or employment contracts) for the current and former directors, officers, employees, attorneys, other professionals and agents of the Loan Parties and such current and former directors and officers' respective affiliates will be assumed and will survive effectiveness of the Restructuring for claims related to or in connection with any actions, omissions or transactions occurring prior to the Effective Date.

**E.  Definitive Documentation**

The Loan Parties, the Senior Lenders and the Agent will negotiate in good faith definitive documentation for the Restructuring consistent with the terms hereof.

**F.  Implementation &**

The parties will agree on an appropriate process to implement the

| | |
|---|---|
| **Restructuring Milestones** | Restructuring, including the execution of appropriate forbearance and lock-up agreements for accepting parties and a possible commencement of chapter 11 proceedings (including appropriate milestones to be determined for definitive documentation and implementation of the Restructuring). |

Summary of Proposed Corporate Governance Terms
<u>International Aluminum Corporation</u>

| | |
|---|---|
| Entities Involved: | • IAC Holding Co. as reorganized or, if different, such other entity that directly or indirectly owns the assets currently owned by IAC ("Holding Co.")<br><br>• International Aluminum Corporation (the "Company")<br><br>• Domestic subsidiaries of the Company (the "Subsidiaries") |
| Board Size: | • The Board of Directors (the "Board") of Holding Co. and the Company will have 5 members (both Boards will have the same 5 directors)<br><br>• The Board of each Subsidiary will have 3 members |
| Board Composition: | • The Boards of Holding Co. and the Company will, in each case, consist of:<br><br>    o Richard Almy;<br>    o 2 unaffiliated outside directors (the "Independent Directors"); and<br>    o 2 directors nominated by the steering committee for the senior lenders (the "Steering Committee")<br><br>• The Board of any Subsidiary will, in each case, consist of:<br><br>    o Richard Almy;<br>    o Jeffrey Park; and<br>    o Group Head for the Subsidiary |
| Chairmanship: | • Richard Almy shall be the Chairman of all Boards |
| Selection of Independent Directors: | • One Independent Director candidate shall be recommended by the Company and will be appointed to the Boards of Holding Co. and the Company upon approval by the Steering Committee<br><br>• One Independent Director candidate shall be recommended by the Steering Committee and will be appointed to the Boards of Holding Co. and the Company upon approval by the Company<br><br>• Within 3 business days of receiving a recommendation, the Steering Committee, the Company's senior lenders and the Company's senior management shall disclose any known connection to the recommended candidate<br><br>• The Steering Committee shall have an opportunity to interview the candidate recommended by the Company and |

| | |
|---|---|
| | conduct its own diligence prior to approving such candidate |
| | • The Company shall have an opportunity to interview the candidate recommended by the Steering Committee and conduct its own diligence prior to approving such candidate |
| | • Notwithstanding the foregoing, any recommendation for an Independent Director candidate shall be approved or objected to within 10 business days of the recommendation |
| Compensation: | • With the consent of the Steering Committee, the Company will engage a compensation consultant to recommend a director compensation structure for Independent Directors<br><br>• The Company and the Steering Committee will finalize the director compensation policy prior to confirmation of the Plan |
| Indemnification: | • The Company and each of the directors will enter into customary Indemnity Agreements<br><br>• The Company charter will continue to provide for indemnification to the maximum degree allowed under law<br><br>• The Company will maintain current level of D&O insurance policy |
| Voting: | • Upon exit, stockholders will enter into a customary voting agreement whereby stockholders will agree to vote in a manner designed to preserve the size and composition of the Boards set forth in this term sheet<br><br>• A majority vote will be required for all actions taken at a meeting |
| Holding Co. and Company Management: | • The officers of Holding Co. and the Company shall remain unchanged |
| Subsidiary Management: | • Each Subsidiary will have 2 officers, consisting of:<br>   o President (the Subsidiary's Group Head); and<br>   o Chief Financial Officer (Geoffrey Pankau) |
| Other Agreements: | • Parties will negotiate and enter into a customary stockholders agreement containing terms governing the rights and obligations regarding the Company securities, including but not limited to:<br>   o Transfer restrictions;<br>   o Right of first refusal; |

| | |
|---|---|
| | o Drag-along rights;<br>o Tag-along rights;<br>o Pre-emptive rights;<br>o Registration rights; and<br>o Information rights |

**<u>Exhibit B to Plan</u>**

**Restructuring Support Agreement**

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this "***Agreement***"), dated as of December 31, 2009, is entered into by and among IAC Holding Co., a Delaware corporation ("***Holdings***"), International Aluminum Corporation, a Delaware corporation ("***IAC***"), United States Aluminum Corporation, a California corporation, United States Aluminum Corporation – Carolina, a California corporation, United States Aluminum Corporation – Illinois, a California corporation, United States Aluminum Corporation – Texas, a Texas corporation, RACO Interior Products, Inc., a Texas corporation, General Window Corporation, a California corporation, International Extrusion Corporation – Texas, a California corporation, International Extrusion Corporation, a California corporation, International Window– Arizona, Inc., a California corporation, and International Window Corporation, a California corporation (collectively with Holdings and IAC, the "***Company***"), Canadian Imperial Bank of Commerce, New York Agency, as administrative agent under the Credit Agreement (as defined below) (the "***Agent***"),and the undersigned lenders party to the Credit Agreement (the "***Consenting Holders***" and each, a "***Consenting Holder***").  The Company, the Agent, each Consenting Holder and each person that becomes a party hereto in accordance with the terms hereof are collectively referred to herein as the "***Parties***" and individually as a "***Party***."

# RECITALS

**WHEREAS**, as of the Effective Date (as defined in <u>Section 10</u>), IAC is a party to (i) that certain Credit Agreement, dated as of March 30, 2007, by and among IAC, Agent, and the lenders party thereto (the "***Lenders***") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***") and (ii) that certain Senior Subordinated Loan Agreement, dated as of March 30, 2007, as amended by that certain First Amendment to Senior Subordinated Loan Agreement, dated as of April 20, 2007, by and among IAC, as borrower, Holdings, as a guarantor, certain subsidiaries of IAC from time to time party thereto, as subsidiary guarantors, Carlyle Mezzanine Partners, L.P., as agent and a subordinated lender, Carlyle Capital Corporation Limited, as a subordinated lender and the other subordinated lenders from time to time party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Subordinated Loan Agreement***"), governing the 12¾% Senior Subordinated Notes due 2014 (the "***Subordinated Notes***");

**WHEREAS**, as of the Effective Date, the Consenting Holders hold at least 50% of the aggregate principal amount of indebtedness under the Credit Agreement;

**WHEREAS**, the Company and the Consenting Holders wish to reorganize and recapitalize the Company (the restructuring and recapitalization transactions, collectively, the "***Transactions***") in accordance with (i) a proposed prearranged Chapter 11 plan of reorganization substantially in the form attached hereto as <u>Exhibit A</u> (the "***Plan***") and (ii) the term sheet substantially in the form attached hereto as <u>Exhibit B</u> (the "***Term Sheet***"), as such Plan and Term Sheet may be amended, modified or supplemented as provided herein below;

**WHEREAS**, it is anticipated that the Transactions will be implemented through a solicitation of votes for the Plan (the "***Solicitation***") pursuant to sections 1125, 1126 and 1145 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "***Bankruptcy Code***");

**WHEREAS**, the Company intends to commence voluntary reorganization cases (the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") to effect the Transactions pursuant to the Plan;

**WHEREAS**, the Company intends to file the Plan and related disclosure statement (the "***Disclosure Statement***") on or shortly after the Commencement Date (as defined in Section 5(a));

**WHEREAS**, the Company intends to seek Bankruptcy Court approval of the Plan and Disclosure Statement; and

**WHEREAS**, the Company intends to use its commercially reasonable efforts to obtain Bankruptcy Court approval of the Plan in accordance with the Bankruptcy Code and on terms consistent with this Agreement and the Agent, and each Consenting Holder intends to use its commercially reasonable efforts to cooperate in that regard.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**AGREEMENT**

1. <u>Plan</u>.

(a)    The Consenting Holders acknowledge and agree that (i) the Plan is substantially in a form and substance reasonably acceptable in all respects to the Consenting Holders and (ii) the terms and conditions set forth in the Term Sheet are reasonably acceptable in all respects to the Consenting Holders.  The plan related documents (the "***Plan Related Documents***"), which shall include, but not be limited to, (A) the Disclosure Statement, (B) the materials related to the Solicitation, (C) the proposed confirmation order, and (D) any other documents or agreements filed with the Bankruptcy Court by the Company or at the Company's direction that are necessary to implement the Plan, including: (1) any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement; (2) an amended and restated Credit Agreement and such other definitive documentation (including without limitation security documents) as is necessary to consummate the Transactions, all on the same terms and otherwise in all material respects on the terms set forth in the Term Sheet; (3) the amended certificate of incorporation and bylaws for the Company as reorganized; (4) any registration rights agreement; and (5) any stockholders agreement, which shall contain the terms and conditions set forth in the Plan and the Term Sheet, be in form and substance reasonably acceptable in all respects to the Consenting Holders and the Agent and be consistent with this Agreement in all material respects.  To the extent there is any inconsistency between the Plan and the Term Sheet, the Plan shall govern, and the other documents and agreements described in clauses (1), (2), (3), (4) and (5) of the preceding sentence shall be consistent with the Plan.

(b)     Except with respect to <u>Section 6</u>, this Agreement may be amended only upon written approval of (i) the Company and (ii) the Agent, at the direction of the Consenting Holders owning more than 50% in aggregate principal amount of the Debt (as defined in <u>Section 3(b)</u>) (the "***Required Consenting Holders***").  Notwithstanding anything herein to the contrary, <u>Section 6</u> may be amended, modified, or waived only upon written approval of 100% of the Consenting Holders.

(c)     The Term Sheet and the Plan may be amended only upon written approval of the (i) Company and (ii) the Agent, at the direction of (A) the Consenting Holders owning more than 66 2/3% in aggregate principal amount of the Debt or, (B) if a Consenting Holder withdraws its support of the Plan pursuant to <u>Section 6</u>, all remaining Consenting Holders.

2.     <u>Bankruptcy Process</u>.  The Company hereby agrees to use commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable in accordance with the Bankruptcy Code, and on terms consistent with this Agreement, and each Consenting Holder shall use its commercially reasonable efforts to cooperate in that regard; <u>provided</u>, <u>however</u>, that, except with respect to <u>Section 6</u>,  the Company and the Agent, at the direction of the Required Consenting Holders, may from time to time mutually agree in writing to further extend any time period or deadline set forth herein.

3.     <u>Support of the Reorganization; Additional Covenants</u>.

(a)     Prior to the Termination Date (as defined in <u>Section 5</u>), neither any Consenting Holder nor the Agent will (i) object to confirmation of the Plan or object to, or otherwise commence any proceeding to oppose or alter, the Plan, any Plan Related Documents, motions filed in connection with the Plan or Plan Related Documents or customary "first day" motions, (ii) vote for, consent to, support, propose, or participate in the formulation of any chapter 11 plan other than the Plan, (iii) directly or indirectly seek, solicit, negotiate, support or engage in any discussion regarding any chapter 11 plan other than the Plan, or any sale or disposition of the Company (or all or substantially all of its assets or equity), or any dissolution, winding up, liquidation, merger, transaction, reorganization or restructuring of the Company, in any case if such action reasonably could be expected to prevent, delay or impede the successful implementation of the Transactions as contemplated by the Plan, the Term Sheet and the Plan Related Documents, (iv) object to the Solicitation or support any such objection by a third party, (v) request, consent to, support or participate in the formation of any committee of creditors or equity security holders, statutory or otherwise, in the Chapter 11 Cases, or (vi) take any other action not required by law that is inconsistent with, or that would materially delay confirmation or consummation of, the Plan.

(b)     Prior to the Termination Date, each Consenting Holder (i) agrees to vote (or cause the voting of) its claims arising from the indebtedness under the Credit Agreement (the "***Debt***") and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Debt (collectively, the "***Claims***") to accept the Plan (subject to its receipt of the materials in connection with the Solicitation that are approved by the Bankruptcy Court as containing "adequate information" under section 1125 of the Bankruptcy Code), and will not change or withdraw (or cause to be changed or withdrawn) such vote, and (ii) consents to the treatment of the Claims as set forth in the Plan and the Term Sheet.

(c)        Each Consenting Holder agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any of the Debt or Claims, or any option thereon or any right or interest (voting or otherwise) therein, unless the transferee is a Consenting Holder or agrees in writing to be bound by all of the terms of this Agreement by executing the Joinder attached hereto as <u>Exhibit C</u> (such transferee, if any, to also be a "*Consenting Holder*" hereunder).  If a transferee of any of the Debt or Claims is not a Consenting Holder or does not execute a Joinder in substantially the form attached hereto as <u>Exhibit C</u> within five days of the completion of such transfer of the Debt or Claims, then such sale, transfer, assignment or other disposition of the Debt, Claims or related option, right or interest shall be deemed void *ab initio*.  This Agreement shall in no way be construed to preclude any Consenting Holder from acquiring additional Debt, Claims or equity interests in the Company; <u>provided</u>, <u>however</u>, that any such additional holdings shall automatically be deemed to be subject to all of the terms of this Agreement and each such Consenting Holder agrees that such additional Debt, Claims or equity interests shall be subject to this Agreement and that it shall vote (or cause to be voted) any such additional Debt, Claims or equity interests entitled to vote on the Plan (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with this <u>Section 3</u>.  Subject to the terms and conditions of any order of the Bankruptcy Court, each Consenting Holder agrees to provide to counsel for the Agent and the Company (i) a copy of any Joinder and (ii) a notice of the acquisition of any additional Debt or Claims, in each case within five (5) business days of the consummation of the transaction disposing of, or acquiring, Debt or Claims.

(d)        The Agent and each Consenting Holder agrees that as long as this Agreement has not been terminated in accordance with its terms, it shall not (i) pursue any right or remedy under the Credit Agreement or (ii) initiate, or have initiated on its behalf, any litigation or proceeding of any kind against the Company with respect to the Debt or Claims other than to enforce this Agreement; <u>provided</u>, <u>however</u>, that such rights and actions can be exercised, after the provision of written notice to the Debtors, during the notice period contemplated by <u>Sections 5(j)</u> and <u>(k)</u>, unless the Agent has received, within a reasonable amount of time after provision of the notice, reasonably satisfactory evidence in writing of the Company's intention and ability to cure the condition that has triggered any such notice period.

(e)        Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Transactions and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Transactions.

4.        <u>Agreements of the Company</u>.

(a)        <u>Additional Transaction Matters</u>.  The Company hereby agrees (i) to prepare or cause the preparation of the Plan and Plan Related Documents, (ii) except where it is not reasonably practicable, to provide draft copies of all material motions, and applications and other documents that the Company intends to file with the Bankruptcy Court in advance of any filing thereof to counsel for the Agent and consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court and (iii) subject to <u>Section 26</u>, to not seek to implement any transaction or series of transactions that would effect a restructuring on terms other than the restructuring terms set forth in the Plan.

(b)     Advisors to the Consenting Holders.  The Company shall, in accordance with any engagement letter executed by the Company and such counsel or financial advisors, for services rendered, pay all fees and expenses of (i) Latham & Watkins LLP, counsel to the Agent, and (ii) Richter Consulting, Inc., financial advisors to the Agent, which are due and owing prior to the Termination Date in accordance with the terms of the existing engagement letters, plus the fees and expenses of one (1) local counsel retained by the Agent, if necessary, which are due and owing prior to the date of termination of this Agreement.

(c)     Cash Collateral Order.  The Company shall support in good faith the entry of, and shall comply with, interim and final orders of the Bankruptcy Court, in form and substance reasonably satisfactory to the Agent, with respect to adequate protection and the use of cash collateral (the "*Cash Collateral Order(s)*").

(d)     Reporting of Litigation Claims.  As soon as reasonably practicable, the Company shall inform the Consenting Holders and the Agent of any litigation claims that become known by or noticed to the Company after the Commencement Date but prior to the Effective Date if (i) such litigation claims are filed against Holdings or any subsidiary of Holdings or (ii) Holdings or any subsidiary of Holdings shall be adjudicated to be responsible for all or part of any settlements or judgments resulting from such litigation claims.

5.     Termination of Agreement.  This Agreement shall terminate, unless waived or extended by the Company and the Agent, at the direction of the Required Consenting Holders in writing, upon the earliest to occur of the following (the date and time of such termination, the "*Termination Date*"):

(a)     at 5:00 P.M. prevailing Eastern Time on the date which is 30 calendar days after the Effective Date unless the Company has commenced the Chapter 11 Cases (the "*Commencement Date*");

(b)     at 5:00 P.M. prevailing Eastern Time on the 75th day after the Commencement Date if a hearing has not been held before the Bankruptcy Court on or before such date to consider the approval of the Disclosure Statement; provided, however, that upon notice from the Company to the other Parties hereto there shall be a 30-day extension of such 75-day period;

(c)     at 5:00 P.M. prevailing Eastern Time on the 120th day after the Commencement Date if the Bankruptcy Court has not entered an order, in form and substance reasonably satisfactory to the Agent, approving the Disclosure Statement on or before such date; provided, however, that upon notice from the Company to the other Parties hereto there shall be a 30-day extension of such 120-day period;

(d)     at 5:00 P.M. prevailing Eastern Time on the 180th day after the Commencement Date if the Bankruptcy Court has not entered an order, in form and substance reasonably satisfactory to the Agent, confirming the Plan on or before such date; provided, however, that upon notice from the Company to the other Parties hereto there shall be a 30-day extension of such 180-day period;

(e)     at 5:00 P.M. prevailing Eastern Time on the date which is 30 calendar days following entry by the Bankruptcy Court of an order confirming the Plan, if there has not

occurred substantial consumption (as defined in Section 1101 of the Bankruptcy Code) of the Plan on or before such date; *provided*, *however*, that upon notice from the Company to the other Parties hereto there shall be a 30-day extension of such 30-day period;

(f)     the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing a trustee pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(g)     the Company files, proposes or otherwise supports any chapter 11 plan other than the Plan;

(h)     the material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, which material breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Required Consenting Holders;

(i)     the breach by any of the Consenting Holders of any of the undertakings, representations, warranties or covenants of such Consenting Holder(s) set forth in this Agreement that would have a material adverse impact on the Company or the consummation of the Transactions, which breach remains uncured for a period of five (5) business days after the receipt by the Consenting Holder(s) of notice of such breach from the Company (*provided* that the Company may unilaterally waive or extend this provision in writing);

(j)     the Company files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement or the Plan (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) and such motion or pleading has not been withdrawn prior to the earlier of (i) five (5) business days after the Company receives written notice from the Required Consenting Holders that such motion or pleading is inconsistent with this Agreement or the Plan, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion; *provided* that this Section 5(j) shall not apply with respect to any motion or pleading that is inconsistent with this Agreement if such motion or pleading is consistent with the Plan;

(k)     the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms hereof); *provided*, that this Section 5(k) shall not apply with respect to any relief that is inconsistent with this Agreement if such relief is consistent with the Plan;

(l)     the Company violates the Cash Collateral Order(s);

(m)     the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Transactions; or

(n)     the Company gives notice pursuant to Section 26(e).

For the avoidance of doubt, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the giving any such notice).

6.    <u>Limited Right of Withdrawal</u>.  Upon the occurrence of any of the following events described below (or the failure to timely occur of any of the following events described below), and subject to any conditions contained therein, each Consenting Holder shall have the right (at its sole and exclusive option) to withdraw from this Agreement and not be subject to the terms and conditions set forth herein:

(a)    On or before the Effective Date, except with respect to ordinary course monthly payments not to exceed $225,000 in connection with the Company's workers' compensation policy with Zurich American Insurance Company, General Unsecured Claims, Priority Non-Tax Claims, and Priority Tax Claims in an aggregate amount in excess of $15,626,000 have been (i) Allowed, (ii) paid pursuant to Section 4 of the Plan or otherwise, or (iii) paid pursuant to orders issued by the Bankruptcy Court.  Capitalized terms used in this provision shall have the meanings ascribed to them in the Plan;

(b)    A Consenting Holder shall notify the Company in writing within 15 days after the later of (i) the Commencement Date or (ii) delivery by the Company to each Consenting Holder of (x) a report specifying the general limits of and amounts paid under each liability insurance policy held by the Company during the period from 1999 through 2009 and (y) insurance policy summary statements and backup documentation sufficient to determine and verify the Company's insurance coverage, that litigation claims disclosed in writing by the Company (other than environmental claims associated with the Alhambra facility) (the "***Litigation Claims***") have been reasonably determined by the Consenting Holders, after consultation with the Consenting Holder's insurance consultants, to be uninsured or underinsured by an amount in excess of $2 million in the aggregate over the legal reserve set forth in the Company's financial statements delivered to the Agent on 12/31/2009.  The Company shall have the right to contest such determination by the Consenting Holders.  The Parties will work together in good faith to resolve any disputed determination under this <u>Section 6(b)</u>.  However, in the event that no consensual resolution to such disputed determination can be achieved within 10 days, the Bankruptcy Court shall resolve any such dispute.  If the Bankruptcy Court resolves a dispute between the Parties, a Consenting Holder shall have the right to withdraw from this Agreement pursuant to this <u>Section 6(b)</u> only upon the entry of a Bankruptcy Court order finding that the Litigation Claims are uninsured or underinsured by an amount in excess of $2 million in the aggregate over the legal reserve set forth in the Company's financial statements delivered to the Agent on 12/31/2009.  The Company will respond promptly and in good faith to any additional information requests which may reasonably arise as a result of the information delivered to a Consenting Holder under this <u>Section 6(b)</u>;

(c)    Since the date of this Agreement, there shall have occurred and be continuing an event, matter, change, occurrence or circumstance that, individually or in the aggregate with any such other events, changes, occurrences or circumstances, has had or is reasonably likely to result in a "Material Adverse Effect" on the Company.  As used in this <u>Section 6(c)</u>, Material Adverse Effect means a material adverse effect on (i) the business, assets, properties, financial condition, or results of operations of the Company, taken as a whole or (ii)

the ability of the Company to consummate the transactions contemplated by, or perform its obligations under, this Agreement, the Plan or any of the Plan Related Documents; <u>provided</u> that in each case, the following shall not constitute a Material Adverse Effect: (A) any adverse effect related to or caused by the announcement, pendency or consummation of this Agreement, the Chapter 11 Cases or any of the transactions contemplated by the Plan or any of the Plan Related Documents, (B) any change in the United States or foreign economies or financial markets in general, (C) any change that generally affects the industry in which the Company operates, (D) any change arising in connection with natural disasters, earthquakes, hurricanes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof, (E) any changes (after the date hereof) in generally accepted accounting principles or applicable law, (F) any action taken by the Company to comply with the terms of this Agreement, the Plan or any other Plan Related Documents or any failure by the Company to take any action as a result of restrictions or other prohibitions under this Agreement, the Plan or any other Plan Related Documents, (G) any failure by the Company to meet any estimates, expectations or projections of the Company's revenue, earnings or other financial performance or results of operations for any period, or any failure by the Company to meet any internal budgets, plans or forecasts of its revenues, earnings or other financial performance or results of operations, or (H) the taking of any action, or failure to take action, to which the Required Consenting Holders have consented or approved in writing; <u>provided</u>, <u>further however</u>, that any of the events, occurrences or effects referred to in clauses (B) through (E) immediately above shall be considered in any determination as to whether a Material Adverse Effect has occurred to the extent any such event, occurrence or effect affects the Company in a materially disproportionate manner when compared to the effect of such events, occurrences or effects on other persons or entities engaged in the industry in which the Company is engaged;

(d)     The Company shall have settled, compromised, or otherwise liquidated (or entered into any agreement to settle, compromise or otherwise liquidate), any litigation claim that arose after the Commencement Date but before the confirmation of the Plan in an amount, excluding any amounts paid or payable by an insurance carrier, in excess of $2 million;

(e)     The Commencement Date has not occurred by 11:59 p.m. prevailing Eastern Time on January 4, 2010.

(f)     The Company shall have failed to provide to a Consenting Holder the information required under <u>Section 6(b)</u> of this Agreement within 30 days after the Commencement Date, <u>provided</u>, <u>however</u>, that such 30-day period shall not apply to the additional information requests referenced in <u>Section 6(b)</u> that may reasonably arise as a result of the information delivered to a Consenting Holder; <u>provided</u>, <u>however</u>, that such 30-day period shall not be subject to any cure period, including the cure period referenced in <u>Section 6(g)</u>; and

(g)     The material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth herein, which material breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from a Consenting Holder.

7.     <u>Good Faith Cooperation; Further Assurances; Transaction Documents</u>.  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of

the Transactions. Furthermore, each of the Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement, including executing and delivering any other agreements and making and filing any required regulatory filings. Each Party hereby covenants and agrees (a) to negotiate in good faith the Plan Related Documents, each of which shall (i) contain terms and conditions consistent in all material respects with the terms set forth in the Plan and the Term Sheet (as amended, supplemented or otherwise modified as provided herein), (ii) be in form and substance reasonably acceptable in all respects to the Parties signatory thereto or beneficiaries thereof and (iii) be consistent with this Agreement in all material respects, and (b) to execute (to the extent they are a party thereto) the Plan Related Documents and otherwise support the Plan and Plan Related Documents.

8. <u>Representations and Warranties</u>. Each Party hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a) <u>Power and Authority; Authorization</u>. It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b) <u>No Conflicts</u>. The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(c) <u>Governmental Consents</u>. The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any Federal, state or governmental authority or regulatory body other than the Bankruptcy Court (and assuming, as to the Company, the accuracy of the representations and warranties herein of each Consenting Holder).

(d) <u>Binding Obligation</u>. This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(e) <u>Ownership</u>. If such Party is a Consenting Holder, such Consenting Holder (i) either (A) is the sole legal and beneficial owner of the Debt set forth below its name on the signature page hereof and all related Claims, in each case free and clear of all claims, liens and encumbrances, or (B) has investment or voting discretion with respect to such Debt and Claims and has the power and authority to bind the beneficial owner(s) of such Debt and Claims to the terms of this Agreement and (ii) has full power and authority to vote on and consent to such matters concerning such Debt and Claims and to exchange, assign and transfer such Debt and Claims.

(f)    Securities Laws Matters.  If such Party is a Consenting Holder:

(i)    it has reviewed this Agreement and all exhibits hereto and has received all such other information as it deems necessary and appropriate to enable it to evaluate the financial risks inherent in the Transactions;

(ii)    it is acquiring the securities to be acquired by it pursuant to the Transactions (the "***New Securities***") for investment purposes, solely for its own account and/or the account of a holder for which it serves as the investment adviser or manager and not with a view to, or for resale in connection with, the distribution thereof and such Consenting Holder will not resell, transfer, assign or distribute the New Securities acquired by it, except in compliance with this Agreement, until this Agreement is validly terminated, and the registration requirements of the Securities Act, and applicable state securities laws or pursuant to an available exemption therefrom;

(iii)    it, or the holder for whom it acts as investment adviser or manager, is an "***Accredited Investor***" (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act);

(iv)    the financial situation of such Consenting Holder is such that it can afford to bear the economic risk of holding the New Securities;

(v)    the knowledge and experience of such Consenting Holder in financial and business matters is such that it, together with its advisors, is capable of evaluating the merits and risks of the investment in the securities;

(vi)    such Consenting Holder acknowledges that no representations, express or implied, are being made with respect to the Company, the New Securities being acquired hereunder, or otherwise, other than those expressly set forth herein or in the Plan and the Disclosure Statement;

(vii)    such Consenting Holder understands that the New Securities are a speculative investment that involve a high degree of risk of loss of its investment therein, that there may be substantial restrictions on the transferability of the New Securities and, accordingly, it may not be possible to liquidate such Consenting Holder's investment;

(viii)    in making its decision to invest in the New Securities hereunder, such Consenting Holder has relied upon independent investigations made by such Consenting Holder and, to the extent believed by such Consenting Holder to be appropriate, such Consenting Holder's representatives, including such Consenting Holder's own legal, tax and other advisors;

(ix)    such Consenting Holder and its representatives have been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Company and its representatives concerning the terms and conditions of the investment in the New Securities;

(x)    it has been advised by the Company that (A) the offer and sale of the New Securities has not been registered under the Securities Act; (B) the offering and sale of the New

Securities is intended to be exempt from registration under the Securities Act pursuant to Section 4(2) of the Securities Act and Regulation D thereunder and, if issued pursuant to the Plan section 1145 of the Bankruptcy Code; and (C) there is no established market for the New Securities and such a public market for the New Securities may not be established in the foreseeable future; and

(xi)     it is familiar with Rule 144 promulgated by the Securities and Exchange Commission under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

(g)     <u>Disclosure of Litigation Claims</u>.  If such Party is the Company, to the Company's knowledge, attached as <u>Exhibit D</u> are all litigation claims that have been asserted in a judicial proceeding prior to the Commencement Date (i) where Holdings or any subsidiary of Holdings is a defendant or (ii) where Holdings or any subsidiary of Holdings may be responsible for all or part of any settlements or judgments resulting from such litigation claims.

9.     <u>Amendments and Waivers</u>.  None of this Agreement, the Plan or the Term Sheet may be modified, amended or supplemented except as set forth in <u>Section 1(b)</u>.

10.     <u>Effectiveness</u>.  This Agreement shall become effective and binding on each Party upon the execution and receipt by the Company of signature pages signed by the Company, the Agent and Lenders holding at least 50% of the aggregate principal amount of indebtedness under the Credit Agreement (the "***Effective Date***").

11.     <u>GOVERNING LAW; JURISDICTION</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.  THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

12. <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by the Agent or any Consenting Holder, and that the Company shall be entitled to specific performance and injunctive or other equitable relief, without the necessity of securing or posting a bond or other security, as a remedy of any such breach, in addition to any other remedy which the Company may be entitled at law or in equity.

13. <u>Remedies Cumulative</u>.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party.

14. <u>Survival</u>.  Notwithstanding (i) any sale of the Debt or Claims in accordance with <u>Section 3(c)</u> or (ii) the termination of this Agreement, the agreements and obligations of the Parties in Sections <u>23</u>, <u>24</u> and <u>26</u> shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Agent and the Consenting Holders in accordance with the terms hereof.

15. <u>Headings</u>.  The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

16. <u>Successors and Assigns; Severability; Several Obligations</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.  The agreements, representations and obligations of the Agent and the Consenting Holders under this Agreement are, in all respects, several and not joint.

17. <u>No Third Party Beneficiaries</u>.  Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

18. <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Plan; <u>provided</u>, <u>however</u>, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company, the Agent and any Consenting Holder(s) shall continue in full force and effect.

19. <u>Counterparts</u>.  The Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof.

20.    Consideration.  It is hereby acknowledged by the Parties that, other than the agreements, covenants, representations and warranties of the Parties, as more particularly set forth herein, no payment or additional consideration shall be due or paid to the Agent or any of the Consenting Holders for their agreement to vote in accordance with, and otherwise comply with the terms and conditions of, this Agreement.

21.    Notices.  All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, during standard business hours on a business day (Monday through Friday, from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth on Schedule I hereto.

22.    Rule of Interpretation.  Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include (a) votes or voting on a chapter 11 plan under the Bankruptcy Code and (b) all means of expressing agreement with, or rejection of, as the case may be, a restructuring or reorganization transaction that is not implemented under the Bankruptcy Code.

23.    Reservation of Rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Consenting Holder to protect and preserve its rights, remedies and interests, including its Claims against the Company.  Nothing herein shall be deemed an admission of any kind.  If the Transactions are not consummated, or this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

24.    Publicity.  The Company shall use commercially reasonable efforts to submit to counsel for the Agent two (2) business days in advance of the Company's anticipated publication date all press releases, public filings, public announcements that constitute the initial disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement. Except as required by law (as determined by outside counsel to the Company and with reasonable prior notice to the Agent), none of the Company, the Agent, any of the Consenting Holders nor their respective counsel shall (a) use the name of any Consenting Holder in any press release without such Consenting Holder's prior consent or (b) disclose to any person, other than legal, accounting and financial advisors to the Company, the principal amount or percentage of Debt held by any Consenting Holder; provided, however, that the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of Debt held by the Consenting Holders as a group.  Notwithstanding the foregoing, the Agent and the Consenting Holders hereby consent to the disclosure by the Company in the Plan, the Disclosure Statement, the Plan Related Documents and any required filings by the Company with the Bankruptcy Court or the Securities and Exchange Commission, or as otherwise required by law or regulation, of the execution, terms and contents of this Agreement.

25.    Representation by Counsel.  Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would

provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

26.  Fiduciary Duties.

(a)  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require (i) the Company or any directors or officers of the Company, in such person's capacity as a director or officer of the Company, to take any action, or to refrain from taking any action, to the extent required to comply with its or their fiduciary obligations under applicable law; or (ii) any Consenting Holder or representative of a Consenting Holder that is also a director or officer of the Company to take any action, or to refrain from taking any action, in such person's capacity as a director or officer of the Company, to the extent required to comply with their fiduciary obligations under applicable law.

(b)  The Company may furnish or cause to be furnished information concerning the Company and its business, properties or assets to a party that expresses a legitimate interest in, as well as the financial wherewithal to consummate, a Business Combination (as defined herein) (each a "***Potential Acquiror***"); *provided*, *however*, that the Board (as hereinafter defined) has reached a business judgment that the Potential Acquiror's interest is bona fide and based on adequate financial wherewithal.  For purposes hereof, "***Business Combination***" means any merger, consolidation or combination to which the Company is a party, any proposed sale, distribution, split or other disposition of capital stock or other equity interest of the Company or any proposed sale, dividend or other disposition of all or substantially all of the assets and properties of the Company;

(c)  following receipt of a proposal or offer for a Business Combination from a Potential Acquiror, the Company may negotiate and discuss such proposal or offer with the Potential Acquiror;

(d)  following receipt of a proposal or offer for a Business Combination from a Potential Acquiror, the Company may disclose the terms and conditions of such proposal or offer to the Agent, the Lenders, the agent under the Subordinated Loan Agreement, the holders of the Subordinated Notes and, if applicable, to the Bankruptcy Court and any statutory committee formed in the Chapter 11 Cases, and

(e)  following receipt of a proposal or offer for a Business Combination from a Potential Acquiror, the Company may immediately terminate its obligations under this Agreement by written notice to the Consenting Holders;

but in each case referred to in the foregoing clauses (b) through (e) only to the extent that:

(i)  if an offer or proposal from a Potential Acquiror is received prior to the commencement of the Chapter 11 Cases, the Company and board of directors (the "***Board***") conclude in good faith that (A) the Potential Acquiror is proposing or offering a Business Combination that the Company and the Board determine is reasonably likely, if negotiated to finality and consummated, to be more favorable to the Company and its stakeholders than the Plan, and (B) such action is necessary or appropriate in order for the Board to comply with its fiduciary obligations under applicable law; and

(ii)     if an offer or proposal from a Potential Acquiror is received after the Commencement Date, the Company shall request such relief from the Bankruptcy Court as the Board deems appropriate to comply with its fiduciary obligations under applicable law, and the Company may disclose any such offer or proposal in a publicly-available filing with the Bankruptcy Court in any and all circumstances.

27.     <u>Conflicts Between the Plan, the Term Sheet, the Plan Related Documents and this Agreement</u>.  In the event of any conflict among the terms and provisions in the Plan and the terms and provisions in the Term Sheet and this Agreement, as applicable, the terms and provisions of the Plan shall control.  In the event of any conflict among the terms and provisions in the Term Sheet and the terms and provisions in this Agreement, the terms and provisions of this Agreement shall control.  In the event of any conflict between the terms and provisions in the Plan and/or the terms and provisions of the Term Sheet and this Agreement, on the one hand, and the terms and provisions in the Plan Related Documents, on the other hand, the terms and provisions of the relevant Plan Related Document, as applicable, shall control and govern.

28.     <u>Releases</u>.  The Agent and the Consenting Holders agree to provide, upon the effective date of the Plan, the releases provided in Section 10.7 of the Plan to all "Released Parties" (as defined in the Plan) without regard to whether all or a portion of such releases are ultimately approved, modified, or rejected by an order of the Bankruptcy Court confirming the Plan.

* * * * *

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

**IAC HOLDING CO.**
**INTERNATIONAL ALUMINUM CORPORATION**
**UNITED STATES ALUMINUM CORPORATION**
**UNITED STATES ALUMINUM CORPORATION – CAROLINA**
**UNITED STATES ALUMINUM CORPORATION – ILLINOIS**
**UNITED STATES ALUMINUM CORPORATION – TEXAS**
**RACO INTERIOR PRODUCTS, INC.**
**GENERAL WINDOW CORPORATION**
**INTERNATIONAL EXTRUSION CORPORATION**
**INTERNATIONAL EXTRUSION CORPORATION – TEXAS**
**INTERNATIONAL WINDOW CORPORATION**
**INTERNATIONAL WINDOW – ARIZONA, INC.**

By: /s/ Richard E. Almy
    Richard E. Almy
    President and Chief Executive Officer

**CANADIAN IMPERIAL BANK OF COMMERCE, NEW YORK AGENCY, AS ADMINISTRATIVE AGENT**

By:_____

Name:
Title:
    E. Lindsay Gordon
    Canadian Imperial Bank of Commerce
    Authorized Signatory

<u>**SCHEDULE I**</u>

NOTICE ADDRESSES

If to the Company:

International Aluminum Corporation
767 Monterey Pass Road
Monterey Park, California 91754
Attn.:  Richard E. Almy, CEO
Facsimile:  323-266-3838
DickAlmy@intalum.com

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn.:   Gary Holtzer, Esq.
        Robert Lemons, Esq.
Facsimile:  212-310-8007
gary.holtzer@weil.com
robert.lemons@weil.com

If to the Agent or the Required Consenting Holders:

Canadian Imperial Bank of Commerce, New York Agency
as Administrative Agent
300 Madison Avenue, 4th Floor
New York, New York 10017
Attn.:  Lindsay Gordon
Facsimile:  212-856-4135
lindsay.gordon@us.cibc.com

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn.: Mark Broude, Esq.
Facsimile:  212-751-4864
mark.broude@lw.com

If to any other Consenting Holder, at the address shown for such Consenting Holder on the applicable signature page hereto, to the attention of the person who has executed this Agreement on behalf of such Consenting Holder.

<u>EXHIBIT A</u>

PLAN OF REORGANIZATION

<u>EXHIBIT B</u>

TERM SHEET

# EXHIBIT C

JOINDER

# JOINDER

The undersigned ("***Transferee***") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [_____], 2009 (the "***Agreement***"), by and among IAC Holding Co., a Delaware corporation ("***Holdings***"), International Aluminum Corporation, a Delaware corporation ("***IAC***" or "***Borrower***"), United States Aluminum Corporation, a California corporation, United States Aluminum Corporation – Carolina, a California corporation, United States Aluminum Corporation – Illinois, a California corporation, United States Aluminum Corporation – Texas, a Texas corporation, RACO Interior Products, Inc., a Texas corporation, General Window Corporation, a California corporation, International Extrusion Corporation – Texas, a California corporation, International Extrusion Corporation, a California corporation, International Window – Arizona, Inc., a California corporation, and International Window Corporation, a California corporation (collectively with Holdings and IAC, the "***Company***"), **[Transferor's Name]** ("***Transferor***"), Canadian Imperial Bank of Commerce, New York Agency, as administrative agent under the Credit Agreement (as defined in the Agreement) and the other holders of claims against the Company signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "***Consenting Holder***" under the terms of the Agreement.

Date: _____, 20__


**[Transferee's name]**


By:_____
    Name:_____
    Title:_____


Principal amount of Claims held:
$_____

Date: _____


**[Address]**
Attention:
Fax: **[*]**
Email:

# EXHIBIT D

## LIST OF LITIGATION CLAIMS

Litigation Claims

1      40 Madison v. Madison Gardens, LLC
        District Court for Colorado, County of Denver
        Colorado Revised Statute § 13-20-801 *et seq.*

2      Aceves v. Paseo Del Sol, LLC
        Superior Court for California, County of Imperial
        Case No. ECU 003377

3      Aguayo v. Correll Estates Development Company
        Superior Court for California, County of Imperial
        Case No. ECU03553

4      Balderas v. Pacific Century Homes
        Superior Court for Riverside County
        Case No. RIC527112

5      Coronado v. Correll Estates Development Company
        Superior Court for California, County of Imperial
        Case No. ECU03553

6      Davidson v. Davidson Estates
        Superior Court for California, County of San Diego
        Case No. 2009-00084318

7      6050 Geary Blvd. Homeowner's Association
        California Civil Code § 1375

8      Camara v. H/S Development Company
        Superior Court of California, County of Merced
        Case No. 150023

9      Chateau DeLouis v. General Window Corporation
        Superior Court for California, County of San Francisco
        Case No. CGC08478447

10    Ochipinti, et al. v. McCumber Glass, et al.
        Superior Court of California, County of Sutter
        Case No. CVCS 09-2103

11    Cherokee Glass v. United States Aluminum Corporation
        Eastern Band of Cherokee Indian
        Cherokee Court File No. CV09-557

12    City of Kissimmee v. Winter Construction
Circuit Court for the Ninth Circuit of Osceola County, Florida
Case No. CI-08-CI-001566

13    Carl Grant v. United States Aluminum Corporation
EEOC Charge No. 31C-2009-0145
FEPA Charge No.: 1A90846

14    GT Leach Builders, LLC v. Ranger Specialized Glass
District Court for Texas, Harris County
Cause No. 2009-16966

15    Ronningen & Hovey v. Z-Bilt Construction, Inc., et al.
Superior Court for Orange County
Case No. 30-2008-00102179

16    Sher v. Davidson Communities
Superior Court for California, County of San Diego
Case No. GIC874286

17    Walton v. Davidson Communities
Superior Court for California, County of San Diego
Case No. 37-2009-0095671-CU-CD-CTL

18    BKK Corporation Landfill
United States District Court, Central District for California
Case No. CV05-7746 CAS

19    McIntosh Estates- United States Aluminum Corporation
Judicial Division, Canada, Supreme Court of British Columbia
Vancouver Registry Action No. S-064548

20    Holly v. International Window Corporation
Humboldt County Superior Court
Case No. DR070141

**Exhibit C to Plan**

**Management Incentive Plan Term Sheet**

# International Aluminum Corporation
## MIP Term Sheet

**Officer Compensation**

| | |
|---|---|
| Almy | Current ($475,000 salary)/(target bonus 65%) |
| Park | Current ($325,000 salary)/(target bonus 50%) |
| Smith | Current ($260,000 salary)/(target bonus 50%) |
| Hall | Current ($187,500 salary)/(target bonus 50%) |
| Cenname | Current ($188,000 salary)/(target bonus 50%) |
| Pankau | Current ($150,000 salary)/(target bonus 35%) |

| | |
|---|---|
| **Employment Agreement Term** | 3+1 yr. for CEO and CFO |
| **Form of Severance Agreement** | EVPs & VP |

**Equity**

| | |
|---|---|
| | 9.34% of Equity Allocated at Close |
| Vesting at Close | 20% of Allocated |
| Time Vesting | 80% of Allocated Vesting over 4 yrs. |
| Reserved for Future Issuance | 0.66% of Equity |

**Form of Equity and related rights**

RSU or any other form of equivalent equity with the most favorable tax consequences for management, the terms of which will be agreed by the parties

**Emergence Bonus**

| | |
|---|---|
| Baseline Cash Bonus at Emergence | $250,000 |
| Additional at $30.0mm Cash Distribution to Lenders | $200,000 If lenders receive $30 million in cash distribution |
| Additional between $30 mm - $37.0mm Cash Distribution to Lenders | $200,000 prorated linearly between $30 million and $37 million at a rate of $0.0285714 of additional bonus per $1.00 of additional cash distribution above $30 million to lenders. |
| Maximum Cash Bonus | $650,000 |

**Severance Months**

| | |
|---|---|
| Almy | 15 |
| Park | 15 |
| Smith | 12 |
| Hall | 12 |
| Cenname | 12 |
| Pankau | 6 |

**Severance Key Terms (1) (2)**

| | |
|---|---|
| Resign for Good Reason Included | CEO & CFO |

| | |
|---|---|
| Base Salary + Previously Earned Bonus + Benefits | CEO & CFO |
| Base Salary + Previously Earned Bonus | EVPs & VPs |
| Change of Control (3) | |
|   Within the Initial Term | Severance benefits paid as per applicable employment or severance agreement, if any and all unvested equity vest |
|   Outside the Initial Term (4) | Severance benefits paid as per applicable employment or severance agreement, if any and at Board discretion all unvested equity vest |

**FYE 2010 Incentive Bonus**

| | |
|---|---|
| Threshold % of Target Bonus | 40% |
| Bonus Targets | |
| EBITDA Threshold Target | ($0.8) |
| EBITDA Driving Target Bonus | $3.1 MM |
| Cash Flow | Free Cash Flow Concept in lieu of PWC % Definition TBD |
| Split Between EBITDA Vs Cash Flow | TBD |
| Cash Payout | 50% yr 1 25% yr 2 & 3 or the greater of 33.3% EBITDA $0.3 MM |

(1) Excludes termination for cause

(2) Good Reason" means any of the following: (i) without Executive's express written consent, (A) any change in Executive's reporting relationships or a significant reduction of Executive's duties, position or responsibilities relative to Executive's duties, position or responsibilities in effect immediately prior to such reduction, (B) Executive's removal from such position, duties and responsibilities, unless he is provided with comparable duties, position and responsibilities, or (C) relocation of Executive's work location with the Company that is farther than 75 road miles from the present location; (ii) a material reduction by the Company in the kind or level of employee benefits to which he is entitled immediately prior to such reduction with the result that Executive's overall benefits package is significantly reduced; or (iii) the Company's failure to cause Executive's employment agreement and its obligations there under to be expressly assumed by the Company's successor

(3) Only applies under a "double trigger" i.e. a change of control and the termination of employment

(4) Applies to CEO, CFO, EVPs & VP.