IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------x
                            :

*In re*                        :      **Chapter 11**

                            :

**INTERNATIONAL ALUMINUM**   :      **Case No. 10-_____ (___)**

**CORPORATION,** *et al.*,        :

                            :      **(Joint Administration Requested)**

          **Debtors.**        :

----------------------------------------------------------x

**DISCLOSURE STATEMENT RELATING TO THE JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF IAC HOLDING CO.,
INTERNATIONAL ALUMINUM CORPORATION, UNITED STATES ALUMINUM
CORPORATION, UNITED STATES ALUMINUM CORPORATION – CAROLINA, UNITED
STATES ALUMINUM CORPORATION – TEXAS, UNITED STATES ALUMINUM
CORPORATION–ILLINOIS, RACO INTERIOR PRODUCTS, INC., GENERAL WINDOW
CORPORATION, INTERNATIONAL EXTRUSION CORPORATION – TEXAS,
INTERNATIONAL EXTRUSION CORPORATION, INTERNATIONAL WINDOW –
ARIZONA, INC., AND INTERNATIONAL WINDOW CORPORATION**

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and Debtors
  in Possession
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000

RICHARDS, LAYTON & FINGER, P.A.
Attorneys for Debtors and Debtors
  in Possession
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700

Dated: January 4, 2010

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN PRELIMINARILY APPROVED BY THE BANKRUPTCY
COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL
BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

.

# DISCLOSURE STATEMENT

## DATED [_____ __], 2010

## SOLICITATION OF VOTES

## WITH RESPECT TO THE JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### OF

# INTERNATIONAL ALUMINUM CORPORATION, *ET AL.*
## FOR THE HOLDERS OF OUTSTANDING

## CREDIT AGREEMENT CLAIMS

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT REORGANIZATION PLAN (THE "PLAN") IS 4:00 P.M. PREVAILING EASTERN TIME, ON FEBRUARY __, 2010, UNLESS EXTENDED BY INTERNATIONAL ALUMINUM CORPORATION.**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC (THE "VOTING AGENT") BY THE VOTING DEADLINE.**

**RECOMMENDATION BY THE DEBTORS**

THE BOARD OF DIRECTORS OF IAC HOLDING CO. ("HOLDINGS"), THE BOARD OF
DIRECTORS OF INTERNATIONAL ALUMINUM CORPORATION ("IAC"), AND THE BOARD OF
DIRECTORS OF EACH OF IAC'S WHOLLY OWNED DIRECT AND INDIRECT DEBTOR
SUBSIDIARIES (TOGETHER WITH IAC AND HOLDINGS, THE "DEBTORS") HAVE
UNANIMOUSLY APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND
RECOMMEND THAT THE HOLDERS OF ELIGIBLE CLAIMS WHOSE VOTES ARE BEING
SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN. CERTAIN SENIOR LENDERS (THE
"REQUIRED SUPPORTING HOLDERS") HOLDING MORE THAN TWO-THIRDS (2/3) IN
OUTSTANDING PRINCIPAL AMOUNT UNDER AND ONE-HALF (1/2) IN NUMBER OF CLAIMS
IN RESPECT OF THE CREDIT AGREEMENT DATED AS OF MARCH 30, 2007, AS AMENDED
THROUGH THE DATE HEREOF, BY AND AMONG IAC, THE LENDERS PARTY THERETO AND
CANADIAN IMPERIAL BANK OF COMMERCE, NEW YORK AGENCY, AS ADMINISTRATIVE
AND COLLATERAL AGENT, HAVE ALREADY AGREED TO VOTE TO ACCEPT THE PLAN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE NEW EQUITY TO BE ISSUED ON THE EFFECTIVE DATE OF THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

TO THE EXTENT THAT THE OFFER OR ISSUANCE OF ANY NEW SECURITY UNDER THE PLAN IS NOT EXEMPT UNDER SECTION 1145(a) OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"), THE OFFER OR ISSUANCE IS BEING MADE ONLY TO THOSE CREDITORS WHO ARE ACCREDITED INVESTORS AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS INCLUDING, BUT NOT LIMITED TO, RISKS ASSOCIATED WITH (I) FUTURE FINANCIAL RESULTS AND LIQUIDITY, INCLUDING THE ABILITY TO FINANCE OPERATIONS IN THE NORMAL COURSE, (II) VARIOUS FACTORS THAT MAY AFFECT THE VALUE OF THE NEW EQUITY TO BE ISSUED UNDER THE PLAN, (III) THE RELATIONSHIPS WITH AND PAYMENT TERMS PROVIDED BY TRADE CREDITORS, (IV) ADDITIONAL FINANCING REQUIREMENTS POST-RESTRUCTURING, (V) FUTURE DISPOSITIONS AND ACQUISITIONS, (VI) THE EFFECT OF COMPETITIVE PRODUCTS, SERVICES OR PRICING BY COMPETITORS, (VII) CHANGES TO THE COSTS OF COMMODITIES AND RAW MATERIALS, (VIII) THE PROPOSED RESTRUCTURING AND COSTS ASSOCIATED THEREWITH, (IX) THE EFFECT OF CONDITIONS IN THE COMMERCIAL BUILDING AND RESIDENTIAL HOUSING INDUSTRY ON THE DEBTORS, (X) THE ABILITY TO OBTAIN RELIEF FROM THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") TO FACILITATE THE SMOOTH OPERATION OF THE DEBTORS UNDER CHAPTER 11, (XI) THE CONFIRMATION AND CONSUMMATION OF THE PLAN, AND (XII) EACH OF THE OTHER RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING

STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

HOLDERS OF PREPETITION TRADE CLAIMS AND EMPLOYEES WILL NOT BE IMPAIRED BY THE PLAN. DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS PROVIDED HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN AND THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

* * * * *

# INTRODUCTION

The Debtors (IAC, Holdings, United States Aluminum Corporation, United States Aluminum Corporation-Carolina, United States Aluminum Corporation-Illinois, United States Aluminum Corporation-Texas, RACO Interior Products, Inc., General Window Corporation, International Extrusion Corporation-Texas, International Extrusion Corporation, International Window Corporation, and International Window-Arizona, Inc.) hereby transmit this Disclosure Statement for use in the solicitation of acceptances of the Plan. At this time, the Debtors are soliciting acceptances of the Plan from holders of Credit Agreement Claims (the "**Eligible Claims**"). Capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to them in the Plan.

The primary purposes of the Plan and the restructuring provided therein are to reduce the Debtors' debt service requirements and overall level of indebtedness, including the principal amount thereof, to realign their capital structure and to provide the Debtors with greater liquidity. This solicitation is being conducted at this time in order to obtain sufficient votes to enable the Plan to be confirmed by the Bankruptcy Court. **Please note that to the extent any inconsistencies exist between this Disclosure Statement and Plan, the Plan shall govern.**

The Debtors are commencing this solicitation after extensive discussions over the past several months among the Debtors and certain of their major creditor groups. The discussions have resulted in holders of more than two-thirds (2/3) in amount and half (1/2) in number of the holders of Credit Agreement Claims (collectively, the "**Required Supporting Holders**") agreeing to support the restructuring transactions and vote to accept the Plan through executing a Restructuring Support Agreement (the "**Restructuring Support Agreement**"), which is attached to the Plan as an exhibit.

The Plan is premised upon the limited substantive consolidation of the Debtors for voting, treatment and distribution purposes under the Plan only. The Debtors believe that no creditors would be prejudiced by such limited substantive consolidation, which does not affect the distributions to any creditor and will best utilize the Debtors' assets to pay to the creditors of each entity the distributions provided under the Plan. Holders of Claims and Equity Interests in impaired classes under the Plan would receive the same distribution absent any substantive consolidation. As such, substantive consolidation is appropriate and warranted under the circumstances.

THE DEBTORS INTEND TO CONTINUE OPERATING THEIR BUSINESSES DURING THE REORGANIZATION CASES IN THE ORDINARY COURSE AND TO SEEK TO OBTAIN THE NECESSARY RELIEF FROM THE BANKRUPTCY COURT TO PAY THEIR EMPLOYEES AND CERTAIN OTHER CREDITORS IN FULL AND ON TIME.

The table below summarizes the classification, treatment and estimated recovery for holders of Claims and Equity Interests under the Plan. The classification and treatment for all Classes are described in more detail in Section IV.D – "THE PLAN – CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS." Estimated amounts are based upon the Debtors' books and records as of October 31, 2009. There can be no assurance that the estimated amounts below are correct and actual amounts may be significantly different from the estimates. This summary is qualified in its entirety by reference to the provisions of the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery[1] |
|-------|-------------|-----------|------------------|----------------------|
| 1 | Priority Non-Tax Claims | Unimpaired. Except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a different treatment, each such holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the holder of such Claim. | No (deemed to accept) | 100% |
| 2 | Credit Agreement Claims | Impaired. On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Credit Agreement Claim shall receive (i) its pro rata share of the Excess Cash, (ii) its pro rata share of the New Term Notes, and (iii) its pro rata share of 100% of the New Equity outstanding on the Effective Date, less any of the New Equity distributed on the Effective Date pursuant to the Management Incentive Plan. | Yes | 72.5%-82%[2] |

---

[1] Recovery based on mid-point valuation and illustrated prior to dilution of the New Equity from the Management Incentive Plan.

[2] The estimated recovery to holders of Allowed Credit Agreement Claims is based on value distributed to Credit Agreement Claims Holders of $86.1 million to $97.5 million, based on implied common equity ownership plus cash distribution and roll-over debt.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery[1] |
|---|---|---|---|---|
| 3 | Other Secured Claims | Unimpaired. On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, each Allowed Other Secured Claim shall be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default. All Allowed Other Secured Claims that are not due and payable on or before the Effective Date shall, at the Debtors' option, be paid (i) in the ordinary course of business in accordance with the course of practice between the Debtors and such holder with respect to such Claim, or (ii) by transfer of the Collateral to the holder of such Claim. | No (deemed to accept) | 100% |
| 4 | Notes Claims | Impaired. The Senior Subordinated Loan Agreement and each of the Senior Subordinated Notes shall be cancelled and terminated and the Notes Claims shall be extinguished with no distribution. | No (deemed to reject) | 0% |
| 5 | General Unsecured Claims | Unimpaired. Each holder of an Allowed General Unsecured Claim shall receive payment in full in Cash of the unpaid portion of such Allowed General Unsecured Claim on the latest of (i) the Effective Date (or as soon thereafter as is reasonably practicable), (ii) the date on which such Claim would be paid in the ordinary course of the Debtors' business, (iii) as otherwise agreed by the Debtors and the holder of such Claim, and (iv) the date on which such General Unsecured Claim becomes Allowed; provided, however, that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business. The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date. | No (deemed to accept) | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| 6 | Intercompany Claims | Unimpaired. On or as soon as practicable after the Effective Date, all Intercompany Claims will either be reinstated to the extent determined to be appropriate by the Debtors or adjusted, waived, continued or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date with or without any further action by equity holders of any Reorganized Debtor. | No (deemed to accept) | 100% |
| 7 | Equity Interests in IAC and IAC Subsidiary Debtors | Unimpaired. On the Effective Date and subject to Sections 5.2 and 5.5 of the Plan, all of the Equity Interests of the IAC Subsidiary Debtors shall be owned by Newco and all existing Equity Interests of IAC shall be cancelled. | No (deemed to accept) | 100% |
| 8 | Equity Interests in Holdings | Impaired. On the Effective Date, or as soon thereafter as is reasonably practicable, all existing Equity Interests in Holdings shall be cancelled, and the Equity Interests of each holder of an Allowed Equity Interest in Holdings shall be extinguished with no distributions. | No (deemed to reject) | 0% |

**Summary of Voting Procedures**

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims in classes that are impaired and that are not deemed to have rejected the Plan are entitled to vote to accept or reject the Plan. Classes of Claims or Equity Interests in which the holders of Claims or Equity Interests are unimpaired under the Plan are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Under section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests is deemed to be "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable and contractual rights to which such Claim or Equity Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Equity Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Equity Interest as it existed before the default.

The Bankruptcy Code defines "acceptance" of a plan by a Class of Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Section VII of this Disclosure Statement.

To be counted, your vote must be received, pursuant to the following instructions, by the Voting Agent at the following address, before the Voting Deadline:

THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASS 2 VOTE TO ACCEPT THE PLAN.

### Additional Information

Attached hereto as **Exhibit B** are the Financial Projections that project the financial performance of the Reorganized Debtors, on a consolidated basis, for the fiscal years ending June 30 for the period 2010 through 2015. The Financial Projections are based on numerous assumptions that are an integral part of the Financial Projections, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.

The Debtors' legal advisors are Weil, Gotshal & Manges LLP and Richards, Layton & Finger, P.A., and their financial advisor is Moelis & Company, each of which may be contacted as follows:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Gary T. Holtzer, Esq.
     Robert J. Lemons, Esq.
     Christopher M. Lopez, Esq.
Telephone: (212) 310-8000

MOELIS & COMPANY
1999 Avenue of the Stars, Suite 1900
Los Angeles, California 90067
Attn: Todd Wadler
     Ashish Ajmera
Telephone: (310) 443-2300

-and-

Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Attn: John Knight, Esq.
     Katherine L. Good, Esq.
Telephone: (302) 651-7700

Please complete the information requested on the ballot, sign, date and indicate your vote on the ballot, and return your completed ballot in the enclosed pre-addressed postage-paid envelope so that it is actually received by the Voting Agent before the Voting Deadline.

**If the return envelope provided with your ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote before the Voting Deadline (4:00 p.m., Eastern Time, on February ___, 2010).**

**IF YOU ARE ENTITLED TO VOTE AND YOU HAVE RETURNED YOUR BALLOT BUT FAILED TO INDICATE ON THE BALLOT WHETHER YOU ACCEPT OR REJECT THE PLAN, SUCH BALLOT WILL NOT BE COUNTED.**

# TABLE OF CONTENTS

I.    GENERAL INFORMATION ................................................................................................ 1

    A.   Purpose and Effect of the Plan ............................................................................... 1

    B.   The Debtors ............................................................................................................. 1

    C.   The Business ........................................................................................................... 2

    D.   Current Officers ...................................................................................................... 3

    E.   Prepetition Indebtedness ......................................................................................... 3

    F.   Key Events Leading to the Reorganization Cases .................................................. 5

    G.   Restructuring Support Agreement .......................................................................... 6

    H.   Restructured Indebtedness; Conversion of Debt to Equity and Satisfaction of General Unsecured Claims ................................................................................................... 6

    I.   Term Loan ............................................................................................................... 7

    J.   Employment Agreements and Management Incentive Plan ..................................... 7

II.   THE REORGANIZATION CASES ................................................................................... 7

    A.   Administration of the Reorganization Cases .......................................................... 7

    B.   Commencement of the Reorganization Cases ......................................................... 7

III.   THE PLAN ........................................................................................................................ 10

    A.   Introduction ........................................................................................................... 10

    B.   Treatment of Unclassified Claims ........................................................................ 11

    C.   Classification and Treatment of Claims and Equity Interests ............................... 12

    D.   Means for Implementation of the Plan .................................................................. 14

    E.   Distributions .......................................................................................................... 18

    F.   Procedures for Disputed Claims Under the Plan ................................................... 21

    G.   Treatment of Executory Contracts and Unexpired Leases .................................... 23

    H.   Conditions Precedent to the Effective Date ........................................................... 24

    I.   Effect of Confirmation .......................................................................................... 25

    J.   Miscellaneous Provisions ...................................................................................... 28

IV.   HISTORICAL FINANCIAL INFORMATION, FINANCIAL PROJECTIONS AND VALUATION ANALYSIS .............................................................................................. 31

    A.   Historical Financial Information ........................................................................... 31

    B.   Financial Projections ............................................................................................. 31

    C.   Valuation Analysis ................................................................................................ 32

V.   CERTAIN FACTORS TO BE CONSIDERED ............................................................... 36

A.   General .............................................................................................................. 36

B.   Failure to Confirm the Plan ................................................................................. 36

C.   The Bankruptcy Court May Not Approve the Compromises and Settlements
Contemplated by the Plan ..................................................................................... 37

D.   The Debtors May Object to the Amount or Secured or Priority Status of a Claim ...................... 37

E.   Parties in Interest May Object to the Debtors' Classification of Claims and Equity
Interests ................................................................................................................ 38

F.   In Certain Instances, any Chapter 11 Case May be Converted to a Case Under Chapter 7
of the Bankruptcy Code ......................................................................................... 38

G.   The Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan ............... 38

H.   The Announcement of the Restructuring Could Adversely Affect the Value of the
Businesses ............................................................................................................. 38

I.   Risk of Prolonged Declines in the Commercial Building and Residential Housing
Markets .................................................................................................................. 39

J.   The Debtors Cannot Predict the Amount of Time Needed in Bankruptcy to Implement the
Plan, and a Lengthy Bankruptcy Case Could Disrupt the Businesses, as well as Impair the
Prospect for Reorganization on the Terms Contained in the Plan and Possibly Provide an
Opportunity for Other Plans to be Proposed ......................................................... 39

K.   The Debtors May Seek to Amend, Waive, Modify or Withdraw the Plan at Any Time
Prior to the Confirmation Date ............................................................................. 40

L.   The Debtors May Fail to Consummate the Plan .................................................. 40

M.   Claims Estimations ............................................................................................... 40

N.   Certain Tax Considerations .................................................................................. 40

O.   Inherent Uncertainty of Financial Projections .................................................... 41

VI.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................. 41

A.   Consequences to the Debtors .............................................................................. 42

B.   Consequences to Holders of Credit Agreement Claims ..................................... 43

VII.   CONFIRMATION OF THE PLAN ......................................................................................... 50

A.   Confirmation Hearing .......................................................................................... 50

B.   General Requirements of Section 1129 ............................................................... 50

C.   Best Interests Test ................................................................................................ 50

D.   Liquidation Analysis ............................................................................................ 50

E.   Feasibility ............................................................................................................. 51

F.   Section 1129(b) .................................................................................................... 51

# TABLE OF CONTENTS

## (continued)

| | | | |
|---|---|---|---|
| VIII. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 52 |
| | A. | Alternative Plans | 52 |
| | B. | Liquidation Under Chapter 7 or Chapter 11 | 52 |
| IX. | | THE SOLICITATION; VOTING PROCEDURES | 53 |
| | A. | Voting Deadline | 53 |
| | B. | Voting Procedures | 54 |
| | C. | Fiduciaries and other Representatives | 54 |
| | D. | Parties Not Entitled to Vote | 55 |
| | E. | Parties Entitled to Vote | 55 |
| | F. | Agreements upon Furnishing Ballots | 55 |
| | G. | Waivers of Defects, Irregularities, Etc | 55 |
| | H. | Withdrawal of Ballots; Revocation | 56 |
| | I. | Further Information; Additional Copies | 56 |
| X. | | RECOMMENDATION AND CONCLUSION | 57 |

## TABLE OF EXHIBITS

| Exhibit A | Plan |
| Exhibit B | Financial Projections |
| Exhibit C | Liquidation Analysis |
| Exhibit D | Historical Financial Information |

# I.  GENERAL INFORMATION

## A.  Purpose and Effect of the Plan

The primary purpose of the Plan is to effectuate a restructuring of the Debtors' capital structure in order to bring it into alignment with the Debtors' present and future operating prospects. Presently, the cash flow expected to be generated by the Debtors will not be sufficient to satisfy the debt service requirements and to satisfy their debt obligations unless the restructuring pursuant to the Plan is consummated. The proposed restructuring will reduce the amount of the Debtors' outstanding indebtedness by converting the obligations under the Credit Agreement into a combination of New Equity, New Term Notes and a payment of Excess Cash to the Senior Lenders. As described in Sections III(C) (Treatment of Credit Agreement Claims) and Section IV(C) (Valuation), the estimated recovery to holders of Allowed Credit Agreement Claims is based on value distributed to Credit Agreement Claims Holders of $86.1 million to $97.5 million, based on implied common equity ownership plus a cash distribution and the approximately $38 million of New Term Notes. The Debtors believe that the proposed restructuring will substantially reduce uncertainty with respect to their future and better position them to develop and maintain new customers.

**TRADE CREDITORS ARE INTENDED TO BE UNAFFECTED BY THE PLAN. THE PLAN PROVIDES THAT ALLOWED GENERAL UNSECURED CLAIMS (OTHER THAN NOTES CLAIMS, WHICH RECEIVE NO DISTRIBUTION) WILL BE SATISFIED IN FULL THROUGH A DISTRIBUTION ON ACCOUNT OF THE ALLOWED GENERAL UNSECURED CLAIMS AND A GIFT FROM THE SENIOR LENDERS ON OR AFTER THE EFFECTIVE DATE IN THE ORDINARY COURSE OF BUSINESS. THE DEBTORS EXPECT TO BE ABLE TO CONTINUE TO PAY ALL TRADE CREDITORS WHO CONTINUE TO PROVIDE NORMAL TRADE CREDIT TERMS IN THE ORDINARY COURSE OF BUSINESS, SUBJECT TO ANY REQUIRED BANKRUPTCY COURT APPROVAL.**

## B.  The Debtors

IAC, a Delaware corporation, was started in 1957 as a single aluminum window manufacturer and gradually expanded in an integrated manufacturer of quality aluminum and vinyl products for use in commercial and residential applications. The following diagram illustrates the organizational structure of the Debtors:[1]

---

[1] Maestro Products, Inc. and United States Aluminum of Canada, Ltd. are not Debtors or parties to the Plan.



## C.    The Business

IAC is headquartered in Monterey Park, California and, through its subsidiaries, operates over 20 facilities located throughout North America. As of January 4, 2010 (the "**Commencement Date**"), IAC, through its subsidiaries, employs approximately 936 employees. The Debtors' business is divided into three business groups: Commercial Products, Residential Products, and Aluminum Extrusion.

The Commercial Products group produces interior and exterior products utilized in several combinations to produce systems for commercial construction and remodeling and tenant improvement. The Commercial Products group offers a full range of aluminum entrance doors, store fronts, curtain walls, window walls, sloped glaze systems, and operable windows for exterior applications. The Commercial Products group also offers interior aluminum door frames and glazing systems for use in commercial buildings. The aforementioned aluminum products are commonly used in retail storefronts, office buildings, educational buildings, healthcare facilities, manufacturing facilities, and hotels. The Commercial Products group has approximately 31 active accounts with key customers and operates in 17 facilities throughout the United States.

The Residential Products group manufactures an extensive line of windows and doors serving the residential and light commercial building industry. These products are fabricated from aluminum and vinyl for use in the new home construction, remodeling, and replacement markets. The Residential Products group sells products to various distributors, wholesalers, and retailers, including building products distributors, glass shops, architects and design specifiers, replacement window companies, lumberyards, home centers, and homebuilders. Windows and doors are specifically designed to meet a customer's needs. The Residential Products group has approximately 1,100 active accounts with key customers and operates in 3 facilities throughout the United States.

Finally, the Aluminum Extrusion group provides extruded aluminum linear shapes and configurations to the aluminum products market. Its extrusions are commonly utilized in the residential and commercial building industry in structural and decorative applications, as well as a wide range of products, including computers, sporting goods, automobiles, and solar heating equipment.

Approximately 60% of the Aluminum Extrusion group's sales are to the Debtors' Commercial Products and Residential Products groups and approximately 40% of sales are to third-party companies.[2] The Aluminum Extrusion group operates in 1 facility located in Waxahachie, Texas.[3]

## D.    Current Officers

The following table sets forth the name and position of each of the current executive officers of the Debtors:

| Name | Position |
| --- | --- |
| Richard E. Almy | President and Chief Executive Officer of Holdings, IAC and the IAC Subsidiary Debtors. |
| Jeffrey B. Park | Senior Vice President – Finance, Chief Financial Officer and Secretary of Holdings, IAC and the IAC Subsidiary Debtors. |
| Geoffrey A. Pankau | Vice President, Controller and Assistant Secretary of Holdings and IAC. |
| Kevin R. Koch | Vice President, Treasurer and Assistant Secretary of Holdings and IAC. |

## E.    Prepetition Indebtedness

### 1.    The Credit Agreement and the Pledge and Security Agreement

On August 16, 2006, Holdings (then known as VCC Holding Corp.) was formed by Genstar Capital Partners IV, L.P. and Stargen IV, L.P. (together, the "**Genstar Parties**") to acquire IAC, which, at the time, was a public company incorporated in California with its common stock listed on the New York Stock Exchange. On March 30, 2007, Holdings acquired all of the then-outstanding shares of IAC's common stock pursuant to an Agreement and Plan of Merger (the "**Acquisition**"). IAC was subsequently reincorporated in the State of Delaware.

As consideration for the Acquisition, the public shareholders of IAC received $53.00 in cash for each share of IAC common stock held by them immediately prior to the Acquisition, in the aggregate amount of approximately $228.4 million. The sources of these funds were (i) approximately $44.65 million invested by the Genstar Parties; (ii) $5 million invested by Carlyle Mezzanine Partners, L.P.; (iii) $350,000 invested by Richard E. Almy; (iv) approximately $125 million of a term loan facility pursuant to the Credit Agreement (as defined below); (v) approximately $45 million of a Senior Subordinated Loan Agreement (as defined below); and (vi) approximately $8.4 million from IAC's cash on hand at the closing of the Acquisition. As a result of the Acquisition, Holdings became the sole

---

[2]  The Aluminum Extrusion group has over 200 active accounts with key customers.

[3]  The Debtors recently shut down their operations in Alhambra, California.

stockholder of IAC and the parties who contributed to the Acquisition became holders of Series A Preferred Stock of Holdings.[4]

In connection with the Acquisition, IAC entered into a credit agreement with various financial institutions and other entities from time to time parties thereto (collectively, the "**Senior Lenders**") and Canadian Imperial Bank of Commerce, New York Agency, as administrative agent for the Senior Lenders (the "**Administrative Agent**"). The Senior Lenders extended to IAC a $125 million term loan and made available a $20 million revolving loan facility, both maturing on March 30, 2013 (the "**Credit Agreement**").

The Administrative Agent, IAC, and the other Debtors, as guarantors, also entered into the Pledge and Security Agreement, dated as of March 30, 2007 (the "**Pledge and Security Agreement**," and together with the Credit Agreement, all other security agreements, pledge agreements, mortgages, deeds of trust, control agreements and other loan, security or ancillary documentation executed or delivered in connection therewith by any of the Debtors in favor of the Administrative Agent or any of the Senior Lenders, the "**Prepetition Agreements**"), pursuant to which the Debtors granted liens on their assets (and the proceeds thereof), other than their cash.

## 2. The Senior Subordinated Loan Agreement

IAC also entered into a mezzanine facility (the "**Senior Subordinated Loan Agreement**") with Carlyle Mezzanine Partners, L.P., as agent for the lenders and as a lender, Carlyle Capital Corporation Limited, as a lender, and the other entities party thereto as lenders from time to time (collectively, the "**Mezzanine Lenders**"). The Mezzanine Lenders agreed to extend the $45 million loan to IAC to finance the Acquisition and the refinancing of certain existing indebtedness of IAC. The Senior Subordinated Loan Agreement is guaranteed by the Debtors, but is not secured and is contractually subordinate to the Debtors' obligations to, and the liens held by, the Senior Lenders under the Prepetition Agreements.

## 3. The Sale-Leaseback Transactions

Subsequent to the completion of the Acquisition and as permitted under the Credit Agreement and the Senior Subordinated Loan Agreement, (i) IAC entered into a sale-leaseback transaction with Alum Landlord (DE) QRS 16-105, Inc. (the "**US Landlord**") on June 14, 2007, whereby IAC sold certain of the properties held by its domestic subsidiaries to the US Landlord and the US Landlord leased them back to IAC (the "**US Sale-Leaseback Transaction**"), and (ii) United States Aluminum of Canada, Limited, a Canadian subsidiary of IAC ("**USAC**"), entered into a sale-leaseback transaction with Alum (Alberta) ULC (the "**Canadian Landlord**") on July 27, 2007, whereby USAC sold certain of its properties to the Canadian Landlord and the Canadian Landlord leased them back to USAC (the "**Canadian Sale-Leaseback Transaction**").

---

[4] Subsequent to the Acquisition, certain members of the IAC Board of Directors and IAC management contributed an additional $750,000 to Holdings for 75,000 shares of Series A Preferred Stock of Holdings. In addition, Carlyle Mezzanine Partners, L.P. and its affiliates transferred approximately 45% of the initial shares of Series A Preferred Stock obtained in connection with the Acquisition to (i) AEA Mezzanine Fund LP and its affiliates and (ii) New York Life Investment Management Mezzanine Partners II, LP and its affiliates.

The aggregate consideration for the purchase of the above-properties by the US Landlord and Canadian Landlord was approximately $60 million. Under the lease agreements entered into in connection with the US Sale-Leaseback Transaction and the Canadian Sale-Leaseback Transaction, the aggregate annual rent for the properties is approximately $5.1 million. Each of the lease agreements has a term of 20 years, renewable in 10-year increments at IAC's or USAC's option, as applicable.

**F.      Key Events Leading to the Reorganization Cases**

The commercial and residential building sector has been plagued by the overall economic slowdown in the United States and the lack of credit available to the Debtors' customers and purchasers of the Debtors' products. The residential construction sector remains weak in the midst of one of its greatest economic downturns in the housing market. Most residential homebuilders have reported decreases in new home orders, a trend that is exacerbated by (i) the substantial nationwide inventory of homes on the housing market; (ii) a growing wave of residential home foreclosures; and (iii) limited availability of financing for developers and home buyers. In addition, the Debtors' commercial and residential products were significantly impacted by the decrease in demand in the remodeling and repair sector, which began in the fourth quarter of 2008 and has maintained at a relatively low demand rate in 2009.

Beginning around December 2008, in response to the decreased demand for products, and to reduce the impact of the aforementioned market difficulties, the Debtors' senior management re-assessed their overall business operations and strategy and implemented a number of proactive steps to strengthen their competitive position and attempt to restore profitability including, but not limited to, the following:

i.      Implementing sales training in all three business segments.

ii.     Revising existing commissions programs.

iii.    Leveraging potential benefits from the federal stimulus program.

iv.     Centralizing product development and combining and reorganizing sales territories.

v.      Holding weekly meetings with each facility to review labor costs.

vi.     Implementing margin based pricing by region.

vii.    Implementing a company-wide wage freeze.

viii.   Negotiating lower materials pricing.

ix.     Implementing a central warehouse.

x.      Proactively managing their balance sheet; and

xii.    Scaling-back or closing operations at certain facilities.

Despite the aforementioned efforts, in or around May 2009, the Debtors' senior management determined that events of default had occurred under the Credit Agreement and the Senior Subordinated Loan Agreement due to the breach of the Debtors' Total Leverage Ratio (as defined in the Credit Agreement) covenant contained in the Credit Agreement (and corresponding default of a similar provision contained in the Senior Subordinated Loan Agreement). The Debtors have not made scheduled interest payments under the Senior Subordinated Loan Agreement since March 2009.

As a result of the aforementioned events of default under the Credit Agreement and the Senior Subordinated Loan Agreement, the Debtors' senior management engaged in a series of good-faith

discussions with the Administrative Agent and, eventually, an ad hoc committee of the Senior Lenders. The Debtors engaged Moelis & Company and Weil, Gotshal & Manges LLP to, among other things, provide restructuring advice to the Debtors' senior management, provide restructuring advice to the IAC Board of Directors, participate in negotiations with the Administrative Agent and the Senior Lenders, and assist in the formulation of a comprehensive business plan.

As a result of these good-faith discussions, the Debtors and a steering committee of the Senior Lenders agreed to the terms of a restructuring of the Debtors' obligations under the Prepetition Agreements (the "**Proposed Restructuring Terms**"). On or about September 23, 2009, the Debtors' legal counsel mailed a letter to the Mezzanine Lenders and Genstar Capital Partners IV, L.P. ("**Genstar**") that enclosed a summary of the Proposed Restructuring Terms. The letter stated that the Debtors were informed by counsel for the Administrative Agent that the Senior Lenders would consider any good faith offer by the Debtors' significant stakeholders, including the Mezzanine Lenders and Genstar, to purchase a portion of the Debtors' capital stock upon exit from the restructuring transactions set forth in the Proposed Restructuring Terms. This letter requested that the stakeholders contact the Administrative Agent if they were interested in making an offer to the Senior Lenders. Subsequent to the September 23, 2009 letter, the Mezzanine Lenders and the Senior Lenders engaged in discussions regarding the Proposed Restructuring Terms.

As of the date hereof, the Mezzanine Lenders and the Senior Lenders have not reached an agreement in principle with respect to the Proposed Restructuring Terms or any other terms of a restructuring of the Debtors' prepetition secured and unsecured debt obligations. The Debtors, the Administrative Agent, and the Required Supporting Holders entered into the Restructuring Support Agreement, dated as of December 31, 2009.

G.    **Restructuring Support Agreement**

The Restructuring Support Agreement provides for the Debtors' financial restructuring to be effected through the Plan. The Required Supporting Holders hold over 72% in principal amount and over 50% in number of claims in respect of the outstanding debt under the Prepetition Agreements and, along with the Administrative Agent, have agreed to support the Plan.

H.    **Restructured Indebtedness; Conversion of Debt to Equity and Satisfaction of General Unsecured Claims**

To significantly reduce debt on the Debtors' balance sheet and provide future liquidity and operational stability, the Debtors have proposed the Plan, which provides for, among other things, the conversion of Allowed Credit Agreement Claims into a combination of New Equity, New Notes and a payment of Excess Cash.

Furthermore, as described above and in the Liquidation Analysis, a copy of which is attached hereto as Exhibit C, any rights of the Mezzanine Lenders to any distributions from the Debtors on account of their Notes Claims are contractually subordinate to the Debtors' obligations to, and the liens held by, the Senior Lenders on account of the Credit Agreement Claims. Accordingly, any distributions that the Mezzanine Lenders would be entitled to receive under the Plan would be turned over to the Senior Lenders to satisfy the Credit Agreement Claims. Therefore, under the Plan, the Mezzanine Lenders do not receive a distribution under the Plan and are deemed to reject the Plan. On or after the Effective Date, holders of Allowed General Unsecured Claims will have their Claims satisfied in full by receiving a combination of (i) a pro rata share of any Cash that is not subject to the liens of the Senior Lenders and (ii) to the extent necessary, a gift of Cash from the Senior Lenders that will be effectuated through payments from the Reorganized Debtors.

## I.    Term Loan

In connection with the Plan, Reorganized IAC will enter into a New Credit Agreement with the Senior Lenders pursuant to which the Senior Lenders will lend Reorganized IAC $38,000,000 (the "**New Term Loan**"). The New Term Loan will be guaranteed by Reorganized Holdings and each of IAC's domestic wholly-owned subsidiaries (other than Maestro Products, Inc.) (the "**Domestic Subsidiaries**", and together with Reorganized IAC and Reorganized Holdings, the "**Term Loan Parties**"). Further, the New Term Loan will have an interest rate of LIBOR plus 4.25% (with a LIBOR floor of 2.5%) plus 3.25% PIK interest, in each case, payable quarterly in arrears. The New Term Loan has a maturity date of [_____], 2015[5]. The obligations of the Term Loan Parties with respect to the New Term Loan shall be secured by (a) a perfected first lien security interest on the equity interests of the Domestic Subsidiaries and substantially all the assets of the Term Loan Parties, including cash (other than trust funds, which includes all funds held by the New Loan Parties as a fiduciary, all taxes required to be collected or withheld (including, without limitation, federal and state withholding taxes), other funds and taxes for which the Term Loan Parties or their directors, officers or employees may have criminal or personal liability, and accrued and unpaid employee compensation) and (b) 65% of the equity interests of the Term Loan Parties' first tier foreign subsidiaries.

## J.    Employment Agreements and Management Incentive Plan

IAC intends to assume all employment agreements currently in effect, except with respect to those agreements to be replaced by the Management Incentive Plan (defined below). IAC intends to adopt a management equity incentive plan (the "**Management Incentive Plan**"), substantially in the form set forth in Exhibit C to the Plan, that is designed to provide incentives to senior management to continue their efforts to foster and promote the long-term growth and performance of Reorganized IAC. Pursuant to the Management Incentive Plan, following the Effective Date, key members of senior management (the "**Key Executives**") will be entitled to receive one time retention or transaction payments, which, in the aggregate, will range between $250,000 and $650,000 depending on certain milestones being achieved. 9.34% of New Equity, on a fully-diluted basis, will be set aside to be granted (subject to vesting) to the Key Executives immediately following the Effective Date, and 0.66% of New Equity, on a fully-diluted basis, will be reserved for future issuance.

## II.    THE REORGANIZATION CASES

## A.    Administration of the Reorganization Cases

The Debtors intend to continue to operate their businesses in the ordinary course throughout their Reorganization Cases as they had prior to the Commencement Date.

## B.    Commencement of the Reorganization Cases

Concurrently with the filing of their chapter 11 petitions, the Debtors filed the following "First Day Motions," which the Debtors believed were necessary to enable them to operate with a minimal disruption and loss of productivity. Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Commencement Date. Certain

---

[5] To be the date that is five years after the closing date of the New Term Loan.

of the First Day Motions filed by the Debtors requested that the court authorize the Debtors to immediately pay all or part of a claim that arose prior to the Commencement Date. In such instances, the relief sought was necessary to avoid immediate and irreparable harm to the Debtors.

## 1. Schedules and Statements of Financial Affairs

Due to the circumstances under which the Debtors commenced these Reorganization Cases and the demands on the limited resources available to the Debtors at this time, the Debtors anticipate that they will be unable to complete their schedules of claims, executory contracts and unexpired leases and related information and a statement of financial affairs (the "**Schedules and Statements**") in the 30 days provided by the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the Local Rules of Bankruptcy Procedure for the District of Delaware.

In appropriate circumstances, however, a Bankruptcy Court may extend, modify or dispense with the requirement to file the Schedules and Statements pursuant to section 521 of the Bankruptcy Code. Accordingly, the Debtors have filed a motion seeking a 60 day extension of the time to file the Schedules and Statements.

## 2. Preliminary Approval of the Disclosure Statement, Establish Solicitation Procedures, Approve the Form of Ballot, Establish Voting and Tabulation Procedures, and Scheduling of a Combined Disclosure Statement and Confirmation Hearing

The Debtors filed a motion seeking the entry of an order (i) preliminarily approving the Disclosure Statement; (ii) approving the form of notice of combined hearing on the approval of the Disclosure Statement and confirmation of the Plan; (iii) approving the solicitation packages and procedures for the distribution thereof; (iv) approving the form of ballot and distribution thereof, setting the record date, the voting deadline, and establishing procedures for vote tabulation; (v) establishing procedures for filing objections to the Disclosure Statement and confirmation of the Plan; and (vi) authorizing related relief. The most sensitive and complex task required to effectuate a successful reorganization – the negotiation of consensual agreements with critical creditor constituencies – has already been accomplished in advance of the Commencement Date. As set forth above, the Required Supporting Holders have agreed to support the Plan. Therefore, it is in the best interests of the Debtors' estates and creditors to proceed with the confirmation process as expeditiously as possible.

## 3. Cash Management System

The Debtors filed a motion to continue using their existing cash management system, bank accounts and business forms. Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Debtors' cash flow could be severely impeded to the detriment of the Debtors' estates and creditors.

Continued use of the existing cash management system will facilitate the Debtors' smooth and orderly transition into chapter 11, minimize the disruption to their businesses while in chapter 11, and expedite their emergence from chapter 11. Requiring the Debtors to adopt and implement a new cash management system would likely increase the costs of the Reorganization Cases, primarily as a result of the significant time and expense associated with the transition to a new cash management system. For the same reasons, requiring the Debtors to cancel their existing bank accounts and establish new accounts or requiring them to create new business forms would only frustrate the Debtors' efforts to reorganize expeditiously.

### 4. Investment and Deposit Policies

Section 345 of the Bankruptcy Code establishes certain guidelines for the deposit and investment of funds of the Debtors' estates. Upon an appropriate showing, such guidelines may be waived by the Bankruptcy Court, and the Debtors may be authorized to continue to deposit and invest their funds pursuant to an existing investment policy. The Debtors believe that strict adherence to the requirements of section 345 would cause significant disruption to their cash management system to the detriment of the Debtors' businesses and creditors. The Debtors also believe that their existing investment policies provide for the secure and efficient investment and management of the Debtors' funds, and that the disruption that would result from compliance with section 345 is not warranted, particularly in light of the anticipated short duration of the Debtors' Reorganization Cases. Accordingly, the Debtors filed a motion seeking a waiver of the requirements of section 345 so as to permit them to continue their existing deposit and investment policies.

### 5. Cash Collateral

The Debtors sought the entry of an agreed order between the Debtors and the Administrative Agent authorizing the use of cash collateral pursuant to certain terms and conditions described in the agreed order, including, but not limited, to the Debtors' reservation of rights to assert that the Debtors' cash and cash equivalents do not constitute cash collateral of the Senior Lenders.

### 6. Payment of Prepetition Employee Wages and Benefits

The Debtors believe that any delay in paying prepetition compensation or benefits would destroy their relationships with employees and irreparably harm employee morale at a time when the dedication, confidence and cooperation of the Debtors' employees is most critical. Accordingly, the Debtors filed a motion to pay employee compensation and benefits that had accrued but remained unpaid as of the Commencement Date.

### 7. Maintenance of Insurance Policies and Programs

The Debtors filed a motion to maintain and continue their insurance policies and programs and pay all pre- and postpetition obligations relating thereto.

### 8. Payment of Prepetition Taxes

The Debtors filed a motion to pay certain prepetition sales taxes, use taxes, real and personal property taxes, and license and permit fees.

### 9. Maintenance of Customer Programs

The Debtors filed a motion to continue their warranty programs, volume rebate program, loyalty programs, cooperative advertising program, customer deposit program, joint check procedures, exchange policies, and billing adjustment procedures in the ordinary course of business and to perform and honor, at the Debtors' sole discretion, their prepetition obligations thereunder.

### 10. Retention of Professionals

The Debtors intend to seek Bankruptcy Court authority to retain and employ certain professionals to represent them and assist them in connection with the Reorganization Cases. Some of these professionals have been intimately involved with the negotiation and development of the Plan and include, among others: (i) Weil, Gotshal & Manges LLP and Richards, Layton & Finger, P.A., as counsel

for the Debtors; (ii) Moelis & Company, as financial advisor to the Debtors; and (iii) Kurtzman Carson Consultants LLC, as claims, noticing, and balloting agent for the Debtors. The Debtors may also seek authority to retain certain professionals to assist with the operations of their business in the ordinary course. These so-called "ordinary course professionals" will not be involved in the administration of the Reorganization Cases.

## 11.  Joint Administration

The Debtors filed a motion to consolidate all filings under a single case name, in a single docket, for convenience and administrative purposes and to reduce costs for parties making filings with the Bankruptcy Court.

## 12.  Utilities

The Debtors filed a motion to restrain utilities from discontinuing, altering or refusing services and to establish appropriate procedures for the determination of requests by utilities for postpetition deposits.

## III.  THE PLAN

### A.  Introduction

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and equity holders. In addition to permitting rehabilitation of a debtor, chapter 11 promotes equality of treatment of creditors and equity holders who hold substantially similar claims against or interests in the debtor and its assets. In furtherance of these two goals, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of a chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any Person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of equity holders.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE

TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## B.     Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

### 1.     Administrative Expense Claims

Administrative expenses are the actual and necessary costs and expenses of the Debtors' Reorganization Cases that are allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code. Those expenses will include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Reorganization Cases and tax obligations incurred after the Commencement Date. Other Administrative Expense Claims include the actual, reasonable and necessary professional fees and expenses of the Debtors' advisors, which fees and expenses are incurred during the pendency of the Reorganization Cases.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or a different treatment is provided for by order of the Bankruptcy Court (including, without limitation, any order governing the use of cash collateral) each holder of an Allowed Administrative Expense Claim shall receive payment in full in Cash of the unpaid portion of such Allowed Administrative Expense Claim (a) in the case of professionals retained by the Debtors in the ordinary course of their business, if any, on such terms as are customary between the Debtors and such professionals, or (b) with respect to all other holders of Allowed Administrative Expense Claims, on the latest of (i) the Effective Date, (ii) the date on which such payment would be made in the ordinary course of the Debtors' business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions, and (iii) the date on which such Administrative Expense Claim becomes allowed.

### 2.     Professional Compensation and Reimbursement Claims

All parties seeking compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code must file an application for compensation for services and reimbursement of expenses with the Bankruptcy Court on or before ninety (90) days after the Effective Date. Upon Bankruptcy Court approval, the Plan provides that these parties will be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or

Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 3. Priority Tax Claims

Priority Tax Claims essentially consist of unsecured claims of federal and state governmental authorities for the kinds of taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, excise taxes and employment and withholding taxes. These unsecured claims are given a statutory priority in right of payment. The Debtors do not intend to set a bar date, and therefore it is difficult to estimate the number and amount, if any, of Priority Tax Claims that will be filed with the Bankruptcy Court.

With respect to any Priority Tax Claims not paid pursuant to a prior Bankruptcy Court order, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Distribution Date; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business; or (c) be treated on such other terms and conditions as are acceptable to the Debtors and the holder of such Claim.

## C. Classification and Treatment of Claims and Equity Interests

### 1. Class 1 – Priority Non-Tax Claims

a.  <u>Impairment and Voting</u>. Class 1 is unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

b.  <u>Treatment</u>. Except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a different treatment, each such holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the holder of such Claim.

### 2. Class 2 – Credit Agreement Claims

a.  <u>Impairment and Voting</u>. Class 2 is impaired by the Plan. The Credit Agreement Claims shall be Allowed in full and, for the avoidance of doubt, shall not be subject to avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection or any challenges under any applicable law or regulation by any Person, in the aggregate amount of (i) $118,800,000, <u>plus</u> (ii) all accrued and unpaid interest thereon at the non-default contract rate under the Credit Agreement as of the Commencement Date, except to the extent such interest is otherwise provided herein to be paid or satisfied, plus (iii) all other Obligations (as defined in the Credit Agreement), except to the extent that the claims of the Administrative Agent under the Credit Agreement are otherwise provided to be paid or satisfied. Each holder of an Allowed Credit Agreement Claim is entitled to vote to accept or reject the Plan.

b.　Treatment. On the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Credit Agreement Claim shall receive (i) its *pro rata* share of the Excess Cash, (ii) its *pro rata* share of the New Term Notes and (iii) its *pro rata* share of 100% of the New Equity outstanding on the Effective Date, less any of the New Equity distributed on the Effective Date pursuant to the Management Incentive Plan.

**3.　Class 3– Other Secured Claims**

a.　Impairment and Voting. Class 3 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

b.　Treatment. On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, each Allowed Other Secured Claim shall be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of an event of default. All Allowed Other Secured Claims that are not due and payable on or before the Effective Date shall, at the Debtors' option, be paid (i) in the ordinary course of business in accordance with the course of practice between the Debtors and such holder with respect to such Claim or (ii) by transfer of the Collateral to the holder of such Claim.

**4.　Class 4 – Notes Claims**

a.　Impairment and Voting. Class 4 is impaired by the Plan. Each holder of an Allowed Notes Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have rejected the Plan.

b.　Treatment. On the Effective Date, the Senior Subordinated Loan Agreement and each of the Senior Subordinated Notes shall be canceled and terminated and the Notes Claims shall be extinguished with no distribution.

**5.　Class 5 – General Unsecured Claims**

a.　Impairment and Voting. Class 5 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

b.　Treatment. Each holder of an Allowed General Unsecured Claim shall receive payment in full in Cash of the unpaid portion of such Allowed General Unsecured Claim on the latest of (i) the Effective Date (or as soon thereafter as is reasonably practicable), (ii) the date on which such Claim would be paid in the ordinary course of the Debtors' business, (iii) as otherwise agreed by the Debtors and the holder of such Claim, and (iv) the date on which such General Unsecured Claim becomes Allowed; provided, however, that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business. The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

6. **Class 6- Intercompany Claims**

a. <u>Impairment and Voting</u>. Class 6 is unimpaired by the Plan. Each holder of an Allowed Equity Interest in IAC or any IAC Subsidiary Debtor is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

b. <u>Treatment</u>. On or as soon as practicable after the Effective Date, all Intercompany Claims will either be reinstated to the extent determined to be appropriate by the Debtors or adjusted, waived, continued or capitalized. Any such transaction may be effected on or subsequent to the Effective Date without any further action by equity holders of any Reorganized Debtor.

7. **Class 7- Equity Interests in IAC and IAC Subsidiary Debtors**

a. <u>Impairment and Voting</u>. Class 7 is unimpaired by the Plan. Each holder of an Allowed Equity Interest in IAC or any IAC Subsidiary Debtor is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

b. <u>Treatment</u>. On the Effective Date and subject to Sections 5.2 and 5.5 of the Plan, all of the Equity Interests of the IAC Subsidiary Debtors shall be owned by Newco and all existing Equity Interests of IAC shall be cancelled.

8. **Class 8- Equity Interests in Holdings**

a. <u>Impairment and Voting</u>. Class 8 is impaired by the Plan. Each holder of an Allowed Equity Interest in Holdings is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have rejected the Plan.

b. <u>Treatment</u>. On the Effective Date, or as soon thereafter as is reasonably practicable, all existing Equity Interests in Holdings shall be cancelled, and the Equity Interests of each holder of an Allowed Equity Interest in Holdings shall be extinguished with no distribution.

D. **Means for Implementation of the Plan**

1. **Limited Substantive Consolidation For Purposes of the Plan Only**

The Plan is premised upon the substantive consolidation of the Debtors for purposes of the Plan only. Accordingly, on the Effective Date, all of the Debtors and their estates shall, for purposes of the Plan only, be deemed merged and (a) all assets and liabilities of the Debtors shall be treated for purposes of the Plan only as though they were merged, (b) all guarantees of Holdings, IAC and the IAC Subsidiary Debtors of payment, performance, or collection of obligations of any other Debtor shall be eliminated and cancelled, (c) all joint obligations of two (2) or more Debtors, and all multiple Claims against such entities on account of such joint obligations, shall be considered a single claim against the Debtors, and (d) any Claim filed in the Reorganization Cases shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Unless otherwise set forth herein, such substantive consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors (including the corporate ownership of the IAC Subsidiary Debtors), (ii) any Intercompany Claims, or (iii) the substantive rights of any creditor. If any party in interest challenges the proposed limited substantive consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by-entity basis.

The Debtors believe that a limited substantive consolidation is warranted based on the criteria established by courts in ruling on the propriety of substantive consolidation in other cases. *See In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). The Debtors reserve the right to present evidence or other information sufficient to meet the applicable standards for consolidation for limited purposes if any objection to substantive consolidation is properly filed.

### 2. Corporate Actions

a. Corporate Actions

1. Corporate Structure.

On the Effective Date, and subject to Sections 5.2 and 5.5 of the Plan, Newco, a legal entity organized pursuant to the laws of Delaware, will acquire the assets of IAC and assume the liabilities and other obligations of IAC under the Plan. Subject to Sections 5.2 and 5.5 of the Plan, the New Equity that will be issued under the Plan to the holders of Allowed Credit Agreement Claims will be equity interests of either Newco or any ultimate top tier holding company that directly or indirectly owns Newco. Subject to Sections 5.2 and 5.5 of the Plan, Holdings and IAC will be dissolved on or as of the Effective Date or as soon as practicable thereafter.

2. General.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) selection of the directors and officers for the Reorganized Debtors, (ii) transfer of the assets of IAC, or any other Reorganized Debtor to Reorganized Holdings, as more fully described in the Plan Supplement, (iii) Reorganized Holdings' distribution of the New Equity, as more fully described in the Plan Supplement, to satisfy Credit Agreement Claims in accordance with Section 4.2(b) of the Plan, (iv) distribution of the New Term Notes, (v) adoption of the Management Incentive Plan, (vi) gifting to holders of Allowed General Unsecured Claims in the form of Cash distributions to satisfy Allowed General Unsecured Claims in accordance with Section 4.5 of the Plan, and (vii) dissolution of Holdings and IAC on or as of the Effective Date or as soon as practicable thereafter, and (viii) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall occur in accordance with the Plan and any governing agreements or transfer documents and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors; provided, however, that the Required Supporting Holders must unanimously consent to any corporate structure of the Reorganized Debtors to be implemented under the Plan, including, to the transfer of IAC's assets to Newco; provided further that the Debtors may elect, with the unanimous consent of the Required Supporting Holders, to utilize an alternative corporate structure to distribute the New Equity to holders of Credit Agreement Claims in accordance with Section 4.2 of the Plan and pursuant to the Management Incentive Plan. Any such alternative structure will be described in the Plan Supplement and shall comply with Section 12.7 of the Plan. As a result, holders of Credit Agreement Claims that have accepted the Plan shall be deemed to have accepted the Plan with the alternative corporate structure and any holders of Claims who were deemed to accept the Plan because such Claims were unimpaired shall continue to be deemed to accept the Plan. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, (w) the Shareholders Agreement, (x) the Registration Rights Agreement, (y) the New Credit Agreement, and (z) any and all other agreements, documents, securities

and instruments relating to the foregoing (including without limitation security documents). The authorizations and approvals contemplated by this Section 5.2(a) shall be effective notwithstanding any requirements under non-bankruptcy law.

3.    Restated Organizational Documents.

On the Effective Date, Reorganized Holdings shall adopt the Restated Certificate of Incorporation and the Restated Bylaws and shall file the Restated Certificate of Incorporation with the Secretary of State of the State of Delaware. In addition, on or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors shall also be amended as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of managers or directors, as applicable, representing such preferred class in the event of default in the payment of such dividends. On the Effective Date, the board of directors of each Reorganized Debtor, as applicable, shall be deemed to have adopted the restated organizational documents for each such Reorganized Debtor.

4.    Boards of Directors.

On the Effective Date, the operation of Reorganized Holdings shall become the general responsibility of its board of directors, subject to, and in accordance with, the Restated Certificate of Corporation and Restated Bylaws of Reorganized Holdings. On the Effective Date, the operation of each of the other Reorganized Debtors shall become the general responsibility of its respective board of directors or board of managers, as applicable, subject to and in accordance with its respective restated certificates of incorporation and restated bylaws or other organizational documents. The initial boards of directors of Reorganized Holdings and the other Reorganized Debtors shall be disclosed in the Plan Supplement. The initial board of directors of Reorganized Holdings shall consist of five (5) directors, one (1) of whom shall be Richard E. Almy, two (2) of whom shall be independent directors unaffiliated with either the Debtors or the holders of the Credit Agreement Claims, and two (2) members whom shall be selected by the holders of the Credit Agreement Claims. The initial board of directors of the other Reorganized Debtors shall, in each case, consist of three (3) directors, one (1) of whom shall be Richard E. Almy, one (1) of whom shall be the Chief Financial Officer of Reorganized Holdings, and one (1) of whom shall be the group head of the applicable Reorganized Debtor.

5.    Officers

The initial officers of Reorganized Holdings and the other Reorganized Debtors shall be disclosed in the Plan Supplement. The selection of officers of Reorganized Holdings and the other Reorganized Debtors after the Effective Date shall be as provided in the respective restated certificates of incorporation and restated bylaws or other organizational documents of Reorganized Holdings or the applicable Reorganized Debtor.

**3.    Distribution of New Term Notes.**

On the Effective Date, the New Credit Agreement shall be executed and delivered, and Reorganized IAC, Reorganized Holdings and the other Reorganized Debtors and any of their affiliates are authorized, as applicable, to distribute the New Term Notes and to execute, deliver and enter into, inter alia, the New Credit Agreement and the New Security Agreement without the need for any further