corporate action and without further action by the holders of Claims or Equity Interests. A copy of the New Credit Agreement and the New Security Agreement will be filed as part of the Plan Supplement.

The New Credit Agreement shall be given in renewal and rearrangement of and in substitution (but not in payment) for, and shall re-evidence the Credit Agreement Claims net of Excess Cash and the value of the New Equity received hereunder by holders of the Credit Agreement Claims. Such re-evidenced Credit Agreement Claims shall continue to be secured by first priority, perfected, valid and enforceable liens in the collateral pursuant to, and as set forth in the New Security Agreement.

### 4. Issuance of New Equity.

The issuance of New Equity under the Management Incentive Plan will be authorized without the need for any further corporate action.

### 5. Merger/Dissolution/Consolidation.

On or as of the Effective Date or as soon as practicable thereafter and without further need for any further action, the Reorganized Debtors may (including to, among other things, effectuate the restructuring transactions described in Section 1.56 of the Plan) (i) cause any or all of the Debtors to be merged into one or more of the Reorganized Debtors or any of their affiliates, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors or any of their affiliates, or (iii) engage in any other transaction in furtherance of the Plan consistent with the Plan Term Sheet.

### 6. Cancellation of Existing Securities

Except for purposes of evidencing a right to distributions under the Plan with respect to executory contracts or unexpired leases which have not been assumed by the Debtors or as otherwise provided hereunder, on the Effective Date, all of the agreements and other documents evidencing (a) the Claims or rights of any holder of a Claim against the Debtors, including all credit agreements, indentures and notes evidencing such Claims, (b) the Equity Interests in Holdings, and (c) any options or warrants to purchase Equity Interests of Holdings, IAC or any of the IAC Subsidiary Debtors, or obligating such Debtors to issue, transfer or sell Equity Interests or any other capital stock of such Debtors, shall be amended, restated, substituted for or cancelled, as the case may be.

### 7. Surrender of Existing Securities

On the Effective Date, the Equity Interests in Holdings and IAC shall be deemed to have been surrendered to the Debtors by each holder thereof and such security shall be deemed cancelled.

### 8. Agreements with Existing Management.

On the Effective Date, Reorganized IAC shall enter into new employment agreements with certain of the Debtors' existing senior management as part of the Management Incentive Plan

### 9. Cancellation of Liens

Except as otherwise provided in the Plan (including without limitation the continuation of the liens securing the Credit Agreement Claims), upon the occurrence of the Effective Date, any lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of any Debtor (including any cash

Collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such lien, including the execution, delivery and filing or recording of such releases.

### 10. Compromises of Controversies.

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

### 11. Exemption from Securities Laws.

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, any issuance under the Plan of the New Equity will be exempt from registration under the Securities Act and the Reorganized Debtors will not be subject to the reporting requirements of the Securities Exchange Act of 1934.

### 12. Exemption from Transfer of Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax. All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan, and thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

## E. Distributions

### 1. Voting of Claims.

Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Sections 3 and 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court approving procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

### 2. Cramdown and No Unfair Discrimination.

In the event that any impaired Class of Claims or Equity Interests rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in

which case the Plan shall constitute a motion for such relief and/or (b) amend the Plan in accordance with Section 12.7 of the Plan.

### 3. Distribution Record Date.

Except with respect to any publicly traded securities, as of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims. The Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims occurring on or after the Distribution Record Date. The Debtors, the Reorganized Debtors, or any party responsible for making distributions pursuant to Section 6 of the Plan, shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 4. Date of Distributions.

Except as otherwise provided in the Plan, any distributions and deliveries to be made pursuant to the Plan will be made on the Effective Date or as soon thereafter as is reasonably practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

### 5. Sources of Cash for Distribution.

All Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations and Cash on hand.

### 6. Disbursement Agent.

Unless otherwise specified in the Plan, all distributions under the Plan will be made by Reorganized Holdings as Disbursement Agent or such other entity designated by Reorganized Holdings as a Disbursement Agent on the Effective Date. A Disbursement Agent will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 7. Rights and Powers of Disbursement Agent.

Each Disbursement Agent will be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated by the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursement Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by such Disbursement Agent to be necessary and proper to implement the provisions in the Plan.

### 8. Expenses of the Disbursement Agent.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by each Disbursement Agent acting in such capacity (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

9.     **Delivery of Distributions.**

(i)     <u>Last Known Address</u>. Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to the address of such holder as set forth in the books and records of the Debtors, unless the applicable Reorganized Debtor has been notified in writing of a change of address, including by the filing of a proof of claim or interest by such holder that contains an address for such holder different from the address reflected on the Debtors' books and records. In the event that any distribution to any holder is returned as undeliverable, the Disbursement Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursement Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

(ii)     <u>Distributions by Administrative Agent</u>. The Administrative Agent shall be the Disbursement Agent for the Allowed Credit Agreement Claims. Distributions under the Plan to holders of such Allowed Credit Agreement Claims shall be made by the Reorganized Debtors to the Administrative Agent, which, in turn, shall make the distributions to the holders of such Allowed Claims. The Administrative Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to its administration of distributions. Upon delivery by the Reorganized Debtors of the distributions in conformity with Section 4.2(b) of the Plan to the Administrative Agent, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

10.     **Manner of Payment Under the Plan.**

(i)     All distributions under the Plan shall be made by, or at the direction of, the applicable Disbursement Agent on behalf of the applicable Debtor.

(ii)     All distributions of New Equity on account of the Management Incentive Plan shall be made by Reorganized IAC.

(iii)     At the option of the applicable Disbursement Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

11.     **No Fractional Shares of New Equity.**

No fractional shares of New Equity shall be issued or distributed under the Plan and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Equity that is not a whole number, the actual distribution of shares of New Equity or New Warrants shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Equity to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

12. **Setoffs and Recoupment.**

Except as set forth in Section 4.2(a) of the Plan, the Debtors and Reorganized Debtors may, but will not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution will be made) any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.

13. **Distributions After the Effective Date.**

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but by which later become Allowed Claims shall be deemed to have been made as of the Effective Date.

14. **Cash Distributions.**

No payment of Cash of less than $100 shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the appropriate Disbursement Agent.

15. **No Postpetition Interest on Claims.**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or as required by applicable bankruptcy law, postpetition interest shall not accrue on or after the Commencement Date on account of any Claim.

F. **Procedures for Disputed Claims Under the Plan.**

1. **Disputed Claims/Process.**

On and after the Effective Date, except as otherwise provided herein, all Claims will be paid in the ordinary course of business of the Reorganized Debtor. If the Debtors dispute any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Reorganization Cases had not been commenced and shall survive the Effective Date as if the Reorganization Cases had not been commenced. Notwithstanding section 502(a) of the Bankruptcy Code, and considering the unimpaired treatment of all holders of General Unsecured Claims under this Plan, all proofs of claim filed in these Reorganization Cases shall be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn. The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under Section 7.1 of the Plan to assert their claims in any forum as though the Debtors' cases had not been commenced.

2. **Objections to Claims.**

Except insofar as a Claim is Allowed under the Plan and notwithstanding Section 7.1 of the Plan, the Debtors or the Reorganized Debtors shall be entitled to object to Claims.

3. **Estimation of Claims.**

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4. **No Distributions Pending Allowance.**

Notwithstanding any other provision of the Plan, if any portion of an Administrative Expense Claim or a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed, and any property withheld pending the resolution of such Claim shall be reallocated *pro rata* to the holders of Allowed Claims in the same Class.

5. **Distribution after Allowance.**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursement Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

6. **Preservation of Claims and Rights to Settle Claims.**

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any Person, without the approval of the Bankruptcy Court, subject to the terms of Section 7.2 of the Plan, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

## G. Treatment of Executory Contracts and Unexpired Leases.

### 1. Assumption and Rejection of Contracts and Leases.

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) previously expired or terminated pursuant to its own terms, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date or (d) is set forth in a schedule, as an executory contract or unexpired lease to be rejected filed by the Debtors as part of the Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

### 2. Cure of Defaults.

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors upon assumption thereof or as soon as practicable thereafter. If there is a dispute regarding (a) the nature or amount of any cure, (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, any cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

### 3. Rejection Claims.

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the Debtors and their counsel within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their estates, and their property.

### 4. Survival of the Debtors' Indemnification Obligations.

Any obligations of the Debtors pursuant to their certificates of incorporation and bylaws or organizational documents, as applicable, or any other agreements entered into by any Debtor at any time prior to the Effective Date, to indemnify current and former directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors, irrespective of whether such indemnification is owed in connection with an event occurring

before or after the Commencement Date, shall not be discharged or impaired by confirmation of the Plan. Such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors hereunder and shall continue as obligations of the Reorganized Debtors. Any Claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 5. Survival of Other Employment Arrangements.

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and benefit plans (other than the existing incentive plans to be replaced by the Management Incentive Plan) entered into before or after the Commencement Date and not since terminated shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed pursuant to the Plan. The Debtors' obligations under such plans and programs shall survive confirmation of the Plan, except for (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (b) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

### 6. Insurance Policies.

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect. All other insurance policies shall re-vest in the Reorganized Debtors.

### 7. Advisory Services Agreement.

That certain Advisory Services Agreement, dated as of March 30, 2007, by and between Holdings and Genstar Capital, LLC, shall be deemed and treated as an executory contract pursuant to the Plan and shall be rejected by the Debtors. No Claims shall arise, survive or result from such rejection.

### H. Conditions Precedent to the Effective Date

### 1. Conditions Precedent to Effective Date of the Plan.

The occurrence of the Effective Date of the Plan is subject to satisfaction of the following conditions precedent:

(a)     Confirmation Order. The Confirmation Order in form and substance reasonably acceptable to the Administrative Agent shall have been entered by the Court and shall have become a Final Order in full force and effect and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(b)     Execution and Delivery of Other Documents. All other actions and all agreements, instruments or other documents necessary to implement the Plan, including all documents comprising the Plan Supplement, shall have been (i) effected or (ii) duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

(c)    Regulatory Approvals.  The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents necessary to implement the Plan and that are required by law, regulation, or order.

(d)    Consents.  All authorizations, consents and approvals determined by the Debtors to be necessary to implement the Plan shall have been obtained.

(e)    Corporate Formalities.  The Restated Certificate of Incorporation shall be filed with the Secretary of State of the State of Delaware contemporaneously with the Effective Date.

(f)    Other Acts.  Any other actions the Debtors determine are necessary to implement the terms of the Plan shall have been taken.

## 2.    Waiver of Conditions Precedent.

Each of the conditions precedent in Section 9.1 of the Plan may be waived, in whole or in part, by the Debtors (with the prior written consent of the Administrative Agent and the Required Required Supporting Holders) in writing without notice or order of the Bankruptcy Court.

## 3.    Effect of Failure of Conditions.

If the conditions specified in Section 9.1 of the Plan have not been satisfied or waived in the manner provided in Section 9.2 of the Plan by the date that is ninety (90) days after the Confirmation Date, then:  (a) the Confirmation Order shall be of no further force or effect; (b) no distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests in the Debtors shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (d) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors; and (e) the Plan shall be deemed withdrawn; provided, however, that the Debtors may extend such ninety (90) day period by an additional thirty (30) day period with the prior written consent of the Administrative Agent.

## I.    Effect of Confirmation

## 1.    Vesting of Assets.

On the Effective Date, except as otherwise provided in the Plan (including, without limitation, the continuation of the liens of the Senior Lenders in accordance with, and as evidenced by, the New Security Agreement), pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' estates shall vest in the Reorganized Debtors, or any transferee of the Reorganized Debtors pursuant to restructuring transactions authorized in the Plan, free and clear of all Claims, liens, encumbrances, charges, and other interests.  Except as otherwise provided in the Plan, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.  On and after the Effective Date, the Reorganized Debtors shall be authorized to operate their respective businesses, and to use, acquire or dispose of assets, without supervision or approval by the Bankruptcy Court and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

2.    **Binding Effect.**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

3.    **Discharge of the Debtors.**

Except to the extent otherwise provided in the Plan (including, without limitation, the re-evidencing of the Credit Agreement Claims (less the Excess Cash and value of the New Equity distributed to the holders of the Credit Agreement Claims) by the New Credit Agreement), the treatment of all Claims against or Equity Interests in the Debtors under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Commencement Date, or against their estate or properties or interests in property. Except as otherwise provided in the Plan, upon the Effective Date, all Claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full exchange for the consideration provided under the Plan. Except as otherwise provided in the Plan, all Persons shall be precluded from asserting against the Debtors, or their respective properties or interests in property any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

4.    **Exculpation.**

Notwithstanding anything provided in the Plan, as of the Effective Date, none of the Released Parties shall have or incur any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan, or any other act or omission in connection with the Reorganization Cases, the Plan, or any contract, instrument, indenture, or other agreement or document related thereto or delivered thereunder; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent that such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

5.    **Term of Injunctions or Stays.**

Except as otherwise expressly provided herein, all Persons who have held, hold or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Reorganized Debtor, or its successors, assigns, or affiliates, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor, or its successors, assigns, or affiliates, with respect to any such Claim or Equity Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor, or its successors, assigns, or affiliates, or against the property or interests in property of any Reorganized Debtor, or its successors, assigns, or affiliates, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Reorganized Debtor, or its successors, assigns, or affiliates, or against the property or interests in property of any Reorganized Debtor, or its successors, assigns, or affiliates, with respect to any such Claim or Equity Interest, and (v) pursuing any Claim released pursuant to Section 10.7 of the Plan.

Unless otherwise provided, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

6. **Injunction Against Interference with the Plan.**

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

7. **Releases.**

(a) <u>Releases by Debtors</u>. Except for the right to enforce the Plan, each Debtor shall, effective upon the occurrence of the Effective Date, be deemed to forever release, waive and discharge each of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Reorganization Cases, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Reorganization Cases, or the Plan; subject to a limited carve-out solely for criminal acts and intentional fraud.

(b) <u>Releases by Holders of Claims</u>. Except for the right to enforce the Plan, each Person who votes to accept the Plan, or who, directly or indirectly, is entitled to receive a distribution under the Plan, including Persons entitled to receive a distribution via an attorney, agent, indenture trustee or securities intermediary, shall, effective upon the occurrence of the Effective Date, be deemed to forever release, waive and discharge each of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Reorganization Cases, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Reorganization Cases, or the Plan.

8. **Preservation of Claims.**

Except as otherwise provided in the Plan, including Sections 10.6 and 10.7 thereof, as of the Effective Date, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, any action, cause of action, liability, obligation, right, suit, debt, sum of money, damage, judgment, claim and demand whatsoever, whether known or unknown, in law, equity or otherwise, accruing to the Debtors shall become assets of the Reorganized Debtors, and the Reorganized Debtors shall have the authority to commence and prosecute such causes of action for the benefit of the estates of the Debtors. After the Effective Date, the Reorganized Debtors shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such causes of action without approval of the Bankruptcy Court.

9. **Reservation of Rights.**

The Plan shall have no force or effect unless and until the Effective Date. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

10.     **Plan Supplement.**

A draft form of the Plan Documents to be entered into as of the Effective Date and any other appropriate documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court ten (10) days prior to the Confirmation Hearing. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in the Plan Supplement will be posted at www.kccllc.net/Intalum as they become available.

## J.     Miscellaneous Provisions

1.     **Payment of Statutory Fees.**

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

2.     **Dissolution of Statutory Committees and Cessation of Fee and Expense Payment.**

Any statutory committees appointed in the Reorganization Cases shall dissolve on the Effective Date. Provided that all such fees and expenses payable as of the Effective Date have been paid in full, the Reorganized Debtors shall not be responsible for paying any fees and expenses incurred after the Effective Date by the Administrative Agent's Professionals, and the professionals retained by any statutory committees, unless such fees and expenses are payable under the terms of the New Credit Agreement.

3.     **Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

4.     **Intercompany Claims.**

On or as soon as practicable after the Effective Date, all Intercompany Claims will either be reinstated to the extent determined to be appropriate by the Debtors or adjusted, waived, continued or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by equity holders of any Reorganized Debtor.

5.     **Determination of Tax Filings and Taxes.**

(a)     For all taxable periods ending on or prior to, or including, the Effective Date, Reorganized United States Aluminum Corporation shall prepare and file (or cause to be prepared and filed) on behalf of the IAC Group, all group tax returns, reports, certificates, forms or similar statements or documents (collectively, "*Group Tax Returns*") required to be filed or that Reorganized United States Aluminum Corporation otherwise deems appropriate, including the filing of amended Group Tax Returns

or requests for refunds. If requested by Reorganized United States Aluminum Corporation, Holdings shall promptly execute or cause to be executed and filed any Group Tax Returns of the IAC Group submitted to Reorganized Holdings for execution or filing. Neither IAC nor Holdings shall file or amend any Group Tax Return for any taxable periods (or portions thereof) described in the preceding sentence without Reorganized United States Aluminum Corporation's written consent.

(b)     Holdings, Reorganized Holdings, IAC, Reorganized IAC, and Reorganized United States Aluminum Corporation shall cooperate fully with each other regarding the implementation of this Section 12.6 of the Plan (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records and documents relating to taxes governed by Section 12.6 of the Plan until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals or litigation with respect to such taxes. Without limiting the generality of the foregoing, Holdings shall execute prior to the Effective Date a power of attorney authorizing Reorganized Holdings and Reorganized United States Aluminum Corporation to correspond, sign, collect, negotiate, settle and administer tax payments and Group Tax Returns for the taxable periods described in Section 12.6(a) of the Plan.

(c)     The Reorganized Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

(d)     If Holdings or IAC receives written notice from a taxing authority of any pending examination, claim, settlement, proposed adjustment or related matters with respect to taxes that could affect any other member of the IAC Group (by operation of law or by reason of this Plan), it shall so notify Reorganized Holdings in writing within ten (10) business days thereafter. Reorganized Holdings shall have the sole right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the IAC Group. With respect to any such proceeding and with respect to the preparation and filing of any Group Tax Returns of the IAC Group, Reorganized Holdings and Reorganized United States Aluminum Corporation may act in its own self-interest and in the interest of its subsidiaries and affiliates, without regard to any adverse consequences to Holdings or IAC.

(e)     If Holdings or IAC is dissolved, merged out of existence, or otherwise treated in a manner that terminates the IAC Group for applicable tax purposes, immediately before such termination, Holdings or IAC (as applicable) shall designate Reorganized United States Aluminum Corporation as the "substitute agent" (within the meaning of Treasury Regulation Section 1.1502-77) for the IAC Group in accordance with Treasury Regulation Section 1.1502-77 and Rev. Proc. 2002-43, 2002-28 I.R.B. 99 (July 15, 2002), in either case, as amended or supplemented, and any comparable provision under state and local law, with respect to all taxable periods ending on or before, or including, the Effective Date.

(f)     Reorganized Holdings shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of the IAC Group, including for any taxable period ending on or prior to, or including, the Effective Date. Within five (5) business days after receipt of any such refunds or credits, Holdings shall notify Reorganized Holdings thereof and shall transfer any refunds to Reorganized Holdings by wire transfer or otherwise in accordance with written instructions provided by Reorganized Holdings.

**6.     Amendments.**

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors (with the prior written consent of the Administrative Agent) at any time prior to or after the Confirmation Date, but prior to the Effective Date. Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification complies with the requirements of Section 12.7 of the Plan and does not materially and adversely change the treatment of the Claim of such holder; provided, however, that any holders of Claims who were deemed to accept the Plan because such Claims were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

### 7. Effectuating Documents and Further Transactions.

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 8. Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors take such action, the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any Person or to prejudice in any manner the rights of the Debtors or any Person in further proceedings involving the Debtors.

### 9. Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the prior written consent of the Administrative Agent), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Nothing in Section 12.10 of the Plan shall be construed to relieve the Debtors from complying with section 1127 of the Bankruptcy Code, to the extent that provision would be applicable, irrespective of such Section 12.10.

### 10. Schedules and Exhibits Incorporated.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if fully set forth therein.

### 11. Solicitation of the Plan.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors, the Administrative Agent and the Senior Lenders, and each of their respective directors, officers, employees, Affiliates, agents, members, managers, partners, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 12. Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 13. Compliance with Tax Requirements.

In connection with the Plan and all instruments issued in connection herewith and distributed hereunder, any Person issuing any instruments or making any distribution under the Plan, including any Person described in Sections 5.3 and 5.4 of the Plan, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any Person issuing any instruments or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or distributing Person for payment of any such tax obligations.

## IV. HISTORICAL FINANCIAL INFORMATION, FINANCIAL PROJECTIONS AND VALUATION ANALYSIS

### A. Historical Financial Information.

The Debtors' (i) audited consolidated balance sheets as of June 30, 2009 and June 30, 2008 and related consolidated statements of operations, shareholders' (deficit) equity, and cash flows and (ii) audited consolidated balance sheets as of June 30, 2008 and June 30, 2007 and related consolidated statements of operations, shareholders' equity, and cash flows are each attached to <u>Exhibit D</u> to the Disclosure Statement, the full text of which are incorporated herein by reference. This financial information is provided to permit holders of Claims and Equity Interests to better understand the Debtors' historical business performance and the potential impact of the Reorganization Cases on the Debtors' business.

### B. Financial Projections.

The Debtors' Financial Projections are attached as <u>Exhibit B</u> to this Disclosure Statement. hereto.

C.    **Valuation Analysis.**

**THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.  SUCH TRADING VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.**

Moelis has advised the Debtors with respect to the reorganization value of the Reorganized Debtors on a going concern basis (the "**Valuation**").  Moelis has determined the estimated range of reorganization value of the Reorganized Debtors to be approximately $34 million to $46 million as of an assumed Effective Date of March 31, 2010.  Moelis' estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF MARCH 31, 2010, REFLECTS WORK PERFORMED BY MOELIS ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO MOELIS AS OF NOVEMBER 12, 2009.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT MOELIS' CONCLUSIONS, MOELIS DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.**

The foregoing Valuation range estimates are based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors' Business Plan, the achievement of the forecasts reflected in the Projections, the continuing leadership of the existing management team, market conditions through the period of covered by the Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed below.

With respect to the Projected Financial Information prepared by the management of the Debtors and included in Exhibit B to this Disclosure Statement, Moelis assumed that such Projected Financial Information has been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors.  Moelis' estimate of a range of reorganization values assumes that the Debtors' Projections will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow.  As a result, to the extent that the estimate of enterprise values is dependent upon the Reorganized Debtors performing at the levels set forth in the Projections, such analysis may differ from the Debtors' actual performance.  If the business performs at levels below those set forth in the Projected Financial Information, such performance may have a material impact on the Projections and on the estimated range of values derived therefrom.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE OF THE REORGANIZED DEBTORS, MOELIS:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND

PROVIDED TO MOELIS BY THE DEBTORS' MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESS AND THEIR PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS THE DEBTORS' OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT MOELIS DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF THE DEBTORS;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE COMMERCIAL CONSTRUCTION, RESIDENTIAL WINDOWS AND EXTRUDED PRODUCTS INDUSTRY;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH MOELIS CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESSES, OPERATING ASSETS AND LIABILITIES AND THE REORGANIZED DEBTORS' BUSINESS PLANS, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, MOELIS DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY MOELIS REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.

**Valuation Methodology.**

Moelis performed a variety of analyses and considered a variety of factors in preparing the valuation of the Reorganized Debtors. Several generally accepted valuation techniques for estimating Reorganized Debtors enterprise value were used. Moelis primarily relied on three methodologies: discounted cash flow analysis, comparable public company analysis, and precedent transactions analysis. Moelis' valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Debtors' enterprise value.

In preparing its valuation estimate, Moelis performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Moelis' conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

(a) **Discounted Cash Flow Approach.** The discounted cash flow ("<u>DCF</u>") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Projections). Moelis' discounted cash flow valuation is based on the business plan Projections of the Reorganized Debtors' operating results. Moelis discounted the projected cash flows using the Reorganized Debtors' estimated weighted average cost of capital and calculated a terminal value of the reorganized Debtors.

This approach relies on the company's ability to project future cash flows with some degree of accuracy. Because the Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Moelis cannot and does not make any representations or warranties as to the accuracy or completeness of the Reorganized Debtors' Projections.

(b) **Comparable Public Company Analysis.** A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial

statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuations by deriving the value of "comparable" assets, standardized using common variables such as revenues, earnings, and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage, and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, target market segments, growth prospects, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. The underlying concept, however, is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. In performing the Comparable Public Company Analysis Moelis evaluated publicly traded companies in the building products and commercial construction sector deemed generally comparable to the Debtors in some or all of the factors described above. Moelis analyzed the current trading value for the comparable companies as a multiple of operating metrics.

(c) **Precedent Transactions Analysis.** Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to the Debtors. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors. In evaluating the comparability of transactions, Moelis considered changes in the macroeconomic operating environment and the capital markets since those transactions were announced.

The valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. Other aspects of value that manifest themselves in a precedent transaction analysis include the following:

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest);

- The market environment is not identical for transactions occurring at different periods of time; and

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions from precedent transactions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis.

THE ESTIMATES OF THE REORGANIZATION VALUE DETERMINED BY MOELIS REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. ANY SUCH TRADING VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES FOR THE REORGANIZED DEBTORS ASSOCIATED WITH MOELIS' VALUATION ANALYSIS.

## V.    CERTAIN FACTORS TO BE CONSIDERED

Holders of Eligible Claims should consider the risks and uncertainties below in making their decision regarding whether to vote to accept the Plan. The risks and uncertainties described below are not the only ones the Debtors face. Additional risks and uncertainties not presently known to the Debtors or that they currently deem immaterial may also harm their business.

### A.    General

While the Debtors would hope that a chapter 11 filing solely for the purpose of implementing an agreed-upon restructuring would be of short duration and would not be seriously disruptive to their business, the Debtors cannot be certain that this would be the case. Although the Plan is designed to minimize the length of the Reorganization Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in chapter 11 or to assure that the Plan will be confirmed.

Even if confirmed on a timely basis, a chapter 11 proceeding to confirm the Plan could have an adverse effect on their business. Among other things, it is possible a bankruptcy proceeding could adversely affect: the Debtors' relationships with their key suppliers; the Debtors' relationships with their customers, particularly those that depend on it as a primary supplier; the Debtors' relationship with their employees; and the legal rights and obligations of the IAC Subsidiary Debtors under agreements that may be in default as a result of the Reorganization Cases.

In order to effectuate the Plan, the Debtors may, pursuant to the terms of the Plan, implement a different corporate structure than that described herein, which may change the overall value of the Reorganized Debtors and create tax consequences that are different from those described herein. Neither the Debtors nor the Reorganized Debtors intend to, and each disclaims any obligation to, furnish updated information regarding valuation or tax consequences should such an alternate corporate structure be effectuated.

A chapter 11 proceeding also will involve additional expenses and will divert the attention of the Debtors' management from operation of the business.

The extent to which a chapter 11 proceeding disrupts the Debtors' business will likely be directly related to the length of time it takes to complete the proceeding. If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, they may be forced to operate in chapter 11 for an extended period while they try to develop a different reorganization plan that can be confirmed, which would increase both the probability and the magnitude of the adverse effects described above.

### B.    Failure to Confirm the Plan

Even if the requisite acceptances are received and, with respect to those Classes deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of

the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors and that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Additionally, the solicitation must comply with the Bankruptcy Code and the applicable Bankruptcy Rules with respect to the length of the solicitation period, compliance with applicable non-bankruptcy law, if any, and in the absence of applicable non-bankruptcy law, the adequacy of the information contained in this Disclosure Statement (as defined in section 1125(a)(1) of the Bankruptcy Code). If the Bankruptcy Court were to find that the solicitation did not so comply, all acceptances received pursuant to the solicitation could be deemed invalid and the Debtors could be forced to resolicit acceptances under section 1125(b) of the Bankruptcy Code, in which case confirmation of the Plan could be delayed and possibly jeopardized.

The Debtors' ability to propose and confirm an alternative reorganization plan is uncertain. Confirmation of any alternative reorganization plan under chapter 11 of the Bankruptcy Code would likely take significantly more time and result in delays in the ultimate distributions to the holders of Claims and Equity Interests. If confirmation of an alternative plan of reorganization was not possible, the Debtors would likely be liquidated. Based upon the Debtors' analysis, liquidation under chapter 7 would result in distributions of reduced value to holders of Claims and Equity Interests. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. However, it is unlikely that any liquidation would realize the full going concern value of their businesses. Instead, the Debtors' assets would be sold separately. Consequently, the Debtors believe that a liquidation under chapter 11 would also result in smaller distributions, if any, to the holders of Claims and Equity Interests than those provided for in the Plan.

C.    **The Bankruptcy Court May Not Approve the Compromises and Settlements Contemplated by the Plan.**

The Plan constitutes a settlement, compromise, and release of rights arising from or relating to the allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and their respective distributions and treatments under the Plan, takes into account for and conforms to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination or section 510(b) and (c) of the Bankruptcy Code. This settlement, compromise, and release requires approval by the Bankruptcy Court in the Confirmation Order. The Debtors cannot ensure that the Bankruptcy Court will approve of the settlement contemplated in the Plan.

D.    **The Debtors May Object to the Amount or Secured or Priority Status of a Claim.**

The Debtors reserve the right to object to the amount or the secured or priority status of any Claim under the Plan, except where indicated otherwise in the Plan and/or the Restructuring Support Agreement. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of any Claims whose Claim is subject to an objection. Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

E.     **Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests.**

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan of reorganization may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code, however, certain holders of Claims and Equity Interests may object.

F.     **In Certain Instances, any Chapter 11 Case May be Converted to a Case Under Chapter 7 of the Bankruptcy Code.**

If no chapter 11 plan can be confirmed, including, but not limited to the Plan, or if the Bankruptcy Court otherwise finds that it would be in the best interest of creditors, the Reorganization Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in no distributions being made to holders of Equity Interests and smaller distributions being made to holders of Claims than those provided for in the Plan because of (i) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing the Debtors' business as going concerns; (ii) additional administrative expenses involved in the appointment of a trustee; and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations.

G.     **The Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan.**

Although the Debtors believe that the Effective Date may occur very shortly after the Confirmation Date, there can be no assurance as to such timing. Moreover, if the conditions precedent to the Effective Date, including the entry of a Confirmation Order, execution and delivery of certain documents, and receipt of all necessary authorizations and regulatory approvals, have not occurred, the Plan may be vacated by the Bankruptcy Court.

H.     **The Announcement of the Restructuring Could Adversely Affect the Value of the Businesses.**

It is possible that announcement of the restructuring or the filing of the Reorganization Cases could adversely affect the Debtors' operations and relationships with employees, customers and suppliers. Due to uncertainties, many risks exist, including the following:

- customers could switch to competitors;

- employees may be distracted from performance of their duties or more easily attracted to other employment opportunities, including with the Debtors' competitors;

- customers may delay making payments;

- although the Plan provides for payment in full for Allowed General Unsecured Creditors, certain customers, lessors, and creditors may suspend or terminate their relationship with the Debtors, exercise rights of set-off or similar remedies, further restrict ordinary credit terms or require guarantee of payment;

- business partners could terminate their relationship or require financial assurances or enhanced performance;

- trade creditors could require payment in advance or cash on delivery;

- the ability to renew existing contracts and compete for new business may be adversely affected;

- the ability to pursue acquisitions and obtain financing for such acquisitions may be negatively impacted; and

- competitors may take business away from the Debtors.

A delay in completing the restructuring of the Debtors may result in the same adverse consequences. The occurrence of one or more of these events could have a material and adverse effect on the financial condition, operations and prospects of the Debtors.

**I.    Risk of Prolonged Declines in the Commercial Building and Residential Housing Markets**

In the event that economic conditions in general and in the commercial building and residential housing markets industry decline at a precipitous rate, the Debtors could potentially be unable to operate their business. Under such circumstances, the Debtors may not be able to confirm the Plan.

**J.    The Debtors Cannot Predict the Amount of Time Needed in Bankruptcy to Implement the Plan, and a Lengthy Bankruptcy Case Could Disrupt the Businesses, as well as Impair the Prospect for Reorganization on the Terms Contained in the Plan and Possibly Provide an Opportunity for Other Plans to be Proposed.**

The Debtors cannot be certain their respective Reorganization Cases will be of relatively short duration (*e.g.*, 30 to 90 days) and will not unduly disrupt their businesses. It is impossible to predict with certainty the amount of time needed in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Moreover, time limitations exist for which the Debtors have an exclusive right to file a plan before other proponents can propose and file their own plan.

Lengthy Reorganization Cases would also involve additional expenses and divert the attention of management from operation of the business, as well as create concerns for employees, vendors and customers. The disruption that chapter 11 cases would inflict upon their business would increase with the length of time it takes to complete the proceeding and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties, including essential vendors, employees, and customers.

If the Debtors are unable to obtain confirmation of the Plan on a timely basis, because of a challenge to the Plan or a failure to satisfy the conditions to the effectiveness of the Plan, the Debtors may be forced to operate in bankruptcy for an extended period while trying to develop a different reorganization plan that can be confirmed. Protracted bankruptcy cases would increase both the probability and the magnitude of the adverse effects described above. Such a protracted process would also jeopardize the proposed reorganization and the benefits the Debtors expect to obtain therefrom.

**K.** **The Debtors May Seek to Amend, Waive, Modify or Withdraw the Plan at Any Time Prior to the Confirmation Date.**

The Debtors reserve the right, prior to the confirmation or substantial consummation of the Plan, subject to the provisions of section 1127 of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, to amend the terms of the Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. While the Debtors will be required to obtain the prior written consent of the Required Supporting Holders with respect to material amendments and waivers or with respect to amendments and waivers that adversely affect the rights of the Required Supporting Holders, the potential impact of any such amendment or waiver on the holders of Claims and interests cannot presently be foreseen, and may include a change in the economic impact of the Plan on some or all of the classes or a change in the relative rights of such classes. All holders of claims and interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances but prior to confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (i) all classes of adversely affected creditors and interest holders accept the modification in writing, or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not materially adversely change the treatment of holders of accepting claims and interests.

**L.** **The Debtors May Fail to Consummate the Plan.**

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order and an order (which may be the Confirmation Order) approving the assumption and assignment of all executory contracts and unexpired leases (other than those specifically rejected by the Debtors) to the Reorganized Debtors or their assignees. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions will be met (or waived) or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

**M.** **Claims Estimations**

There can be no assurance that the estimated amount of Claims and Equity Interests set forth herein are correct and the actual Allowed amounts of Claims and Equity Interests may differ from estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims and Equity Interests may vary from those estimated therein.

**N.** **Certain Tax Considerations**

THERE ARE A NUMBER OF MATERIAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN SECTION VIII – "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN" FOR A DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS PROPOSED BY THE PLAN AND HOLDERS OF CLAIMS THAT ARE IMPAIRED UNDER THE PLAN.

## O.    Inherent Uncertainty of Financial Projections

The Financial Projections cover the Debtors' operations through the period ending 2015. These Financial Projections are based on numerous assumptions that are an integral part of the Financial Projections, including confirmation of the Plan and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, competition, adequate financing, the ability to make necessary capital expenditures, the ability to establish market strength, consumer purchasing trends and preferences, and the ability to stabilize and grow the Debtors' sales base and control future operating expenses, absence of material contingent or unliquidated litigation or indemnity claims, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. The Debtors believe that the assumptions underlying the Financial Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may undermine the financial results of the Reorganized Debtors and affect the actual financial results of the Reorganized Debtors' operations. These variations may be material and may adversely affect the ability of the Reorganized Debtors to pay the obligations owing to certain holders of Claims entitled to distributions under the Plan and other post-Effective Date indebtedness. Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections should not be relied upon as a guaranty, representation or other assurance of the actual results that will occur.

## VI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, and to holders of Credit Agreement Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired and holders of Equity Interests or Claims who are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, controlled foreign corporations, passive foreign investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, holders that are, or hold Credit Agreement Claims through, partnerships or other pass-through entities for U.S. federal income tax purposes, U.S. persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, expatriates and former long-term residents of the United States, persons subject to the alternative minimum tax, and persons holding Credit Agreement Claims that are part of a straddle, hedging, constructive sale or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the New Equity or New Term Notes in the secondary market.

This discussion assumes that the Credit Agreement Claims, New Equity and New Term Notes are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.*

<u>*Internal Revenue Service Circular 230 Notice:*</u>  *To ensure compliance with Internal Revenue Service Circular 230, holders of Credit Agreement Claims are hereby notified that:  (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Credit Agreement Claims for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (C) holders of Credit Agreement Claims should seek advice based on their particular circumstances from an independent tax advisor.*

## A.     Consequences to the Debtors

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations, of which Holdings is the common parent, which files a single consolidated U.S. federal income tax return (the "**IAC Group**").  The IAC Group will terminate for U.S. federal consolidated return filing purposes on the Effective Date upon the issuance of the New Equity.

### Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of any cancellation of debt income ("**COD**") incurred pursuant to a confirmed chapter 11 plan.  The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes.  If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced.

The COD incurred by the Debtors will not reduce the basis of the assets acquired by Newco.  Newco will have a fair market value basis in the assets held directly by IAC.

### Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the

corporation's aggregate tax basis in its assets is reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

## B. Consequences to Holders of Credit Agreement Claims

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Credit Agreement Claims, New Equity or New Term Notes that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Credit Agreement Claims, New Equity or New Term Notes, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.

### *Distributions under the Plan*

Pursuant to the Plan, and in complete and final satisfaction of their respective Claims, U.S. Holders of Credit Agreement Claims will receive from Reorganized Holdings their pro rata share of the (A) Excess Cash, (B) New Term Notes and (C) 100% of the shares of New Equity outstanding on the Effective Date, less any shares of New Equity distributed on the Effective Date pursuant to the Management Incentive Plan.

An exchange by U.S. Holders of Credit Agreement Claims for Excess Cash, New Equity, and New Term Notes should be treated as a fully taxable transaction, with the consequences described below in "—Fully Taxable Exchange.

*Fully Taxable Exchange.* Upon an exchange of a Credit Agreement Claim in a fully taxable exchange, the exchanging U.S. Holder generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the Excess Cash, the fair market value of any New Equity and the "issue price" of any New Term Notes received (see "—Ownership and Disposition of New Term Notes—OID and Issue Price" below) (other than any exchange consideration received in respect of a Claim for accrued but unpaid interest), and (ii) the U.S. Holder's adjusted tax basis in the Credit Agreement Claims exchanged (other than any basis attributable to accrued but unpaid interest). *See* "—Character of Gain or Loss" below. In addition, a U.S. Holder of a Credit Agreement Claim will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income. *See* "—Payment of Accrued Interest" below.

U.S. Holders of Credit Agreement Claims are urged to consult their own tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting any gain that may be recognized by such holders in respect of such Credit Agreement Claims, due to the receipt of New Term Notes.

Generally, a U.S. Holder's adjusted tax basis in a Credit Agreement Claim will be equal to the cost of the Claim to such U.S. Holder, increased by any original issue discount ("**OID**") previously included in income. If applicable, a U.S. Holder's tax basis in a Credit Agreement Claim will also be (i) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any cash payments received on the Claim other than payments of qualified stated interest, and by any amortizable bond premium which the U.S. Holder has previously deducted.

In the case of a taxable exchange, a U.S. Holder's tax basis in any New Equity or New Term Notes received will equal the amount taken into account in respect of such stock or notes, as applicable, in determining the U.S. Holder's gain or loss. The U.S. Holder's holding period in such stock or notes received should begin on the day following the exchange date.

*Character of Gain or Loss.* Except to the extent that any consideration received pursuant to the Plans is received in satisfaction of accrued but unpaid interest during its holding period (*see* "— Payment of Accrued Interest" below), where gain or loss is recognized by a U.S. Holder in respect of the satisfaction and exchange of its Claim, such gain or loss will be capital gain or loss except to the extent any gain is recharacterized as ordinary income pursuant to the market discount rules discussed below. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

A U.S. Holder that purchased its Credit Agreement Claims from a prior holder at a "market discount" (relative to the principal amount of such Credit Agreement Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount. The *de minimis* amount is equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity. Generally, qualified stated interest is a stated amount of interest payable in cash at least annually.

Under these rules, any gain recognized on the exchange of Credit Agreement Claims (other than in respect of a Credit Agreement Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant interest basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder of Credit Agreement Claims did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Credit Agreement Claims, such deferred amounts would become deductible at the time of the exchange, up to the amount of gain that the U.S. Holder recognizes in the exchange.

In the case of an exchange of Credit Agreement Claims that qualifies as a reorganization, the Tax Code indicates that any accrued market discount in respect of such Credit Agreement Claims in excess of the gain recognized in the exchange should not be currently includible in income under Treasury regulations to be issued. However, such accrued market discount should carry over to any non-recognition property received in exchange therefor (*i.e.*, to any New Term Notes). In addition, any New Term Notes received in an exchange for Credit Agreement Claims that qualifies as a reorganization will be treated as acquired at a market discount if the issue price of such notes exceeds the adjusted tax basis

for such notes by more than a *de minimis* amount. Any gain recognized by a U.S. Holder upon a subsequent disposition (or repayment) of such exchange consideration would be treated as ordinary income to the extent of any accrued market discount not previously included in income plus the market discount that has accrued on the New Term Notes that constitute securities. To date, specific Treasury regulations implementing this rule have not been issued.

*Payment of Accrued Interest.* In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### Ownership and Disposition of New Equity

Subject to the discussion of "publicly traded partnerships" below, and subject to the discussion regarding a possible election to be treated as a corporation after the Effective Date, Reorganized Holdings under will be treated as a partnership for U.S. federal income tax purposes.

Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation. The Plan Documents will prohibit the transfer of New Equity in Reorganized Holdings if such transfer would jeopardize the status of Reorganized Holdings as a partnership for federal income tax purposes. Any purported transfer in violation of such provisions will be null and void and would not be recognized by Reorganized Holdings.

This discussion of the U.S. federal income tax consequences of the Plan assumes that Reorganized Holdings will be treated as a partnership for federal income tax purposes.

As a partnership, Reorganized Holdings itself will not be subject to federal income tax. Instead, Reorganized Holdings will file an annual partnership information return with the IRS which will report the results of Reorganized Holdings's operations. Each Reorganized Holdings partner will be required to report on its federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Reorganized Holdings's income, gain, loss, deduction and credit for each taxable year of Reorganized Holdings ending with or within the partner's taxable year. Each item generally will have the same character as if the partner had realized the item directly. Partners will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized Holdings for such taxable year, and thus may incur income tax liabilities in excess of any distributions from Reorganized Holdings. For purposes of calculating Reorganized Holdings's items of

income, gain, loss and deduction, upon the implementation of the Plan, Reorganized Holdings should have a new cost tax basis and holding period in the underlying assets of IAC and its subsidiaries.

A partner is allowed to deduct its allocable share of Reorganized Holdings losses (if any) only to the extent of such partner's adjusted tax basis (discussed below) in its partnership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the Tax Code may significantly limit a partner's ability to deduct its allocable share of deductions and losses of Reorganized Holdings against other income.

Reorganized Holdings will provide each partner with the necessary information to report its allocable share of Reorganized Holdings's tax items for U.S. federal income tax purposes. However, no assurance can be given that Reorganized Holdings will be able to provide such information prior to the initial due date of the partners' federal income tax return and the partners may therefore be required to apply to the IRS for an extension of time to file their tax returns.

Under the Plan Documents, the New Board will decide how items will be reported on Reorganized Holdings's federal income tax returns, and all partners will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of Reorganized Holdings are audited by the IRS, the tax treatment of Reorganized Holdings income and deductions generally will be determined at the Reorganized Holdings level in a single proceeding, rather than in individual audits of the partners. The Plan Documents will generally provide that the partners will elect one partner to be the "Tax Matters Partner" for Reorganized Holdings, as such term is defined in Section 6231(a)(7) of the Tax Code. The Tax Matters Partner will have considerable authority under the Tax Code and the Plan Documents to make decisions affecting the tax treatment and procedural rights of all partners.

A partner generally will not recognize gain or loss on the receipt of a distribution of cash or property from Reorganized Holdings (provided that the partner is not treated as exchanging such partner's share of Reorganized Holdings's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property). A partner, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from Reorganized Holdings (including any constructive distribution of money resulting from a reduction of the partner's share of the indebtedness of Reorganized Holdings) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such partner's adjusted tax basis in its partnership interest. Such distribution would be treated as gain from the sale or exchange of a partnership interest.

A partner will recognize gain on the complete liquidation of its partnership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by a partner on the receipt of a distribution from the Partnership generally will be capital gain, but may be taxable as ordinary income, either in whole or in part, under certain circumstances. No loss can be recognized on a distribution in liquidation of a partnership interest, unless the partner receives no property other than money and ordinary income items.

A partner's adjusted tax basis in its partnership interest generally will be equal to such partner's initial tax basis (see "Distributions under the Plan – Fully Taxable Exchange" above), increased by the sum of (i) any additional capital contribution such partner makes to Reorganized Holdings, (ii) the partner's allocable share of the income of Reorganized Holdings, and (iii) increases in the partner's allocable share of the indebtedness of Reorganized Holdings, and reduced, but not below zero, by the sum of (iv) the partner's allocable share of the losses of Reorganized Holdings, and (v) the amount of money or the adjusted tax basis of property distributed to such partner, including constructive distributions of money resulting from reductions in such partner's allocable share of indebtedness of Reorganized Holdings.

A sale of all or part of a partner's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such partner's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent that the proceeds of the sale are attributable to a partner's allocable share of certain ordinary income items of Reorganized Holdings and such proceeds exceed the partner's adjusted tax basis attributable to such ordinary income items. A partner's ability to deduct any loss recognized on the sale of its partnership interest will depend on the partner's own circumstances and may be restricted under the Tax Code.

U.S. Holders of Credit Agreement Claims are urged to consult their tax advisors regarding the tax consequences of owning and disposing of partnership interests in Reorganized Holdings.

### Ownership and Disposition of New Term Notes

*Stated Interest.* A U.S. Holder of New Term Notes will be required to include stated interest on the New Term Notes in income in accordance with the U.S. Holder's regular method of accounting for U.S. federal income tax purposes to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is unconditionally payable in cash at least annually. The stated interest payable on the New Term Notes is qualified stated interest.

*OID and Issue Price.* A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than qualified stated interest.

The "issue price" of the New Term Notes depends on whether, at any time during the 60-day period ending 30 days after the exchange date, the New Term Notes are traded on an "established market" or the Credit Agreement Claims exchanged (in whole or in part) for the New Term Notes are traded on an established market. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient that the New Term Notes or Credit Agreement Claims appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions. Also, under certain circumstances, debt is considered to be traded on an established market when price quotations for such debt are readily available from dealers, brokers or traders.

If the New Term Notes are treated for U.S. federal income tax purposes as traded on an established market, the issue price of the New Term Notes will equal the fair market value of such notes on the Effective Date. If the New Term Notes are not treated, but the Credit Agreement Claims are treated, for U.S. federal income tax purposes as traded on an established market, the issue price of the New Term Notes will equal the fair market value of the Credit Agreement Claims less the Excess Cash and fair market value of the New Equity received in exchange for such Credit Agreement Claims on the Effective Date. In either such event, a New Term Note will be treated as issued with OID to the extent that its issue price is less than its stated principal amount. Depending on the fair market value of the New Term Notes or the Credit Agreement Claims, the total amount of OID could be substantial.

If neither the New Term Notes nor the Credit Agreement Claims are traded on an established market, the issue price for the New Term Notes should be the stated principal amount of the New Term Notes.

It is uncertain whether the Credit Agreement Claims are, or whether the New Term Notes will be, traded on an established market (though the Debtors believe that this is unlikely). In general, the

Debtors' determination of issue price will be binding on all holders of Credit Agreement Claims, other than a holder that explicitly discloses its inconsistent treatment in a statement attached to its timely filed tax return for the taxable year in which the exchange occurs. There can be no assurance, however, that the IRS will not successfully assert a contrary position.

If the New Term Notes are treated as issued with OID, a U.S. Holder of a New Term Note generally will be required to include such OID in income over the term of the note in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when the U.S. Holder receives cash payments of interest on the New Term Notes. Accordingly, a U.S. Holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the tax basis of the U.S. Holder in its New Term Notes. A U.S. Holder will not be required to include separately in income cash payments received on the New Term Notes to the extent such payments constitute payments of previously accrued OID, and such payments will reduce its tax basis in its New Term Notes by the amount of such payments.

The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases. Accordingly, you should consult your own tax advisor regarding the determination of the issue price of the New Term Notes and the possible application of the OID rules.

*Acquisition and Bond Premium.* If the New Term Notes are treated as having OID, the amount of OID includible in a U.S. Holder's gross income with respect to a New Term Note will be reduced if the note is acquired (or deemed to be acquired) at an "acquisition premium." A debt instrument is acquired at an "acquisition premium" if the holder's tax basis in the debt is greater than the adjusted issue price of the debt at the time of the acquisition, but is less than or equal to the stated principal amount of the debt. A U.S. Holder may have an "acquisition premium" only if an exchange qualifies as a reorganization and the New Term Notes constitute securities for U.S. federal income tax purposes. Otherwise, a U.S. Holder's initial tax basis in a New Term Note will equal the issue price of the note.

If a U.S. Holder has acquisition premium, the amount of any OID includible in its gross income in any taxable year with respect to its New Term Notes will be reduced by an allocable portion of the acquisition premium (generally determined by multiplying the annual OID accrual with respect to such New Term Notes by a fraction, the numerator of which is the amount of the acquisition premium, and the denominator of which is the total OID). Alternatively, if a U.S. Holder is willing to treat all stated interest as OID, such holder may elect to recompute the OID accruals by treating its acquisition as a purchase at original issue and applying the constant yield method. Such an election may not be revoked without the consent of the IRS.

If a U.S. Holder has a tax basis in any of the New Term Notes received that exceeds the stated principal amount of such notes, the New Term Notes will be treated as having "bond premium." A U.S. Holder may have bond premium only if an exchange qualifies as a reorganization and the New Term Notes constitute securities for U.S. federal income tax purposes. A U.S. Holder may elect to amortize any bond premium over the period from its acquisition of such New Term Note to the maturity date of such New Term Note but not in excess of the stated interest; if the New Term Note is treated as having OID, the U.S. Holder will not include any of the OID in income. If such bond premium is amortized, the amount of stated interest on any New Term Note that must be included in the U.S. Holder's gross income for each period ending on an interest payment date or at the maturity date, as the case may be, will (except as Treasury regulations may otherwise provide) be reduced by the portion of any bond premium allocable to such period based on the New Term Note's yield to maturity. The U.S. Holder's tax basis in its New Term Note will be reduced by a like amount. If such an election to amortize bond premium is not made, a

U.S. Holder will receive a tax benefit from the premium only in computing such holder's gain or loss upon the sale or other taxable disposition of the New Term Notes, including the repayment of principal.

An election to amortize bond premium will apply to amortizable bond premium on all debt instruments the interest on which is includible in the U.S. Holder's gross income and that are held at, or acquired after, the beginning of the U.S. Holder's taxable year as to which the election is made. The election may be revoked only with the consent of the IRS.

*Sale, Redemption or Repurchase.* Subject to the discussion above (*see* "—Distributions under Plan—Character of Gain or Loss") and below with respect to market discount, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption (including at maturity) or other taxable disposition of New Term Notes in an amount equal to the difference between the U.S. Holder's adjusted tax basis in the New Term Notes and the sum of the cash plus the fair market value of any property received from such disposition (other than amounts attributable to accrued but unpaid stated interest on the New Term Notes, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously so taxed). Generally, a U.S. Holder's adjusted tax basis in a New Term Note will be equal to its initial tax basis (as determined above), increased by any OID previously included in income. If applicable, a U.S. Holder's adjusted tax basis in a New Term Note also will be (i) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any cash payments received on the New Term Note other than payments of "qualified stated interest," and by any amortizable bond premium which the U.S. Holder has previously deducted.

The gain or loss will generally be treated as capital gain or loss except to the extent the gain is treated as accrued market discount in which case it is treated as ordinary income. *See* "—Distributions under the Plan—Character of Gain or Loss" above. Any capital gain or loss generally should be long-term if the U.S. Holder's holding period for its New Term Notes is more than one year at the time of disposition. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

### Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information, and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld should generally be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your own tax advisor regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on your tax return.

# VII. CONFIRMATION OF THE PLAN

## A. Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan. On, or as promptly as practicable after the Commencement Date, the Debtors will request that the Bankruptcy Code schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all known creditors, equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer, Esq., Robert J. Lemons, Esq., and Christopher M. Lopez, Esq.) attorneys for the Debtors, (ii) Richards, Layton & Finger, P.A. One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq.), co-attorneys for the Debtors, (ii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801, (iii) Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Attn: Mark A. Broude, Esq.), attorneys for the Administrative Agent, and (iv) such other parties as the Bankruptcy Court may order.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## B. General Requirements of Section 1129.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied.

## C. Best Interests Test.

The Bankruptcy Code requires that each holder of an impaired Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors. The analysis is based on a number of significant assumptions which are described below. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

## D. Liquidation Analysis.

The Debtors' liquidation analysis is attached as <u>Exhibit C</u> hereto.

## E.    Feasibility.

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections attached as <u>Exhibit B</u> to the Disclosure Statement.  Based upon such Financial Projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## F.    Section 1129(b).

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a Class of Claims or Equity Interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### 1.    No Unfair Discrimination.

This test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment is "fair."  The Debtors believe that the Plan does not unfairly discriminate against any Claims or Equity Interests.

### 2.    Fair and Equitable Test.

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no Class of Claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or equity interests in such class:

*Secured Creditors.*  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim.

*Unsecured Creditors.*  Either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.

*Equity Interests.*  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity interests that are junior to the equity interests of the dissenting class will not receive any property under the plan of reorganization.

The Debtors believe the Plan will satisfy the "fair and equitable" requirement.

## VIII.    ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of impaired Claims and impaired Equity Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If, however, the requisite acceptances are not received, or the requisite acceptances are received and the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan or plans of reorganization or (ii) liquidation of the Debtors under chapter 7 or 11 of the Bankruptcy Code.

### A.    Alternative Plans

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a reorganization plan have expired, any other party-in-interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

With respect to an alternative plan, the Debtors have explored various other alternatives in connection with the extensive negotiation process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, which is the result of extensive negotiations between the Debtors and various constituencies, enables holders of impaired Claims and Equity Interests to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

### B.    Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Reorganization Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Equity Interests in the Debtors.

The Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' assets. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of chapter 11 plans of liquidation. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distribution to the holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because of the greater return the Debtors anticipate is provided by the Plan.

The liquidation analysis, prepared by the Debtors with their financial advisors, is premised upon a liquidation in a chapter 7 case. In the analysis, the Debtors have taken into account the nature, status, and underlying value of the assets of the Debtors, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests.

The Debtors have no knowledge of a buyer ready, willing, and able to purchase the Debtors as a whole or even to purchase significant portions of the Debtors as ongoing businesses. Therefore, the likely form of any liquidation would be the sale of individual assets. Based on this analysis, it is likely that a liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan because of (a) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (b) additional administrative expenses involved in the appointment of a trustee, and (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations, and (ii) no or limited distributions being made to holders of General Unsecured Claims. In the opinion of the Debtors, the recoveries projected to be available in liquidation are not likely to afford holders of Claims and Equity Interests as great a realization potential as does the Plan.

**THE DEBTORS BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF IMPAIRED CLAIMS AND IMPAIRED EQUITY INTERESTS THAN WOULD ANY OTHER REASONABLY CONFIRMABLE REORGANIZATION PLAN OR LIQUIDATION UNDER ANY CHAPTER OF THE BANKRUPTCY CODE.**

## IX. THE SOLICITATION; VOTING PROCEDURES

Before voting to accept or reject the Plan, each Eligible Claim should carefully review the Plan attached as Exhibit "A", and described herein above under "Summary of the Plan." All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

**IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 2 EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PLAN.**

### A. Voting Deadline

All known holders of the foregoing Claims in the foregoing Class entitled to vote on the Plan have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Special procedures are set forth below for holders of securities through a bank, broker or other nominee.

The Debtors have engaged Kurtzman Carson Consultants, LLC as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE (OR, IN THE CASE OF SECURITIES HELD THROUGH A BANK OR BROKER, THE BENEFICIAL OWNER BALLOTS THAT HAVE BEEN VALIDATED BY THE NOMINEE) MUST BE RECEIVED BY**

**THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE.** The Debtors reserve the absolute right, at any time or from time to time, to extend by the collective agreement of the Debtors, by oral or written notice to the Voting Agent, the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason including, but not limited to, determining whether or not requisite acceptances of the Plan have been received, by making an announcement of such extension no later than 9:00 a.m. (Eastern Time) on the first business day next succeeding the previously announced Voting Deadline. Without limiting the manner in which the Debtors may choose to make any announcement, the Debtors will not have any obligation to publish, advertise, or otherwise communicate any such announcement. There can be no assurance that the Debtors will exercise their right to extend the Voting Deadline.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

International Aluminum Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Ave
El Segundo, CA 90245
Toll Free No.: 877-499-4509

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the telephone number set forth immediately above.

## B.     Voting Procedures

Under the Bankruptcy Code, for purposes of determining whether the Requisite Acceptances have been received, only holders of Eligible Claims who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

The Debtors are providing a solicitation package to holders of Eligible Claims whose names appear as of the Voting Record Date in the records maintained by the Debtors.

You should provide all of the information requested by the Ballots you receive. You should complete and return all Ballots that you receive in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot, to the Voting Agent.

## C.     Fiduciaries and other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballot of each beneficial owner for whom they are voting.

UNLESS THE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH BALLOT BE COUNTED. **IN NO**

**CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE VOTING AGENT.**

### D.    Parties Not Entitled to Vote

Under the Bankruptcy Code, creditors are not entitled to vote and are deemed to have accepted the Plan if their contractual rights are left unimpaired by the Plan. In addition, classes of Claims or Equity Interests that are not entitled to receive property under the Plan are not entitled to vote and deemed to have rejected the Plan. Based on this standard, for example, the holders of Priority Non-Tax Claims are not being affected by the Plan and thus deemed to have accepted the Plan. In addition to the foregoing, holders of (i) Other Secured Claims (Class 3); (ii) General Unsecured Claims (Class 5); (iii) Intercompany Claims (Class 6); and (iv) Equity Interests in IAC and IAC Subsidiary Debtors (Class 7) are not entitled to vote and are deemed to accept the Plan. Conversely, holders of Notes Claims (Class 4) and Equity Interests in Holdings (Class 8) are not entitled to vote and deemed not to have accepted the Plan because they are not receiving any property under the Plan.

### E.    Parties Entitled to Vote

In accordance with applicable sections of the Bankruptcy Code, the Debtors are soliciting acceptances from holders of Credit Agreement Claims (Class 2).

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a Class of Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.

### F.    Agreements upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this solicitation and (ii) the terms of the Plan, including the releases and exculpations provided in Section 10 of the Plan. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### G.    Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any claimant not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve their rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any claimant. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities

for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## H.  Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s); (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn; (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn; and (iv) be received by the Voting Agent in a timely manner. The Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots that is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his/her or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

**The Debtors will pay all costs, fees and expenses relating to the Solicitation, including, without limitation, customary mailing.**

## I.  Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d)), please contact the Voting Agent:

## X.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all holders of Claims in Class 2 to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be received by the Voting Agent on or before 4:00 p.m., prevailing Eastern time on [_____].

Dated:  January 4, 2010

INTERNATIONAL ALUMINUM CORPORATION

IAC HOLDING CO.

UNITED STATES ALUMINUM CORPORATION

UNITED STATES ALUMINUM CORPORATION–CAROLINA

UNITED STATES ALUMINUM CORPORATION–ILLINOIS

UNITED STATES ALUMINUM CORPORATION–TEXAS

RACO INTERIOR PRODUCTS, INC.

GENERAL WINDOW CORPORATION

INTERNATIONAL EXTRUSION CORPORATION–TEXAS

INTERNATIONAL EXTRUSION CORPORATION

INTERNATIONAL WINDOW–ARIZONA, INC.

INTERNATIONAL WINDOW CORPORATION


By:____/s/ Richard E. Almy_____
Name:  Richard E. Almy
Title:    Chief Executive Officer